Volume 11

Pages 2095 - 2326

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, MAGISTRATE JUDGE

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) |
| VS. | ) NO. C 08-4238 EMC ) |
| MICHAEL C. PATTISON, | ) ) San Francisco, California |
| Defendant. | ) Tuesday ) September 21, 2010 ) 8:06 a.m. |

TRANSCRIPT OF TRIAL PROCEEDINGS

APPEARANCES:

For Plaintiff:        U.S. Securities and Exchange Commission
                      44 Montgomery Street, Suite 2600
                      San Francisco, CA  94104
                      (415) 705-2456
                      (415) 705-2500 (fax)
                 BY:  SUSAN F. LAMARCA
                      ROBERT L. TASHJIAN
                      WILLIAM SALZMANN

For Defendant:        Nossaman, LLP
                      50 California Street, 34th Floor
                      San Francisco, CA  94111
                      (415) 398-3600
                      (415) 398-2438 (fax)
                 BY:  PATRICK J. RICHARD
                      BRENDAN F. MACAULAY
                      JAMES VORHIS

Reported By:   Belle Ball, CSR 8785, RMR, CRR, and
               Lydia Zinn, CSR 9223, RPR
               Official Reporters - U.S. District Court

1   **TUESDAY, SEPTEMBER 21, 2010**                        **8:06 A.M.**

2                       **P R O C E E D I N G S**

3               (The following proceedings were held in open court,

4               outside the presence and hearing of the jury.)

5           **THE COURT:**  Good morning, everyone.

6           **MS. LAMARCA:**  Good morning.

7           **MR. RICHARD:**  Good morning, your Honor.

8           **THE COURT:**  Okay.  So I thought we would take this

9   time to talk about the motion for judgment as a matter of law,

10  and then also spend some time talking about the instructions.

11  I can't devote the whole half an hour to the motion, and I

12  don't think we need to, because I've read the briefs; but why

13  don't I -- I have some questions.  Why don't we just get into

14  it?

15          Mr. Richard, why isn't it, on the question of

16  materiality, that we have a restatement itself, which has

17  the -- assuming you're right, that the focus should be on the

18  information omitted, and not the fact of the omission, and

19  therefore, you know, if one were to go down the road of an

20  event analysis, there's some question about whether, you know,

21  the first press release really, you know, has any probative

22  value with respect to materiality or not -- at least I

23  understand your argument, but why isn't it when we actually

24  have a number -- $14.6 million, as measured against income, et

25  cetera -- why isn't it enough for a finder of fact -- i.e., the

1  jury -- to say, "Well, you know, that's not insignificant"?

2          **MR. RICHARD:**  Your Honor, it's not; at least, in the

3  Ninth Circuit.

4          We begin with the standard that the government was

5  required to produce substantial evidence that -- from which the

6  jury could find that there was a substantial likelihood that a

7  reasonable investor would have regarded what was not disclosed

8  to him or her as having significantly altered the total mix of

9  information that he took into account in deciding whether to

10 buy or sell the security.

11         And there are two ways to address materiality,

12 your Honor.  You could either present evidence that in the

13 period 2000 to 2004, here's how the reasonable investor would

14 have considered that information in the context of making their

15 investment decision in the total mix of information available

16 to them.  That's right out of the jury instruction.

17         If you're not going to present evidence as to how a

18 reasonable investor would have used this information -- this

19 noncash expense -- in making an investment decision, then the

20 other way is:  Well, let's look and see what happened later to

21 see if, when the information was disclosed, it impacted the

22 share price, and we can draw an inference that the information

23 was material, because we look at the how the market reacted,

24 and we can assume that the information that was withheld caused

25 the stock price to be overvalued.  Your Honor's question --

1              THE COURT:  Let's focus on the first one.  That's

2    what I'm focusing on.  And --

3              MR. RICHARD:  Yes, your Honor.

4              THE COURT:  How a reasonable investor would have used

5    the information?  Are you saying that the Ninth Circuit law

6    requires expert testimony, no matter what, on how a reasonable

7    investor values things and thinks?

8              MR. RICHARD:  The Ninth Circuit hasn't come out and

9    said that.

10             The cases that address -- if you're going to try to

11   prove it by pointing to subsequent events, then you absolutely

12   need expert testimony to explain what conclusions, if any, can

13   be drawn from a subsequent change.

14             THE COURT:  I'm focusing on prong one, the first one

15   you said.  And that is:  We have the information that should

16   have been considered.  We know the magnitude.

17             MR. RICHARD:  Well --

18             THE COURT:  And at least we know the dollars.

19             So what seems to be missing is any specific evidence

20   of how that would have been relevant or evaluated by a

21   reasonable investor.

22             MR. RICHARD:  Yes, your Honor.  Your Honor's

23   question -- and -- and it gets -- I do want to talk about the

24   evidence that the -- that the government points to, because

25   I -- it really does highlight the total failure of proof on

PROCEEDINGS

 1  this point.  It is not enough to go to the jury.  And it

 2  shouldn't go to the jury, because it's a confusing point, as

 3  your Honor just raised the question:  Well, there was a

 4  $14 million restatement.  Isn't that material?

 5          That begs the question.  There's not a presumption

 6  that economic materiality -- that just because you have a

 7  restatement means that it has --

 8          Accounting materiality and economic materiality are

 9  different.  And the case that address the point all speak to

10  cash flow, revenue, and -- and information that is related to

11  the value of stock or the value of the company.

12          So, without testimony as to how this noncash

13  compensation expense would -- could be used by a reasonable

14  investor in light of the total mix of information available,

15  no, your Honor, there is no substantial evidence on that point.

16          So to answer your question, it is not enough --

17  cannot be enough -- simply to point to a restatement on a

18  noncash expense and say, "Well, let the jury figure out how a

19  reasonable shareholder would have used that information in the

20  total absence of any testimony as to how that noncash expense

21  item -- whether it was a dollar or a million dollars or

22  $14 million -- would have affected a reasonable investor's

23  decision."

24          **THE COURT:**  Well, isn't it some point -- for

25  instance, if it turned the net operating income from positive

PROCEEDINGS

1  to a negative, are you still saying even under those

2  circumstances, you need some expert to say, "Here's how a --

3  this is why a reasonable investor would have been affected?"

4        Or what if it cut net income by half?  I mean, at

5  some point isn't there enough for a jury to say, "Well, looks

6  like enough to me"?

7        **MR. RICHARD:**  No, your Honor.  I think the question

8  is:  Would what a reasonable investor considers -- is that

9  beyond the scope of the average juror?

10        And I think that in this case, it is.

11        I think that, to -- to group all --

12        **THE COURT:**  That is implying a per se rule that

13  the -- what a -- in order to implement the jury instruction, a

14  juror cannot use common experience and what they've seen here

15  in numbers.  They need expert testimony?

16        **MR. RICHARD:**  In this case, your Honor, where we're

17  not talking about any information that affects revenues or cash

18  flow, absolutely.

19        It's essential, because it's misleading, as we've

20  heard from the witness we called that the government chose not

21  to call about the distinction between cash and then noncash

22  expenses.  So, for the very reason that your Honor's asking the

23  question, "Well, there was a restatement, and it was

24  $14 million isn't that enough," the answer is "No."  We have to

25  understand.  How would that information have been used by a

 1   reasonable investor?  And, to turn it over to the jury and say

 2   "$14 million is a big number, and it affected earnings per

 3   share.  It affected net income," when all the evidence that,

 4   you know -- that -- we're here because the government chose not

 5   to present any evidence as to how this information could or

 6   would have been used by a reasonable investor in making an

 7   investment decision.

 8            Instead, they're hoping your Honor will just allow

 9   the case to go to the jury and say, "Restatement, restatement,

10   restatement.  $14 million."

11            That's not enough.

12            And if we look at the case law that the government

13   cited, they ellipsed out the references to revenues in the *SEC*

14   *versus System Software Associates* case from the Northern

15   District of Illinois cited at page 4 of their brief.

16            It's quite telling that the government puts in a

17   quote that says,

18              "A financial statement that does not

19              conform to the requirements of GAAP is

20              presumptively a false or misleading

21              statement."

22            When what the case said -- and why they ellipsed out

23   two words -- three words.  The case actually said,

24              -- "a financial statement that

25              recognizes revenue and does not conform."

PROCEEDINGS

1          Well, revenue and cash flow, your Honor, are the

2  basis on which valuations are made.  They know that.  Their

3  expert knows that.  Mr. Bravo knows that.  The Northern

4  District of Illinois court knows that.

5          To jump from, well, revenue, and therefore noncash

6  expense -- aren't they really all the same?

7          No.  You need to sort that out with someone who knows

8  what they're talking about.

9          **THE COURT:**  What's your best authority?  What's your

10 best case for the proposition that where there's not an obvious

11 impact on revenue or cash flow, but only on stated operating

12 income, because of noncash expense, you need an expert?  Is

13 there any case that says that --

14         **MR. RICHARD:**  Yeah, I think you --

15         **THE COURT:**  -- or close to that?

16         **MR. RICHARD:**  We did cite a couple of cases on the

17 importance of expert testimony.  I only hesitate because the --

18 the -- when you look at the subsequent period and try to draw

19 conclusions about what happened then --

20         **THE COURT:**  Yeah.  Well, that's under number two.  I

21 understand that.

22         **MR. RICHARD:**  Okay.

23         **THE COURT:**  But that's, perhaps, a little more

24 complicated.

25         **MR. RICHARD:**  In looking at each of the cases that

1  the government cited, they refer to cash flow or revenue for

2  the proposition -- I guess I didn't think of it in terms of

3  expert or nonexpert on the question of substantial evidence as

4  to how a reasonable juror would have used that information.

5         **THE COURT:**  Okay, but you're saying all of the cases

6  cited by the government -- all pertain to actual cash flow

7  revenue; none of them deal with noncash, what one might call,

8  sort of, a technical bookkeeping --

9         **MR. RICHARD:**  To the extent they address it.

10        There was one case.  I think it was either on a

11 motion to dismiss -- where they just relied on allegations in

12 the complaint or a motion for class certification; but to the

13 extent that the cases cited at page 4, if you actually look at

14 the *Murphy* case, and -- the *SEC-Murphy*, and then the *SEC versus*

15 *System Software.*  *Murphy* plainly repeatedly talked talks about

16 cash flow.  And the *System Software* case talks about

17 recognizing revenue.

18        **THE COURT:**  All right.  Let me hear from the

19 Commission on this first point, before we get to any

20 after-events analysis.

21        **MS. LAMARCA:**  Sure.

22        **THE COURT:**  What about that?

23        **MS. LAMARCA:**  Okay.  So, first of all, we would not

24 agree that whether something is categorized on a balance sheet

25 as a, quote, "noncash expense," means that it's not a technical

1   violation or that it's -- has any other -- excuse me -- that it

2   somehow escapes his presumption that GAAP violations are

3   presumptively material.  And so -- just to sort of set the

4   record straight on that.

5           And the other thing I think that has been overlooked

6   in this is:  There is a cash consequence to these options.

7   When the company issues an option to an employee for, let's

8   say, $5, and could have, if it was really giving it on the

9   right -- on the day it said it was -- today or, you know, the

10  day that they made the options, and really gave it at fair

11  market value, and fair market value was up to $7, that's a $2

12  difference that that employee doesn't have to pay.  And that

13  wouldn't go into the company's coffers if it were cashed in.

14          So it's -- yes, the accounting, just like for

15  depreciation and other expenses, expenses we saw in cases like

16  *Enron* and *WorldCom* and *Tyco* -- even those these are categorized

17  by accountants as noncash.  That doesn't make them mythical or

18  technical or anything like that.  They are full-fledged

19  expenses.  They have to flow through one's income statement.

20  They affect the bottom line; the net income numbers.

21          And we did see, in fact, in this case the reported

22  earnings flip to large reported losses.

23          **THE COURT:**  Which -- for every year, or --

24          **MS. LAMARCA:**  Not for every year, but we did see --

25  we saw for the first year a flip from a large gain -- a, you

PROCEEDINGS                                        2105

1  know, reported earnings of 2.2 million the first year after

2  their IPO.  And it flipped down to a negative; you know, a loss

3  of $500,000.  And we saw significant decreases to the reported

4  earnings -- the net income number -- at the end of the day.

5  And that affected the numbers that Embarcadero told its

6  shareholders were important, earnings per share, the things

7  they talked about in earnings calls.  We heard testimony about

8  that.

9          And there is a principle as well in the case law that

10 when management thinks something is important -- important

11 enough to guide to or to talk to shareholders and investors

12 about -- then it is material.

13          **MR. RICHARD:**  Okay, but --

14          **MS. LAMARCA:**  Well, let me finish my point here.

15          **THE COURT:**  What was that last point?

16          **MS. LAMARCA:**  When management of a company regards

17 information as material --

18          **MR. RICHARD:**  Is there a cite on that, please?  It

19 wasn't in the brief.

20          **THE COURT:**  If they regard it as material --

21          **MS. LAMARCA:**  Yes.

22          **THE COURT:**  -- what's the consequence?

23          **MS. LAMARCA:**  Then it is a fair inference to draw

24 that it is material.

25          **THE COURT:**  What's -- do you have a cite for that

```
 1   in --

 2              MS. LAMARCA:  I actually don't have it at my

 3   fingertips.  I'm sorry.

 4              THE COURT:  Is it in your brief?

 5              MS. LAMARCA:  I believe it's in our brief, but I must

 6   admit I can't remember.

 7              And I will also tell the Court that, because we were

 8   doing this within the trial, we had one of our colleagues help

 9   us write this brief.

10              THE COURT:  Yeah.  It was short notice.  I understand

11   that.

12              MS. LAMARCA:  Let me continue on that same point, if

13   I may, just to respond to a couple of points raised by Counsel.

14              The Ninth Circuit case law also supports the fact or

15   the principle that the jury is allowed to look at these facts

16   and draw their conclusions based on the testimony about the

17   facts that the witnesses have described, including -- we had

18   accountants and Mr. Haroian testifying about the importance of

19   these numbers.  We had testimony from our second witness,

20   Caitlin Haberberger, talking about how these financials were

21   put together and presented to the public.  And I think the jury

22   can draw conclusions even from that testimony about the

23   importance of those numbers.

24              We also have --

25              THE COURT:  I don't recall her talking specifically
```

 1  about the magnitude or anything specific about these numbers.

 2          **MS. LAMARCA:**  Let me just make -- let me clarify

 3  something.  There are two -- there's a separate issue that I

 4  think has sort of been overlooked in this discussion, is:  It

 5  isn't the case that we look solely to that 14.6 million.  That

 6  is very important number.  So if the Court is asking us about

 7  that, yes.  I mean, I can limit all of my comments to that

 8  number.  However, there are other material misstatements, as

 9  we've pointed out, in the financial statements prepared by the

10  defendant.  And those as well deserve the jury's consideration

11  in this materiality analysis.

12          **THE COURT:**  Okay.  Which are those?

13          **MS. LAMARCA:**  So, for instance, the easy one is the

14  claimed statement that we don't grant stock options at below

15  fair market value.  And that has a lot of meaning to investors,

16  because investors think that employees are on the same page as

17  them.  We heard that testimony.  We also heard -- and we've

18  continued to hear it in the defendant's case.  So, I mean, that

19  is going to be something that's riddled throughout this case.

20          We also heard about an investor group called "ISS,"

21  which cared at the time about that very fact.

22          **MR. RICHARD:**  May I respond to your Honor's question?

23  I found the citation.  I --

24          **THE COURT:**  Okay.

25          **MR. RICHARD:**  At page 11 of our brief, your Honor, we

 1   referred to the Northern District of California decision in *In*

 2   *re: Oracle Securities Litigation*, where the Court said, quote,

 3              "A securities value does not fluctuate

 4          with reported earnings, but varies,

 5          instead, with the discounted value of

 6          future cash flows which are expected to

 7          accrue to the security."

 8          Closed quote.

 9          The argument that the -- in their brief, what the

10   government said -- and let's be clear on --

11          **THE COURT:**  Well, let's take it -- for instance, if

12   that's true --

13          **MR. RICHARD:**  Yes, your Honor.

14          **THE COURT:**  And, of course, that's not Ninth Circuit.

15   That's a district court.

16          But assuming that's true, one of the responses I just

17   heard was that although it is treated, at least in the

18   operation statement, as a noncash expense, it ultimately

19   impacts upon the balance sheet, because if you're paying, you

20   know, $5 a share when you exercise instead of the $10, it

21   should have been, if the grant were at the true fair market

22   value as of the "measurement date," as we called it, that's

23   less money into the treasury when it's exercised, right?

24          **MR. RICHARD:**  There are two points that absolutely

25   rebut that.

```
 1          One:  Total failure of proof on that evidence.  I

 2  challenge the government.  It's not in their brief.  It wasn't

 3  in any witness' testimony how much money that would be; whether

 4  it would be material.  That concept didn't even come out of any

 5  witness' mouth, and it cannot fairly be argued from the

 6  evidence in this case.

 7          But there's a second and more important point.  And

 8  it's a point that other courts have addressed, like the

 9  Shanahan case we cite, where the SEC has tried to change their

10  theory of the case.  And the Court went back and looked at the

11  complaint and the trial brief.  And I've done that in this

12  case.  And your Honor's read the complaint.  And in their trial

13  brief, what they allege repeatedly -- and the issue that was in

14  the complaint is, as they say at page 2 of their trial brief,

15  quote,

16          "Pattison was in charge of accounting

17           at Embarcadero, including accounting for

18           stock options throughout this period.

19           However, Pattison caused Embarcadero's

20           publicly disclosed financial statements to

21           be materially false and misleading, as he

22           failed to record the required expense

23           associated with the granting of stock

24           options."

25          Period.  Closed quote.
```

PROCEEDINGS                                                2110

```
 1              Further down on the page, at line 15, quote,
 2                  "Pattison knew that the options
 3          Embarcadero issued to employees were
 4          granted in-the-money; that is, with striker
 5          exercise prices below the then-fair market
 6          value of Embarcadero stock.  He also knew
 7          the accounting rules required that an
 8          expense be recorded when options were
 9          granted in-the-money or below the fair
10          market value of the company's stock
11          period."
12          Closed quote.
13          The issue before your Honor is:  For that expense
14 under APB 25 for these noncash charges, how would an investor
15 ever have used that information at the time in making their
16 investment decision?
17              On that point, there's been a total failure of
18 evidence.
19              Now, we don't need to peek ahead to what Mr. Bravo
20 told us last Friday, which is absolutely consistent with what I
21 just read from the In re:  Oracle Securities Litigation.
22 Absolutely known to the government and anyone within the SEC
23 when you get away from cash flows and revenue, and start
24 talking about a noncash compensation expense, whether it's a
25 dollar or a million dollars or $14 million -- where is the
```

PROCEEDINGS

1 evidence as to how a reasonable investor would have used that

2 information at the time?

3          Total failure of proof.

4          And so now we hear, "Well, it's in the restatement."

5 Management said it's important.  I asked Betty Jo Charles,

6 their witness, "Why is this information in here?"  Because it's

7 required.  I asked her that twice.  Because it's required.

8          **THE COURT:**  Let me ask you this other question.

9          We did hear evidence about dilution, and why people

10 care about dilution.  Pieces of the pie get smaller and

11 smaller.  It seems to me it doesn't take an expert to say,

12 "Well, if employees can buy stock at a deal, compared to not a

13 deal, there's going to be more exercises and more dilution."

14          **MR. RICHARD:**  Okay.  Now we're changing the case.  If

15 this case, now, your Honor -- it's not in the complaint or

16 their trial brief, if what we're saying is, "Assume that one of

17 the four or five key terms of the stock option agreement were

18 different, would that have changed the likely exercise of the

19 stock options?"  That's what your Honor's just asked.

20          If they had stock options at -- on different terms,

21 would they have exercised them differently?

22          That -- the question requires one to assume and argue

23 and present evidence and allege that, well, if the exercise

24 price had been different, wouldn't the dilutive effect have

25 been different.

1          THE COURT:  Yeah.

2          MR. RICHARD:  That's a very different question than

3    saying, "Mr. Wong absolutely had the right to pick whatever

4    exercise price he wanted.  How was it accounted for?"

5          THE COURT:  Well, but what they're saying is that one

6    of the material misstatements which underpins their 10(b)(5)

7    claim is not just how many dollars, but there was a statement,

8    I guess, in the notes or something about:  We don't grant below

9    fair market value.

10         MR. RICHARD:  That's just the flip side of saying,

11   "We don't take a compensation expense."  That's why they don't

12   take the compensation expense.

13         THE COURT:  Well, but if -- can't they rely on that

14   as one of the, quote, "misstatements" or alleged misstatements?

15   And if so, then you have to look at the materiality of that.

16   And that's where this, then, dilution argument comes in.

17         MR. RICHARD:  And, your Honor, the dilution

18   argument -- if they would have had anyone say, "Here's the

19   total mix of information available on the question of

20   dilution," their case would collapse, because, as your Honor

21   knows, all of the information about dilution -- the number of

22   outstanding options, the average weighted exercise price --

23   every piece of information from which one would need to

24   determine dilution was in the total mix of information

25   available.

PROCEEDINGS

```
 1              So that's why, when we stray from the actual standard
 2    here -- let's look at the information they're saying should
 3    have been disclosed.  Let's look at the total mix of
 4    information available.  And would this have a significant
 5    impact?  Is there a substantial likelihood that the failure to
 6    disclose this information would have had a significant impact
 7    on that reasonable shareholder in making their investment
 8    decision?
 9              So if we move into dilution -- same problems.
10    Where's the evidence as to what the total mix of information
11    available was?
12              We know that they fully disclosed the diluted
13    information.  That's why we went through with Ms. Charles,
14    What's this information in here under FAS 123?  Why do we have
15    average number of -- average exercise price?  Average life of
16    outstanding options?  Number of options?
17              So if we're going to try to change this into a
18    dilution case, let's be clear on it; but the case they alleged
19    and the case they described in their trial brief has failed.
20              **MS. LAMARCA:**  Your Honor, may I respond?
21              **THE COURT:**  Certainly.
22              **MS. LAMARCA:**  First, we did have evidence about how
23    important this was to investors.
24              Now, this further question --
25              **THE COURT:**  What's the evidence?
```

1              **MS. LAMARCA:**  Among others, the ISS evidence that

2    they didn't want a plan that allowed anybody to grant shares at

3    below fair market value.  And that they rewrote their plan to

4    deal with this issue.

5              Beyond that, I think that it is a mis -- a

6    misstatement of the law to suggest that there has to be

7    evidence about how an investor uses this.

8              I think that the jury can draw inferences from the

9    facts and make their own judgment about how investors used this

10   information.

11             But, to move on, I think the other part of this is:

12   even if -- even if we were to go down the road of other parts

13   of the 10-K had information that investors could have relied on

14   instead of the earnings and instead of this statement that

15   said, you know, "We don't grant it below fair market value,"

16   which is what I understood Counsel's argument to be just now --

17   even that from Betty Jo Charles' testimony was not accurate.

18   We went through with her how the outstanding options was not an

19   accurate number.  So those other numbers -- if they -- you

20   know, to the extent they --

21             **THE COURT:**  How the outstanding options were --

22             **MS. LAMARCA:**  The number of options outstanding at

23   the end of a period is a number that is reported by the

24   company.

25             **THE COURT:**  Okay.

PROCEEDINGS                          2115

 1        **MS. LAMARCA:**  I think it has been the argument of the

 2  defense that the number of options outstanding, if that's

 3  reported, then one can somehow estimate or derive what the,

 4  quote, "value" of options would be.  I think that's what we're

 5  going to hear that from Mr. Lehn.

 6        And Ms. Charles laid the factual groundwork for that

 7  number, itself, being inaccurate.

 8        So I didn't want to go down that road.  That's not

 9  our materiality case, but I just wanted to set the record

10  straight that these things are not part of the vast facts about

11  what really was disclosed and a failure of proof on our part

12  about what was not.  It is clear that there was a GAAP

13  violation; but in addition, there was also a pure and simple

14  false statement.  And both of those things are impactful.  Both

15  of these things are significant to investors.

16        **THE COURT:**  It's now 8:30.  I want to hear your

17  response on the knowledge question.

18        **MS. LAMARCA:**  Sure.

19        **THE COURT:**  What evidence was there in your case in

20  chief that Mr. Pattison knew what APB required, in fairly clear

21  terms?

22        **MS. LAMARCA:**  Okay.  Let me state for a moment I'm

23  not sure that the defendant has to know in clear terms what

24  APB 25 states, but we do have -- we do have evidence that the

25  defendant, himself, had that information first at his

PROCEEDINGS                                                        2116

 1  fingertips as an accountant.  As a CPA, those are the rules he

 2  deals with.

 3          Second, he received, as early as 2001, an e-mail from

 4  a fellow named Richard Cain.  And I'm actually forgetting the

 5  exhibit number.  It's cited in our brief, I believe.  And he

 6  also worked with the professionals at Pricewaterhouse, quarter

 7  after quarter.  And he understood the actual language in the

 8  10-K that he helped put together.  He, himself, was preparing

 9  the FAS 123 numbers.  And he was preparing the APB bit, as it

10  was described by the --

11          **THE COURT:**  Is there testimony that he prepared the

12  APB -- you mean, the note?

13          **MS. LAMARCA:**  No.  The portion of the disclosures

14  that had to do with APB 25, and the portion of the financial

15  statement, itself, that had to do with APB 25 calculations.

16  That came from Eddy Jackson's testimony.

17          I'm sorry.  I could go on.  I just need a moment.

18          We had testimony from Ms. Haberberger about her

19  receipt of these numbers from the defendant.

20          **THE COURT:**  Well, there's no question that the --

21  that there's testimony that, you know, he was responsible for

22  the numbers, for rolling it up, providing the numbers,

23  reporting the numbers, et cetera, et cetera.

24          **MS. LAMARCA:**  Right.

25          **THE COURT:**  This case ultimately is going to turn, in

 1  part, upon the jury's determination about his either

 2  recklessness or purposefulness.

 3          (Reporter interruption)

 4          **THE COURT:**  Willfulness.

 5          **MS. LAMARCA:**  If I could make an analogy, your Honor,

 6  if we had a case right now against -- let's take somebody who's

 7  not the top accountant.  He's the CEO.  And we had evidence

 8  that the CEO, himself, had a hand in these numbers, and that

 9  the CEO, himself, did this same sort of backdating.  We would

10  have a case for fraud against that CEO, even though we don't

11  have to prove in that case and wouldn't likely have information

12  showing that he, himself, is reading APB 25.

13          **THE COURT:**  Well, yeah, but you'd have to show

14  something from which a jury can infer that the CEO had enough

15  knowledge to know that the reporting aspect was wrong.

16          **MS. LAMARCA:**  Correct.  And some of that information

17  is the defendant's own role in being the top accountant at the

18  company; being the person who interfaces on a quarterly and

19  annual basis with the accountants about this very fact.

20          And so for -- two things can be drawn from that.

21          One:  He doesn't tell those accountants what he's --

22  how he's really doing it.  So the evidence is that he is

23  avoiding telling them that, and that is a perfectly fair

24  inference from this record.

25          We have all kinds of documents that describe the

PROCEEDINGS                                                    2118

```
 1  grant date, and documents that he helped author, including the

 2  financial statements, that talk about what happens on the date

 3  of grant.  And nothing happened on that date.  And that was an

 4  important piece of information he needed to tell the

 5  accountants -- he knew that -- if he was going to explain what

 6  he was doing.
```

**THE COURT:**  That's the question.  That's the

question:  Whether he knew it was important enough to tell the

accountants.  I mean, I'm not necessarily -- I'm just saying

that's the question.  That is the question.

No question he did these things.  At least, there's

testimony as to that.

The question is:  Did he know it was significant

enough, such that he should have told them?  Or can the jury

infer that, based on his training and everything else, he knew

full well, and he was, you know, hiding the ball.

**MS. LAMARCA:**  Yes.  And, in fact, I think the other

testimony that helps us in that regard was the testimony from

the auditors, who thought this was not difficult; Mr. Jackson,

in particular.  And some of that testimony was elicited on

cross-examination as well.

**THE COURT:**  All right.  Let me just hear a quick

response.

**MR. RICHARD:**  Sure, your Honor.  Mr. Macaulay is

addressing the intent issues.  I don't want to step on his

1    toes.  Doesn't look like we're going to conclude this

2    discussion at this point.

3            **THE COURT:**  Well, I'm likely to take this under

4    submission, but I want to hear --

5            **MR. MACAULAY:**  One thing that just jumped out from

6    what the SEC has just mentioned.  And that is:  They can't

7    establish a primary violation.  Just right off the top, they

8    mentioned Stephen Wong; if he was a CEO, we would need some

9    proof that he knew what he was doing.

10           And what he just highlighted -- what the government

11   has just highlighted that they have absolutely no evidence

12   whatsoever of a primary violation by somebody else.

13           Now, this is a slightly different take on some of the

14   things we've been discussing.  Goes to the two aiding and

15   abetting claims.

16           **THE COURT:**  Mm-hm.

17           **MR. MACAULAY:**  Number two and four.

18           There was a total failure of proof as to what

19   Mr. Sabhlok knew; whether he had a knowing violation that

20   would, therefore, create the primary violation for which

21   Mr. Pattison could be aiding and abetting; or that Mr. Wong,

22   likewise, had any knowing violation of 10(b)(5), or false

23   filings, because, if you contrast them to Mr. Pattison, the

24   only thing they really have to say about Mr. Pattison:  Well,

25   he was a CPA.  That's what they hang their hat on here.  He's a

 1  CPA; he ought to have known.

 2           **THE COURT:**  Well, and also he's the one who dealt

 3  very closely with the auditors in drafting the narrative, et

 4  cetera, et cetera.

 5           **MR. MACAULAY:**  Sure, but where is there, anywhere, a

 6  piece of evidence saying, "What you are doing is wrong"?

 7           **MS. LAMARCA:**  Your Honor.

 8           **MR. MACAULAY:**  Please let me finish.

 9           **THE COURT:**  Let him finish.

10           The closest they can come is a

11  Friday-night-at-midnight e-mail with an 80-age presentation

12  that was sent by someone on -- the tax lawyer.  And in there it

13  even said,

14                "Measurement date equals grant date in

15           most cases."

16           The Court in *Shanahan* was looking at the same kind of

17  thing, and saying,

18                "No, you cannot get intent from this

19           kind of metaphysical distinctions."

20           The Court went through those very same arguments as

21  the SEC is making here, and saying,

22                "No, there's not enough.  You're going

23           to need to do more."

24           Now -- so that's the one presentation.

25           The mere fact that he's a CPA -- that doesn't get

```
 1  them anywhere.  It's like saying to a lawyer, "Well, you've got
 2  a license to practice law.  Well, that means you must know
 3  everything about trusts and estates and divorce law and
 4  securities law."
 5          THE COURT:  Well, that's a little disingenuous,
 6  because he actually wrote -- I mean, it's clear certainly
 7  enough for the jury to -- to infer that he had a hand in
 8  writing the notes in terms of, you know, in reference to the
 9  accounting policies and in reference to actual APB 25 in the
10  10-Ks.  So it wasn't like as if there was some admiralty lawyer
11  not knowing something about ERISA or something.  This is
12  something he wrote.  It's something he knew about.  It's
13  something that pertained.  So --
14          MR. MACAULAY:  There's no actual evidence he wrote
15  it.
16          THE COURT:  I'm just saying that there's evidence
17  enough that -- from which they could infer.  And from that, if
18  they infer that, then they can infer he knew more than
19  you're --
20          MR. MACAULAY:  All right, but we're getting fairly
21  attenuated.
22          THE COURT:  Well, it's what a reasonable juror --
23          MR. MACAULAY:  That's not substantial evidence.  And
24  to say Ms. Haberberger, the closest she can come -- "Well, I
25  don't know where all of this language came from.  It must have
```

PROCEEDINGS                                                    2122

1  come from Mr. Pattison" -- that someone would cut and paste

2  from some other filing -- well, potentially we don't even have

3  any evidence of that.  That doesn't make them aware.  That

4  doesn't show actual knowledge.

5           **THE COURT:**  All right.

6           **MR. MACAULAY:**  Merely touching a 90-page restatement.

7           **THE COURT:**  Okay.  We're --

8           **MR. RICHARD:**  May I suggest that when we resume the

9  discussion, we distinguish between standard of care under

10 recklessness, as other courts have done, and then *scienter* and

11 actual knowledge, which I took to be your -- I think we're

12 going to end up having that distinction as we go forward.

13          **THE COURT:**  Let me ask your response about the

14 failure to prove on Wong and Sabhlok.  What's the evidence if

15 you have to prove a primary violation for aiding and abetting?

16 Don't you have to show --

17          **MS. LAMARCA:**  Sure.  Yes.  And here we do have proof

18 on Wong and Sabhlok.  And, in fact -- and the Sabhlok proof

19 actually goes to Mr. Pattison's mental state as well.

20          So what we do have is -- this is just sort of very

21 plain, easy evidence.  Mr. Ferruolo sent a response to an

22 e-mail from Mr. Sabhlok.

23              "Can we grant options retroactively?"

24              "No, absolutely not."

25          The parties have a telephone call that day.  And the

```
 1  parties were Mr. Wong -- Mr. Sabhlok, Mr. Pattison, and

 2  Mr. Ferruolo.  And there's plenty of evidence from which the

 3  jury finds that.

 4           THE COURT:  That was 2004, as I recall.

 5           MS. LAMARCA:  Yes.  And so --

 6           THE COURT:  Were there grants in question made after

 7  that phone call?

 8           MS. LAMARCA:  There were grants made days -- that

 9  were put into the process of being "born" as grants, so to

10  speak, in the first week of October.  And this is two weeks

11  later.  And days later, Mr. Pattison makes sure those grants

12  are finalized by Ms. Cerles.

13           And then months later -- two months later -- he makes

14  sure that those financial statements -- both Mr. Wong and -- I

15  mean, Mr. Sabhlok and Mr. Pattison make sure that those

16  financial statements failed to include the compensation expense

17  associated with those, and that they also do not disclose that

18  they had been backdating, notwithstanding that they know that

19  they cannot do so.

20           THE COURT:  Okay.  What about Mr. Wong?

21           MS. LAMARCA:  And Mr. Wong -- the evidence about

22  Mr. Wong's conduct is best, I think, put in light of:  He was

23  doing this.  He was actively involved in it and, at the end of

24  day, he kept silent about it.  That evidence, although it's

25  after Mr. Pattison's time, is still highly indicative of
```

PROCEEDINGS                                        2124

```
 1   Mr. Wong's consciousness of guilt.
 2            THE COURT:  All right.  I'm going to take the matter
 3   under submission.
 4            MS. LAMARCA:  Okay.
 5            THE COURT:  And what we will need to talk about -- I
 6   mean, you've filed extensive briefs.  I will reread the briefs
 7   with cases; but what we will need to talk about are jury
 8   instructions, which I don't want to do right now.  Let's take
 9   that up maybe at the lunch break or something.
10            MR. RICHARD:  Thank you, your Honor.
11            MS. LAMARCA:  Thank you.
12            THE COURT:  Thank you.
13            (Jury in at 8:42 a.m.)
14            (The following proceedings were held in open court,
15            in the presence of the Jury:)
16            THE CLERK:  Please be seated.
17            THE COURT:  Okay.  Good morning once again.  I
18   apologize for the slight delay.  We had some legal matters to
19   take care of.  We are now ready to resume and pick up where we
20   left off yesterday, which was the continued cross-examination
21   of Mr. Pattison.
22            MR. TASHJIAN:  Thank you, your Honor.
23            (Defendant resumes stand.)
24
25
```

1          **MICHAEL PATTISON,**

2   called as a witness for the Defendant herein, having been

3   previously sworn and testified, resumed the stand and testified

4   further as follows:

5

6          **CROSS-EXAMINATION, RESUMED**

7   BY MR. TASHJIAN:

8   Q.   Good morning, Mr. Pattison.

9   A.   Good morning.

10  Q.   When you started at Embarcadero, the company was already

11  preparing for its IPO in 2000.  Is that fair to say?

12  A.   If they hadn't started, it was very close.

13  Q.   Embarcadero went public in April of 2000.  Is that right?

14  A.   Yes.

15  Q.   And you started a few months before that?

16  A.   Right.

17  Q.   The company's stock did very well after its IPO.  Is that

18  fair to say?

19  A.   I believe it did, yes.  I remember the initial periods.

20  Q.   The initial periods through the end of the year 2000 --

21  during that period, Embarcadero was one of the top-performing

22  IPOs of the year.  Is that right?

23  A.   I can't remember that.  I'm thinking, like, the first day.

24  It was up $4 the first day.

25  Q.   At what price did it go public:  10 or 15?

1  **A.**    $10.

2  **Q.**    And by the end of the year, it had hit highs of about $60.

3  Is that right?

4  **A.**    I think it got to 60.  I don't know when.

5  **Q.**    Is it fair to say that when you were thinking about

6  joining Embarcadero, that you didn't go there for the salary

7  the company was going to pay you?  Is that a fair statement?

8  **A.**    No.  I think I did go there for the salary.

9  **Q.**    Okay.  Your attorney, in his opening statement, said

10  something about your first-year starting salary.  Do you recall

11  that?

12  **A.**    Right.

13  **Q.**    And in addition to your salary, your total compensation

14  was more than that.  Is that right?

15  **A.**    Well, it was.  I mean, I did have stock options, but I

16  mean, the fact was, you know, a starting controller isn't going

17  to make a lot of money.  So I don't think I was underpaid for

18  the job I had with my salary alone.

19  **Q.**    Okay.  Well, let's take a look at -- at some of those --

20  the stock options.  If we could, pull up Exhibit 655 first,

21  which is already in evidence.  It's the Equity Edge database

22  report.  And if we look down to the P's, I think it starts on

23  page -- could be on page 22.  There, according to the

24  Equity Edge report, it looks like you've got -- you received

25  three stock option grants that were dated prior to April 2000.

 1   **A.**   Right.  About half the options, I was -- I received while

 2   I was there.

 3   **Q.**   So over the course of your employment at Embarcadero,

 4   about half of your options came before you start -- before the

 5   IPO or dated before the IPO.  Is that right?

 6   **A.**   I think generally that's correct, yes.

 7          **MR. TASHJIAN:**  And if you look at those grants -- and

 8   in particular, we're looking at one that's dated June 30th,

 9   1999.  It's the top one on the Mr. Pattison's list, if you

10   could highlight that.

11   **BY MR. TASHJIAN:**

12   **Q.**   Do you see that?

13   **A.**   Yes, I do.

14   **Q.**   June 30th.

15          And then there's one dated January 4th, 2000.  Do you see

16   that?

17   **A.**   Yes.

18   **Q.**   And then there's a third one that's dated March 22nd,

19   2000.  That was just about a month or so -- the month prior to

20   the IPO.  Is that right?

21   **A.**   Right.  Stephen granted options to everyone in the company

22   on that date.

23   **Q.**   The options that are dated in 1999 -- were those granted

24   to you when you did a little bit of consulting work for the

25   company?

1   **A.**   Exactly.  They were thinking about being acquired by

2   another company, so I helped Stephen pull together some of the

3   documents.

4   **Q.**   And that was before you became the controller?

5   **A.**   Yes.

6   **Q.**   And you were doing -- you were on a consulting agreement.

7   Is that right?

8   **A.**   I think it was an envelope consulting agreement.

9   **Q.**   Okay.

10  **A.**   I don't think there was an actual agreement.

11  **Q.**   The January 4th, 2000, options -- those were the

12  equivalent of your new-hire options.  Is that fair to say?

13  **A.**   Yes.

14  **Q.**   And then the once that are dated March are just, as we

15  said, just slightly before the IPO?

16  **A.**   Right.  And Stephen, you know, kind of granted to the

17  whole firm.

18  **Q.**   Now, we've heard a lot about a vesting period of options.

19  Those three grants invested over time.  Is that right?

20  **A.**   That's right.

21  **Q.**   So it meant you couldn't exercise them right away.  You

22  had to wait a period of time during your employment before you

23  could exercise those options?

24  **A.**   Correct.

25  **Q.**   And before the company's IPO in April 2000, Embarcadero

1   stock wasn't listed on a -- on a stock exchange, right?

2   **A.**    No.

3   **Q.**    It wasn't?

4   **A.**    It --

5   **Q.**    I'm sorry.  I asked the question.  I just want to make

6   sure --

7   **A.**    Sorry.

8         No, it was not.

9   **Q.**    It was not.

10        So the -- in order to come up with the exercise price for

11  those options, the Board made that determination.  Is that fair

12  to say?

13  **A.**    I'm not quite sure.  The Board -- I guess the Board did,

14  but it was subject to review through the IPO process, I guess,

15  would be the best way to say it.

16  **Q.**    What do you mean by that?

17  **A.**    It was my understanding that, you know, we talked a little

18  bit about cheap stock; that oftentimes when companies were

19  going public, the auditors would ask about, you know, the

20  historical pricing, and then do a look-back, to see if they

21  were adequate, and really kind of mapped to, you know, a

22  reasonable range of prices, as compared to, you know, a

23  hypothetical value of the company.

24  **Q.**    Okay.

25  **A.**    So the Board granted it without knowing what the company's

1   value really would be, because they didn't have any evidence,

2   because it wasn't traded.  So then, you know, collaboratively,

3   the firm and PwC and the underwriters went back and just tried

4   to pick subjective dates to get, you know, maybe a better

5   measurement date, so to speak.

6   Q.   So, in other words, the Board and the company couldn't

7   look to stock market on the date of grant to figure out what

8   that fair market value was.  It had to -- the Board had to make

9   its best judgment.  Is that right?

10  A.   Right.

11  Q.   And then, in retrospect, as the company led up to its IPO,

12  there was a look-back process to see whether those best

13  judgments sort of corresponded to where the market was.  Is

14  that a way to say it?

15  A.   You know, having just spent my only IPO, that, I think, is

16  a general way.  I mean, everybody was very familiar with the

17  process at the time.  So --

18  Q.   And you've referred to this term called "cheap stock" or

19  "cheap stock charge," right?

20  A.   I think that's the -- you know, the underwriting

21  vernacular.  I don't know where it came from.

22  Q.   All right.  So, in retrospect, as the company looked back

23  in time as it went up to the IPO, it determined that the

24  exercise price was less than the fair market value on the date

25  of grant?  Is that essentially what happened?

1  **A.**   I believe so, yes.

2  **Q.**   And the company took a charge over time for that

3  difference in the value?  Is that right?

4  **A.**   That's right.

5  **Q.**   And that's what's referred to as the "cheap stock charge"?

6  **A.**   Yes.

7  **Q.**   And, as the controller, you helped prepare the

8  amortization of that charge over the next three or four years.

9  Is that right?

10  **A.**   I recorded the amortization.  I didn't help prepare it.

11  **Q.**   Meaning that a calculation of the charge was done by

12  somebody else.  Is that right?

13  **A.**   Correct.

14  **Q.**   But you knew what the amortization was.  You had that

15  schedule, right?

16  **A.**   Exactly.

17  **Q.**   Then you applied that amortization schedule to the charge,

18  and took those expenses over time.  Is that right?

19  **A.**   Well, the schedule kind of mapped out the amortization

20  over the life of the options, so it was well defined in

21  quarterly columns.

22  **Q.**   I guess that's all a long way of saying that for the three

23  pre-IPO stock options that you received -- those three

24  grants -- the company ended up taking an expense for those.  Is

25  that fair to say?

1  A.   No, I don't think so, because the March 22nd was actually

2  higher than the IPO price.  So I would say that that was not

3  the case on that one.

4  Q.   Oh, I see.  So the March 22nd, 2000, grant was priced at

5  $12 a share.  Is that right?

6  A.   Right.

7  Q.   That was higher than the IPO price?

8  A.   Right.

9  Q.   So the company didn't take a charge for that particular

10  grant?

11  A.   I can't say that, but based on what we just discussed, I'm

12  assuming they did not.

13  Q.   Okay.  The other 12 grants -- the 1999 grant and the

14  January grant -- is it fair to say the company took a charge

15  for those -- for those stock options?

16  A.   It's fair to say that.

17  Q.   Now, you were employed at Embarcadero through August --

18  the beginning of August 2005.  Is that what you said?

19  A.   I think it was July or August.  I don't remember.

20  Q.   We'll call it "mid 2005."

21  A.   Okay.

22  Q.   So over the next five and a half years, is it fair to say

23  that you exercised some of these stock options?

24  A.   I did.

25  Q.   And by -- when you exercised the stock options, it meant

1  you paid the exercise price.  Is that right?

2  **A.**   Yes.

3  **Q.**   And that meant you bought the shares at that price.

4       And then you sold the shares at the prevailing market

5  price.  Is that right?

6  **A.**   Right.

7  **Q.**   And your -- the profits or the proceeds that you made

8  would be the amount that you sold the shares for, less the

9  amount that you paid to exercise the options?

10 **A.**   Yes.

11 **Q.**   And you did that for the -- for these pre-IPO stock

12 options as well?  It's fair to say that?

13 **A.**   I did.  I don't know to what extent.  And then those would

14 be considered wages.

15 **Q.**   So you paid taxes on them?

16 **A.**   Right.

17 **Q.**   Now, in order for you to exercise your stock options, were

18 you -- like the other employees at Embarcadero, did you have an

19 E*Trade account that you did that?

20 **A.**   I did.

21 **Q.**   So you would go onto your E*Trade account and place your

22 order to do that.  Is that right?

23 **A.**   I did.  I mean, there was a period of time where E*Trade

24 wasn't set up.  We had a lot of difficulty getting all of the

25 information loaded.  And we -- I don't think we contracted with

1   E*Trade until maybe July of 2000.  So there was a period of

2   time where it was actually being done manually, but for most of

3   the time say, after, you know, 2000, it was done via E*Trade.

4   **Q.**   Okay.  And E*Trade took the exercise information and the

5   sale information, and put that information into the Equity Edge

6   database.  Is that right?

7   **A.**   Yes.

8   **Q.**   And, as controller, you had access to that Equity Edge

9   database.  Is that fair to say?

10  **A.**   Yes.

11  **Q.**   And you would use that exercise information as part of

12  your routine part of your job.  Is that right?

13  **A.**   On a quarterly basis, yeah.  I mean, it -- it affected the

14  outstanding stock options.

15  **Q.**   Sure.  And that was some of the information that you had

16  to provide to the auditors, too, right?

17  **A.**   Yes.

18          **MR. TASHJIAN:**  Could we pull up Exhibit 657, which is

19  in evidence?  At the very top of Exhibit 657 -- scroll down a

20  little bit, Mr. King.

21          **MR. MACAULAY:**  Is this in evidence?

22          **MR. TASHJIAN:**  Yes.

23          **THE COURT:**  Well, let's see.

24          **THE CLERK:**  Yes, yes.

25          **MR. MACAULAY:**  Okay.  Thank you.

1          **MR. TASHJIAN:**  I need to see the very top line.  It

2   says, "Stock Options Exercised."  There we go.

3   **BY MR. TASHJIAN:**

4   **Q.**   It says, "Stock Options Exercised."  Did you have

5   access -- you had access to reports like Exhibit 657 in the

6   course of your employment at Embarcadero.  Is that fair to say?

7   **A.**   I did.  Yes.

8          Is this supposed to be a complete document, or is it just

9   mine, or --

10  **Q.**   It is an excerpt from a fuller report.

11  **A.**   Yeah.  It starts at page 74.

12  **Q.**   That's right.  The exhibit starts at page 74.

13  **A.**   Okay.

14  **Q.**   But it reflects, I believe -- and we can go through

15  this -- exercise data for your stock options.

16  **A.**   Okay.

17  **Q.**   So do you see your name there on the "Name" column?

18  **A.**   I do.

19  **Q.**   And then above your name there's a number.  Do you see the

20  number on the first page of the exhibit is 254?  Do you see

21  that?

22  **A.**   Okay.  I do.

23  **Q.**   That refers to a grant number that Equity Edge assigned to

24  each one of your grants?

25  **A.**   Okay.

1  Q.   And all -- I mean, Equity Edge assigned to all grants in

2  the database a number; a grant number.  Is that right?

3  A.   I believe so.  Yes.

4  Q.   So the first three pages of Exhibit 657 reflect exercises

5  for -- that you made for that particular grant:  254.  Is that

6  fair to say?

7  A.   It appears so, yes.

8       So this first one is the one in 1999.

9  Q.   That's right.  So exhibit -- I mean, Grant Number 254

10  reflects your June 30th, 1999, stock options.  Is that right?

11  A.   Yes.

12  Q.   And you can -- you can tell also because, if you look over

13  on the column, if you scroll over to the right, you'll see a

14  price.

15  A.   Yeah.  That's what I -- that's what helped me.

16  Q.   Okay.  The 25-cent price there in the first column -- that

17  was the exercise price for each one of the shares in the 1999

18  grant.  Is that right?

19  A.   Yeah, I believe so.

20  Q.   And then the total price is the amount that you paid.

21  It's the number of shares -- the 417 shares -- times the

22  exercise price equals the total price?  That's what you paid to

23  exercise that particular chunk of shares?  Is that fair to say?

24  A.   I haven't looked at these reports in a long time.  I don't

25  have a calculator.  I'm very -- I would assume that that is

1  correct, yes; but I'm not sure if I'm supposed to be

2  recalculating these.  I think the total price would be the

3  total price I paid, but I really haven't seen these documents

4  in a long time.  So --

5  Q.  The value basis column -- it's $16.82.  That's just the

6  entry in the first column, but the numbers that are reflected

7  in that column reflect the market price that you ended up

8  selling the shares at.  Is that fair to say?

9  A.  Again, I -- I guess it is.  I don't -- I don't remember

10  how this schedule works.

11  Q.  Okay.  That's fair.

12  A.  It would look that that's the total value.  And then, as

13  you just described -- and then we would take the total price.

14  And the difference would be, you know, the wage.

15  Q.  The wage that --

16  A.  Right.

17  Q.  And that's the tax deduction over there $6,909?

18  A.  Exactly.

19  Q.  And that's the tax deduction to Embarcadero.  I mean,

20  those are Embarcadero records.  That's the tax deduction

21  Embarcadero would take for, essentially, the profits from that

22  particular exercise?

23  A.  Right.

24  Q.  But that six -- the $6,909 number -- that reflected also

25  for -- from your perspective, the total proceeds from that

1  exercise and sale?  Is that fair to say?

2  **A.**    I think that's fair.  Yeah.

3  **Q.**    And if you totaled up, as we go down the page, each entry

4  where you see your name on the --

5           **MR. TASHJIAN:**  If you could scroll over, Mr. King --

6  **BY MR. TASHJIAN:**

7  **Q.**    Each entry where we see your name is a different date that

8  you exercised portions of this particular grant:  254.  Is that

9  fair to say, too?

10 **A.**    I think so.  Are these grants in question, too?

11         I don't even -- I don't know what the ultimate outcome of

12 the whole investigation was.  Is there a problem with that

13 pre-IPO one as well -- the 99?

14 **Q.**    Well, what I'm interested in is the amount of money that

15 you ended up exercising and selling these pre-IPO shares for.

16 **A.**    Okay.

17 **Q.**    Is it fair to say that we could derive the amount of money

18 that you made from these Equity Edge reports if we totaled up

19 the total number of exercises in your gross proceeds for each

20 one of the pre-IPO stock options?

21 **A.**    That's something that I'm not going to speculate on.  I

22 mean, if that's the research you've done, then that's the

23 answer; but I'm not going to comment on that.

24 **Q.**    Well, let me put it this way.  Is it fair to say that for

25 the three grants -- the three IPO grants that -- for the 199 --

1 I'm sorry -- for the 1999 stock options, that your total

2 proceeds from those 2000 shares totaled about $80,000?

3 **A.**   That's what this report, you know, reflects.

4       I mean, it would be easier if we just looked at my W-2 and

5 saw it on there or something; but I mean, I never really used a

6 report like this for me individually.

7       I think there's another report that shows -- you know,

8 that better reflects it; that -- and that's the one that I used

9 to pass out to the employees, you know, or via Nichole, or

10 actually maybe E*Trade even mailed it to them as a part of

11 their W-2 package.

12       So I -- I do recall this report.  I used to run this just

13 to get the information for -- not so much for the total value

14 or the total price or the total deduction, but what quantity of

15 shares were exercised in a given point so it could go into the

16 stock option roll-forward.

17 **Q.**   Okay.

18 **A.**   And we did use the total price column to provide evidence

19 to PwC that the funds were actually hitting the bank account,

20 because that was one of their tests.

21 **Q.**   So --

22 **A.**   So that was the extent of my work with this document.

23 **Q.**   No.   That's fair enough.

24       I'm asking for your -- your best recollection and whether

25 it's consistent with these reports that for the 1999 shares,

 1   that you exercised them over -- over the next five years?

 2   A.   Yeah.   That's what I was going to say.   I mean, it wasn't

 3   all at once.

 4   Q.   It wasn't all at once?

 5   A.   No.

 6   Q.   And is it fair to say that you made about $80,000 from

 7   those 1999 shares?

 8   A.   If you look at this schedule, that's what totals in that

 9   tax deduction column.   Again, I've never looked at this

10   schedule, you know, for that purpose, so I don't want to

11   speculate as to what that means.

12   Q.   Is -- if we looked at the next grant, the grant that was

13   dated January 4th, 2000, I think that those options were

14   numbered 274.   Is it fair to say that you made approximately

15   $290,000 from those options over time?

16   A.   I don't know.   I don't want to speculate on that.   I mean,

17   that's what this -- I don't even see that amount on this.

18   Q.   If you turn to page 98 on the report, you'll see a total

19   value number and a total price number.   The total value is

20   $308,000.   The total price that you paid was $18,700?

21   A.   Okay.   Well, why isn't there an amount in the

22   tax-deduction column, like on the first one?

23   Q.   I'm not a tax expert, Mr. Pattison; but I would surmise

24   that perhaps the company couldn't take a tax deduction for

25   those particular --

1  **A.**   Oh, okay.

2  **Q.**   -- options.

3  **A.**   Well, that's why I don't want to speculate as to what

4  these reports say.

5  **Q.**   That's fair enough.

6       And from the -- that third tranche of options that were

7  dated in March -- you exercised those as well.  Is that fair to

8  say?

9  **A.**   Over the course of my employment.  I think that's fair to

10  say.

11  **Q.**   Is it fair to say that you made about $80,000 from those

12  options as well?

13  **A.**   I can't say.  We could look at my payroll records.  That

14  would probably be a much more defining report.

15  **Q.**   Well, I've got to say we do have copies of your W-2, but

16  I'm not sure that we really need to get those into evidence.

17  **A.**   Okay.

18       **MR. TASHJIAN:**  If we could go back to Exhibit 655 and

19  look at the Pattison -- there we go.

20  **BY MR. TASHJIAN:**

21  **Q.**   There are eight lines there.  We've gone through three of

22  them.  The other five grants were post-IPO stock options.  Is

23  that fair to say?

24  **A.**   Yes.

25  **Q.**   So there's one that's dated April 5th, 2001.  Do you see

1  that?

2  **A.**   Yes, I do.

3  **Q.**   One that's dated October 2nd, 2001?

4  **A.**   Yes.

5  **Q.**   October 17th, 2002?

6  **A.**   Yes.

7  **Q.**   July 2nd, 2003?

8  **A.**   Yes.

9  **Q.**   And October 3rd, 2003?  Do you see that?

10  **A.**   Yes, I do.

11  **Q.**   Each one of those grants, is it fair to say, was priced at

12  the low of the respective quarter in which they were dated and

13  priced?  Is that a fair statement?

14  **A.**   More than likely.

15  **Q.**   And you exercised those stock options during the course of

16  your employment, too, didn't you?

17  **A.**   That's right, but I mean, that's really, you know, the

18  point of, you know, stock options.  So, I mean, it's a part of

19  your compensation package.  And if -- if the price goes up,

20  then you sell them.

21  **Q.**   Isn't it fair to say that you made approximately $86,000

22  from the exercises of those grants?

23  **A.**   I don't know.

24  **Q.**   Would you agree that we could look in the Equity Edge

25  records to figure that out?

1   **A.**   I believe we could, yeah; a report better than this one,

2   from my recollection.  I know a lot of those were never

3   exercised, so I think maybe a little more than half were

4   exercised out of the total grant.

5   **Q.**   I wanted to ask you a little bit more about the

6   October 2nd, 2001, grant, if I could ask you to turn to

7   Exhibit 483 in your binder.

8           **MR. TASHJIAN:**  Your Honor, the parties have

9   stipulated Exhibit 483 is an authentic copy of a grant list

10  from Embarcadero.

11  **BY MR. TASHJIAN:**

12  **Q.**   Mr. Pattison, do you recognize Stephen Wong's signature at

13  the bottom of the grant list?

14  **A.**   I do.  That's about all I recognize.  Mine is almost

15  impossible to read.

16  **Q.**   It's a pervasive problem in this case.  I apologize.

17          Do you see -- can you -- if you look at your -- through

18  the P's on the list, do you see your name on the -- on the

19  grant list?

20  **A.**   I do.

21          **MR. TASHJIAN:**  Your Honor, I'd ask that Exhibit 483

22  be put into evidence.

23          **THE COURT:**  Any objection?

24          **MR. RICHARD:**  No, your Honor.

25          **THE COURT:**  Admitted.

1           (Trial Exhibit 483 received in evidence)

2           **MR. TASHJIAN:**  Now everyone gets to suffer.

3           So if we could enlarge -- yes.  Keep going.  Scroll

4    down, please, to the P's.  Difficult to see, but now I've lost

5    it.

6    **BY MR. TASHJIAN:**

7    **Q.**   Michael Pattison.  10/2/01.  10,000 shares at $7.

8         Do you see that, Mr. Pattison?

9    **A.**   I do.

10   **Q.**   Is it fair to say that $7 was the lowest closing stock

11   price in the fourth quarter 2001?

12   **A.**   Through the course of the investigation, I'm assuming that

13   that is.

14   **Q.**   I mean, we could look at the stock price.

15   **A.**   I know.  I'm just -- if you're telling me, so then I

16   believe it.

17   **Q.**   October -- I'm sorry.  Seven dollars was the -- well, you

18   were at Embarcadero on -- through the course of the

19   September 11th terrorist attacks.  Do you remember that?

20   **A.**   Yes, I do, very well.

21   **Q.**   And do you recall that the stock market was closed for a

22   period of time after the after the attacks?

23   **A.**   I do.  And -- yeah, and we closed for a day or two as

24   well.

25   **Q.**   And Embarcadero stock, like the rest of the stock market,

1  fell after the market reopened.  Do you recall that?

2  **A.**    You know, I'm sure it did.  I don't recall the specifics.

3  **Q.**    Do you recall that October 2nd was the lowest closing

4  stock price through the end of 2001 for Embarcadero?

5  **A.**    I don't, but I know it was, you know, Stephen's process to

6  pick the low of the quarter.  So going on that, I'm assuming it

7  was.

8  **Q.**    Well, let's look at Mr. Wong's significant down at the

9  bottom, if we could scroll down.  You see "Approved."  And you

10  recognize Mr. Wong's signature, I think you said?

11  **A.**    I do.

12  **Q.**    There's a date underneath Mr. Wong's signature.  Do you

13  see that?

14  **A.**    I do.

15  **Q.**    It says, "3 Oct. '01."  Do you see that?

16  **A.**    Right.

17  **Q.**    Now, October 3rd was the third day of the fourth quarter

18  2001.  Is that right?

19  **A.**    Yes.

20  **Q.**    Would you say it was not -- it was not the customary

21  practice for Embarcadero to approve or grant stock options on

22  the third day of a quarter?

23  **A.**    That's correct.

24  **Q.**    Mr. Wong didn't sign this grant list on October 3rd, 2001,

25  did he?

1  **A.**    My guess is he didn't.

2        You know, I think you're reading too much into the

3  language around this.  There -- we've seen a lot of

4  inconsistencies.  I don't think he did.  Some had dates.  Some

5  had "Approved."  Some had "as of."  Some had "grant date."

6        You know, I don't think there's a lot of value to looking

7  to the language around his signature.  I wasn't looking at

8  that.  I was looking at the fact of authorization.  So it's

9  somewhat frustrating, because every one we look at looks

10 different.  So it's hard for me to really determine exactly

11 what, you know, the intent was, and the literal intent and the

12 literal reading of the words around these.  So --

13       But you're right.  I don't think he did.

14 **Q.**    You spoke yesterday, I believe, about the importance to

15 you of consistency as it came to the financial statements.

16 Isn't that right?

17 **A.**    That's right.

18 **Q.**    You talked about GAAP applied on a consistent basis?

19 **A.**    That's right.

20 **Q.**    And you knew, as a controller, that it was important.  If

21 there was one thing that was important, it was to be

22 consistent.  Is that fair to say?

23 **A.**    That's right.  And he consistently approved and authorized

24 options every quarter.  You know, this -- you can read the

25 language.  And the import of some of these words in a literal

1   reading -- I mean, that -- we saw that document the other day

2   or yesterday -- "grants not granted."

3       I mean, it doesn't make any common sense, right?  I mean,

4   the language doesn't mean that they were granted but they were

5   not granted.

6       So it's kind of difficult.  We look at these words and

7   we're picking up meanings as to what it is.  And I just -- I

8   don't think there's any there there, but that's just me.  I

9   mean, I wasn't looking at that language.

10  **Q.**   Well, let's look at when you sent the October 2nd grants

11  to E*Trade.

12      Could I ask you to turn to Exhibit 495, please?

13  **A.**   Sure.

14      You know, and your -- okay.  Your point as to the -- the

15  market collapse -- you know, I don't remember.  Maybe he said,

16  "This is a good time to buck up morale."  I don't know, but

17  clearly it was sent at the end of the quarter.

18  **Q.**   If you look at --

19          **MR. TASHJIAN:**   Your Honor, Exhibit 495 -- parties

20  have stipulated that it's an authentic copy of the e-mail and

21  attachment that Mr. Pattison sent to E*Trade, dated

22  January 7th, 2002.  I guess I would ask that we move it into

23  evidence at this time.

24          **THE COURT:**   Any objection?

25          **MR. RICHARD:**   No, your Honor.

 1              **THE COURT:**  Admitted.

 2              (Trial Exhibit 495 received in evidence)

 3              **THE WITNESS:**  I do note as well that I think, you

 4    know, in that October one, there were, you know, 250,000

 5    options granted on that date, just as a point of interest.

 6    **BY MR. TASHJIAN:**

 7    **Q.**   The subject line is "Fourth Q Grants."  Would you agree

 8    with me that that refers to the fourth quarter, 2001, grant

 9    information?

10    **A.**   Yes.

11    **Q.**   Were you sending it to E*Trade on January 7th, 2002?  Is

12    that right?

13    **A.**   We typically sent stuff at the end of the quarter, yes.

14    **Q.**   January -- I don't want to argue with you, but you would

15    agree that January 7th is after the end of -- after the end of

16    the fourth quarter?

17    **A.**   Yes.

18    **Q.**   And, in fact, if you look at the attachment here, if you

19    go to the next page, you'll see that at the top column at the

20    top of the column, it's option date.  And those are the 10/2

21    grants -- the 10/2/01 grants.  Is that fair to say?

22    **A.**   Yes.

23    **Q.**   So you'll see -- on the third page, you'll see your name

24    as one of the grantees.  The third page of the attachment.

25    There we go.  Michael Pattison.

 1      Do you see that?

 2  **A.**    I do.

 3  **Q.**    Okay.  Could I ask you to turn to Exhibit 566?

 4          **MR. TASHJIAN:**  Your Honor, Exhibit 566 is -- the

 5  parties have agreed that it's an authentic printout of an

 6  e-mail exchange involving the defendant and Mr. Sabhlok on

 7  October 6, 2003.  And I'd ask that it of be moved into evidence

 8  at this time.

 9          **THE COURT:**  Any objection?

10          **MR. RICHARD:**  It appears to have marginal relevance,

11  your Honor.

12          **THE COURT:**  Relevance?

13          **MR. TASHJIAN:**  I can ask a question or two, or I

14  could state that it involves stock options to the defendant.

15          **THE COURT:**  Well, why don't you ask him questions?

16  And I'll --

17          **MR. RICHARD:**  I'll withdraw the objection,

18  your Honor.

19          **THE COURT:**  Okay.  All right.  566 admitted.

20          (Trial Exhibit 566 received in evidence)

21          **MR. TASHJIAN:**  Thank you, your Honor.

22  **BY MR. TASHJIAN:**

23  **Q.**    Mr. Pattison, on October 6, 2003, you were still the

24  controller at Embarcadero?

25  **A.**    I am.

1    **Q.**    Mr. Sabhlok was the CFO?

2    **A.**    Correct.

3    **Q.**    He was your manager.  Is that right?

4    **A.**    That's correct.

5    **Q.**    And he had the -- he had the position of making

6    recommendations about your stock options.  Is that fair to say?

7    **A.**    That is correct.

8    **Q.**    So if you look down at the last e-mail in the chain, we

9    see an e-mail from you to Mr. Sabhlok referring to something

10   that -- you wrote,

11                "Walter gave Michael Clarke 3,500

12            options, and you gave him 5,000.  Let me

13            know how you want to proceed."

14        Michael Clarke -- now, he was somebody in the financial

15   department.  Is that right?

16   **A.**    Yeah.  He was the U.K. controller.

17   **Q.**    He was the controller for the U.K. subsidiary?

18   **A.**    That's right.  And this is a -- this is a great example

19   of, you know, people using language incorrectly, right?  "You

20   gave him."

21        Well, he didn't gave him anything.

22        He was proposing him 5,000 options.  And Walter was

23   proposing; but you know, they didn't "give" them to him.

24   **Q.**    "Walter" referred to -- is that Walter Scott?

25   **A.**    That's Walter Scott, who -- you know, the U.K. subsidiary,

 1  while it had its books and records, was -- you know, it wasn't

 2  an R & D shop.  It was a sales and marketing organization.  So

 3  Walter was involved in the U.K.

 4      So Stephen would have said,

 5              "Walter, I'm allocating, you know, you

 6          to give me a list of people for 50,000

 7          options."

 8          And so Walter went and allocated.

 9          Well, in the meantime, you know, Michael Clarke

10  really reported directly to Raj.  So Raj did the same thing.

11  And they doubled it up.

12  Q.  Oh, I see.  So Walter Scott recommended that

13  Michael Clarke receive 3,500 options.  And Raj Sabhlok

14  recommended that he get 5,000?

15  A.  Exactly.

16  Q.  Okay.  And maybe that refers to -- I mean, maybe that

17  explains Mr. Sabhlok's e-mail.

18              "That's crazy.  The sales guy giving

19          the accounting guy options.  Now that looks

20          good."

21          Do you see that?

22  A.  That's exactly right.

23  Q.  And if we scroll up the e-mail chain, there's a little bit

24  of a back-and-forth.  Would you agree?

25  A.  Yes.

```
 1   Q.   Okay.  Ultimately, you say,

 2              "Okay.  What should we do with the

 3         5,000?  Do you want him to have 5 and 3.5

 4         both, or redistribute?"

 5         What were you referring to?

 6   A.   Whether Michael was going to get, you know, 5 plus 3.5, or

 7   8,500 options proposed, or we were going to get rid of them, or

 8   redistribute.

 9   Q.   And the Michael that you refer to is Michael Clarke?

10   A.   Clarke.  Correct.

11   Q.   Okay.  So let's go back up and see, to the top of the

12   e-mail.  And we see, "No."  And Mr. Sabhlok responds,

13              "No.  Let's go with their plan of 3.5K

14         for him, and give the rest evenly to you

15         and Charlie."

16         Do you see that?

17   A.   Right.

18   Q.   So that is it fair to say that Mr. Sabhlok was saying,

19   "No.  Let's give Michael Clarke 3,500 options"?  Is that right?

20   A.   That's correct.

21   Q.   And take the 5,000 that was doubled up, and split it up

22   among you and Charlie?  Is that right?

23   A.   Right.  So he was reallocating the options within the

24   Finance Department pursuant to that.

25   Q.   And the "Ann" referred to Ann Roesch.  Is that right?
```

1   **A.**    Right; who reported to Raj.

2   **Q.**    And Charlie is Charlie Norman?

3   **A.**    Yes.  Charlie Norman.  I don't know how; he had some type

4   of direct line to Raj.  He was working on business development,

5   I believe; so that side of Raj's responsibilities.

6   **Q.**    So if we divided 5,000 into those 3, you get somewhere

7   around 1,666 shares.  Is that right?

8   **A.**    .66.

9   **Q.**    .66?

10  **A.**    Right.

11          **MR. RICHARD:**  That clears it up for me, your Honor.

12          **THE COURT:**  It's .66667, or something.

13  **BY MR. TASHJIAN:**

14  **Q.**    Just to show you what a nice guy I am, Mr. Pattison, I'm

15  going to ask you to turn to Exhibit 201.  And you can see the

16  good work that you did.

17  **A.**    I thought you were going to say it was larger print.

18  **Q.**    No.  I can't help you there.

19          Exhibit 201 has already been moved into evidence.

20          There's a grant approval list for the third quarter 2003.

21  It's on page that starts "ETSC1952."  I think that these are

22  arranged chronologically.

23          Do you see one that says, "third quarter" from the top --

24  actually, it says "From 1/1/03 to 9/30/03."

25  **A.**    And it's a list of, like, 400,000 options.

1   **Q.**   That sounds about right.  Yes.

2   **A.**   Okay.

3   **Q.**   388,000?

4   **A.**   I've got it.

5   **Q.**   If you look -- if we could pull up --

6             **MR. TASHJIAN:**  If we could go to the third page of

7   that list, and blow up the part right -- yeah.  So you see

8   "Ann Roesch"?  If you can scroll up a little bit, Mr. King.

9   No.  I mean, scroll down.

10  **BY MR. TASHJIAN:**

11  **Q.**   Ann Roesch, Charles Norman, and Michael Pattison.  Do you

12  see that?

13  **A.**   Yes, and the rest of the people in the Finance Department.

14  **Q.**   And the rest of the people in the Finance Department.

15           So your option number is 9,166.  Do you see that?

16  **A.**   Yes.

17  **Q.**   That reflects the 1,166 options that you split up for --

18  that Mr. Sabhlok recommended be split up for -- from the

19  Michael Clarke pool.  Is that fair to say?

20  **A.**   Right.  So he must have previously presented 7,500 or

21  something like that, right.

22  **Q.**   Or 8,000, perhaps?

23  **A.**   No.  7,500.

24  **Q.**   7,500.  Okay.  I'm sorry.  Maybe my math is off.

25           And Charles Norman got 6,666?

1   **A.**   Right.

2   **Q.**   And then Ann Roesch got 6,668.  Do you see that?

3   **A.**   Yes.

4   **Q.**   You gave the extra one to Ann Roesch.  Is that fair to

5   say?

6   **A.**   It looks like it.

7   **Q.**   Okay.  All right.  Could I ask you to turn to Exhibit 613

8   in your binder?  That, I believe, has already been moved into

9   evidence.  It's the workpapers that include the end -- end year

10  of '04.

11             **THE CLERK:**  Yes.

12  **BY MR. TASHJIAN:**

13  **Q.**   If I could ask you to turn to the page that says, "Equity

14  Cycle Narrative control environment" at the top, it's on

15  page -- one, two, three, four -- it may be the fifth page in on

16  the exhibit.

17  **A.**   Okay.

18  **Q.**   If we look down at the bottom of that page, there was a

19  date at the bottom in the footer:  EMBT equity narr. 12/31/04.

20       Do you see that, Mr. Pattison?

21  **A.**   Yes.

22  **Q.**   I'm going to ask you a few questions about this particular

23  version of the narrative that ended up in the workpapers.

24       If we turn to the next -- the top of the next page, you'll

25  see that there's a heading that says, "Stock Option Grants."

1    Do you see that?

2    **A.**    Yes.

3    **Q.**    And then on that -- the following page begins the portion

4    that I'd like to ask a few questions about.  So if you turn to

5    the next page.  Okay.

6            **MR. TASHJIAN:**  If we could scroll up, so we see the

7    paragraph that says -- no.  I'm getting my ups and my downs

8    mixed up.  The portion that says, "The controller records stock

9    option grant information quarterly in E*Trade."

10   **BY MR. TASHJIAN**

11   **Q.**    (Reading)

12            "The controller records stock option

13            grant information quarterly in E*Trade

14            based on the CEO approved list and

15            Comp Committee minutes."

16            Do you see that Mr. Pattison?

17   **A.**    Yes.

18   **Q.**    The approved list -- is that fair to say that that

19   reflects a list similar to those grant approval summaries that

20   we've been looking at?

21            **MR. RICHARD:**  Objection.  Lacks foundation as to this

22   document.  It's not clear about whether he's asking about the

23   words or this particular document.  I think it's somewhat

24   misleading, without laying a foundation for this witness and

25   this particular version, as Counsel referred to.

 1              **THE COURT:**  Why don't you go ahead and lay a

 2    foundation?

 3              **MR. TASHJIAN:**  Okay.

 4    **BY MR. TASHJIAN:**

 5    **Q.**   Mr. Pattison, you were -- 12/31/04, you were still the

 6    controller at Embarcadero?

 7    **A.**   I was.

 8    **Q.**   You were -- you've testified a little bit, at least, about

 9    your work on the Equity Narrative Cycles.  Is that fair to say?

10    Equity Cycle Narrative?

11    **A.**   It is fair to say.  Earlier on, I think I was more

12    involved than later; but it's fair to say I did work on it.

13    **Q.**   You knew that there was a version of the Equity Cycle

14    Narrative that was going to go to PwC at the end of the year.

15    Is that fair to say?

16    **A.**   Absolutely.

17    **Q.**   You worked with PwC to show them the Equity Cycle

18    Narrative.  Is that fair to say?

19    **A.**   Earlier on, but you know, then the work kind of got parsed

20    out.  And, you know, different priorities took over; at least,

21    for me.

22    **Q.**   You're not saying you had nothing to do with the version

23    of the Equity Cycle Narrative that appears in Exhibit 613, are

24    you?

25    **A.**   I think I could say that pretty closely to the final

1  version.  Yes, I would say that.

2  **Q.**   You would say that you didn't have anything to -- let me

3  make sure I understand what you're saying.  You're saying you

4  didn't have anything to do with this version?

5  **A.**   I think that's fair to say.  I mean, there --

6  **Q.**   Let me -- could I ask you some questions about whether the

7  description of the process that appeared in the PwC workpapers

8  was consistent with your understanding of how the process

9  worked at the time when you were the controller from 2000

10 through the end of 2004?

11 **A.**   Okay.

12 **Q.**   So the portion I'm asking you about says,

13             "The controller records stock option

14         grant information quarterly in E*Trade

15         based on the CEO approved list and the

16         Comp Committee minutes."

17         You sent information to E*Trade about the grants.

18 We've talked about that.  Is that right?

19 **A.**   Yes.

20 **Q.**   You've also talked about the preparation of the grant

21 approval summaries that Mr. Wong had signed?

22 **A.**   Yes.

23 **Q.**   Is that fair to say?

24     And you also collected and aggregated the information from

25 the stock option grants that the Compensation Committee

1  approved.  Is that right?

2  **A.**    Yes.  I mean, I -- I -- every quarter, I collected the

3  Board and committee meeting minutes for the auditors, so I

4  would review them at that time or whenever they were sent over

5  to me.

6  **Q.**    And, if we could skip down two paragraphs, it says,

7              "On a quarterly basis the controller

8              prepares the option activity worksheet

9              containing the new-hire authorized stock

10             option grants in the quarter, and the

11             authorized performance bonus stock award

12             option grants in an Excel workbook."

13      So we've heard testimony about how you prepared the --

14  the -- I'm sorry.

15      There were these lists that were prepared that

16  Stephen Wong signed.  Is that right?

17  **A.**    Yes.

18  **Q.**    And those reflected the new-hire stock option grants.  Is

19  that right?

20  **A.**    I think this is somewhat of a new process, actually.  I

21  don't remember them being on different lists.  You know, if you

22  look back at the quarterlies we were looking at, they were all

23  on one list.  So I think this is a new process from SOX.

24  **Q.**    Well, you wouldn't dispute the fact that Nichole Cerles --

25  Miss McKenzie -- kept track of the new hires during the

1  quarter, and provided you with that information at the end of

2  each quarter, from 2000 through the end of 2004?

3  **A.**    Yeah.   That's correct.

4  **Q.**    And you wouldn't dispute that there were -- there was an

5  aggregation of all of the managers' recommendations for the

6  performance grants.   Is that fair to say?

7  **A.**    Yes.

8  **Q.**    And that you put those two lists together to send to

9  Stephen Wong for his approval.   Is that right?

10 **A.**    Yes.

11 **Q.**    The sentence at the very bottom of the page says,

12             "The controller forwards the option

13        activity worksheet to the CEO for

14        reverification of previously authorized

15        stock option award grants."

16        Do you see that?

17 **A.**    Yes, I do.

18 **Q.**    Mr. Pattison, isn't that what you had been telling the

19 auditors for the last -- for the four years preceding the end

20 of 2004; that those grant-approval lists were simply

21 reverifications by the CEO of previously authorized grants?

22 **A.**    No, I never told them that.

23 **Q.**    You didn't tell them that?

24 **A.**    No.

25 **Q.**    You didn't -- you didn't lead them to believe that over

1  the course of their audits --

2  **A.**   No, I did not lead them to believe that.

3  **Q.**   Would you agree, at the very least, that this Equity Cycle

4  Narrative doesn't discuss at all the practice of looking back

5  to select the lowest stock option price for the course of the

6  quarter?

7  **A.**   I would agree with that, but it -- it doesn't talk about

8  who gets options, and, you know, how many options.  It

9  doesn't -- you know, there's things -- this is, to describe the

10  processes, the controls, the paperwork, how it went from A to B

11  to C to D.  It didn't talk about -- at least, mine didn't.

12       I note in this one, you know, it doesn't talk about the

13  delegation; but the delegation is in here.  So, you know, it

14  talks about how they're granted from that perspective, at

15  least, mechanically.

16  **Q**   Okay.  But you would agree that it doesn't discuss the

17  practice of looking back and picking the low stock price of the

18  quarter.

19  **A**   Among other things, that's correct.  Which, if it were

20  important, you know, the auditors would have asked for it to be

21  in here.

22       And if this -- this went through probably, you know, eight

23  or ten revisions with us, Jefferson Wells, PwC, us, Jefferson

24  Wells, PwC.  Got to the point where PwC and Jefferson Wells

25  were working amongst themselves, even, without us being in it.

 1      There was just too much work for everybody to be involved

 2 in every one of the 25 cycles.

 3 **Q**    So, you -- if it were important to the auditors, they

 4 would have asked for it to be in there.  Is that -- is that

 5 your testimony?

 6 **A**    Well, I look at this as, you know, this -- this is

 7 intended to be best practices and internal controls to, you

 8 know, make sure everything rolls up.  So, they had checklists

 9 of what they wanted to see in these.

10      And, Jefferson Wells, as the SOX consultants, probably had

11 what would be considered best practices.  I'm assuming, after

12 everyone sat there for a year, whatever wanted to be in here,

13 was in here.

14      But again, I wasn't involved in the final discussion.  So,

15 I don't know how they negotiated this language.  I think there

16 was a lot of back-and-forth.

17 **Q**    The practice of looking back to select the lowest price of

18 the quarter, that was done every quarter after Stephen Wong was

19 delegated the authority through the end of the third quarter,

20 2004.

21      Is that fair to say?

22 **A**    I -- I -- I think that would be a broad statement.  I

23 don't know -- I can't say that that happened every quarter.  I

24 know that was the general practice.  He could have picked

25 higher, or he could have picked lower.

1   Q    It was part of your regular quarterly practice at the end

2   of each quarter to look back?

3   A    Not mine.  It was Stephen Wong.

4   Q    Sure.  I understand that he ultimately made the decision,

5   but you helped him identify what the lowest price of the

6   quarter was.  Isn't that fair to say?

7   A    I don't think Stephen really needed much help from

8   anything, from me.

9   Q    So he could have done this all by himself?

10  A    He absolutely could have done this by himself.

11  Q    But, in fact, you were involved in the grant process

12  quarter after quarter after quarter, weren't you?

13  A    Yes, I was.

14  Q    Recording equity was important.  And that's why the

15  controller did it.  Is that right?

16  A    I think that that referred more to the SEC filings with

17  respect to the Section 16 officers.  But I'm not discounting

18  that it's not important.  It's as important as all the rest of

19  the stuff.

20  Q    And it was a routine part of the practice for either you

21  or Mr. Wong to look back over the course of the quarter.  Isn't

22  that fair to say?

23  A    I would say it was routine.  I wouldn't say it was me

24  looking back.  Stephen Wong had the authorization to grant

25  options pursuant to the delegation, whenever he wanted to.

1    Now, that's a lot of flexibility.  That doesn't really

2  make me comfortable.  It -- it made it -- it didn't make me

3  comfortable from the perspective of I couldn't, you know, have

4  him issuing grants all the time and he realized that, too.

5    So, you know, we came to a quarterly process.

6  Q    It didn't make you comfortable at the time?  Is that what

7  you're saying?

8  A    The fact that if people passed him in the hall, and he

9  said, "What about Jason Hahn?"

10    And he said, "Oh, okay."

11    I mean, imagine -- imagine what that would -- the

12  moment-of-time scenario we have been talking about.  Right?

13  How would you ever keep track of that?

14  Q    Did you tell the auditors at the time that you were

15  uncomfortable with that practice?

16  A    I think I described to you what I was uncomfortable with.

17  I was uncomfortable with the concept of Stephen passing out

18  options in the hallway.  That's why we had the quarterly

19  system.

20  Q    And I asked, did you tell the auditors that you were

21  uncomfortable with that practice?

22  A    The auditors got every board and committee minute --

23  meeting minutes.  And they saw the delegation, and never

24  commented on the delegation.

25    They knew exactly what the delegation was, and what

 1   Stephen's rights under the delegation were.

 2   **Q**    I'm sorry, I didn't hear an answer, though.

 3        Did you tell the auditors that you were uncomfortable with

 4   that practice?

 5             **MR. RICHARD:**  Objection; argumentative --

 6             **THE WITNESS:**  No, the practice didn't --

 7             **THE COURT:**  Overruled.  Overruled.

 8             **THE WITNESS:**  The practice didn't --

 9             **THE COURT:**  Hold on, Mr. Pattison.

10             **THE WITNESS:**  Yes.

11             **THE COURT:**  You need to answer the question yes or

12   no.  Then you can explain.

13             **THE WITNESS:**  No.  The practice didn't happen,

14   because we had a quarterly practice.

15   **BY MR. TASHJIAN:**

16   **Q**    Could I ask you to look at Exhibit 131 in your binder.

17   **A**    131?

18   **Q**    Yes.

19             (Request complied with by the Defendant)

20   **A**    Okay.

21             (Document displayed)

22             **MR. TASHJIAN:**  Exhibit 131 is already in evidence,

23   and we are publishing it on the screen.

24   **BY MR. TASHJIAN:**

25   **Q**    The e-mail you sent to Saulius Bakas on August 6, 2004,

1  the e-mail contains a number of different narratives, or

2  attaches a number of different narratives.

3       Is that fair to say?

4  **A**    Yes.

5  **Q**    There were narratives for reporting and disclosure, is

6  that right?

7  **A**    Yes.

8  **Q**    For financial reporting and disclosure, is that right?

9  **A**    Yes.

10  **Q**    There's another one for the close narrative, is that

11  right?

12  **A**    Yes.

13  **Q**    And then finally there's one for the equity narrative.  Do

14  you see that?

15  **A**    Yes, I do.

16  **Q**    In fact, that's the only one that made it into this

17  exhibit.  If we could take a look at it, on the next page.

18            (Request complied with by the Defendant)

19            (Document displayed)

20            **MR. TASHJIAN:**  If we could flip to the next page,

21  it's the stock option overview -- or stock option grants.

22            Maybe it's next page.

23            (Document displayed)

24  **BY MR. TASHJIAN:**

25  **Q**    The sentence about three lines up, the short paragraph

1    that reads (As read):

2           "Controller forwards this list to CEO for

3           approval of proposed grants."

4       Do you see that?

5    A   Yes.

6    Q   (As read):

7           "The CEO signs at the bottom of the list to

8           indicate approval."

9       Do you see that?

10   A   Yes.  And "the board" highlight means it's a control.

11   Q   Meaning the portion that reads:

12          "The CEO signs at the bottom of the list to

13          indicate approval..."

14      That was a control?

15   A   Yes.

16   Q   An internal control.

17   A   Yes.

18   Q   To make sure that the options were granted properly.  Is

19   that right?

20   A   No, to make sure that there was proper authorization.

21   Q   You would agree that there's nothing in those two

22   sentences that discusses the practice of looking back to select

23   the lowest price of the quarter, wouldn't you?

24   A   That's correct.

25   Q   Now, this version (Indicating), that you sent in August,

1  uses the word "proposed."  Do you see that?

2  **A**    Yes.

3  **Q**    Do you agree that in the version that's dated 12-31-04,

4  that that word "proposed" is not in the description of the

5  granting process?

6  **A**    I don't remember that.  I know it said "reverification."

7  I don't remember the "proposed."  I was focused on something

8  else.

9  **Q**    That leads me to my next question.  You would agree that

10  the words "reverification of previously authored grants" don't

11  appear in this version.  Is that fair to say?

12  **A**    That's right.

13  **Q**    Could I ask you to turn to Exhibit 312.  312 was an

14  exhibit that your attorney asked you about yesterday, and I

15  think it's in evidence.

16            (Request complied with by the Defendant)

17            (Document displayed)

18            **MR. TASHJIAN:**  If we could flash up to the top.

19            (Document displayed)

20  **BY MR. TASHJIAN:**

21  **Q**    Richard Janney, now, he was the consultant from Jefferson

22  Wells.  Is that right?

23  **A**    That's correct.

24  **Q**    He was not an employee of Embarcadero?

25  **A**    No.  He and about four or five other Jefferson Wells

1  people were working, you know, on the SOX project, the 404.

2  Q    And he came in in mid-2004, is that fair to say?

3  A    Probably, you know, a little before.  Around that time.

4  Q    So, is it fair to say that Mr. Janney and his team at

5  Jefferson Wells had to learn how the process worked at

6  Embarcadero?

7  A    That's correct.

8  Q    I mean, he was helping with you the narratives, is that --

9  is that right?

10  A    Well, no, I -- I think they all started off -- you know,

11  we saw that July 1, 2002 internal control memorandum.  So, that

12  was kind of a precursor to the Sarbanes-Oxley.  And then you

13  saw my version.

14      So, he would have taken my version, and I guess the -- you

15  know, the best way I could put it would be customize it for

16  best practices.

17  Q    Okay.

18  A    To -- to, you know, Sarbanes-Oxley-ize it.

19  Q    Well, he worked with you, is it fair to say, to learn how

20  -- what the process was at Embarcadero for granting stock

21  options?

22  A    He worked with -- yes.

23  Q    And he had to help you document the process in the

24  narratives.  Is that right?

25  A    Yeah, me or others.

1  Q    Now, you never told Mr. Janney that you looked back and

2  selected the lowest price of the quarter for the employee stock

3  option grants, did you?

4  A    You know, this gets back to the -- you know, the

5  discussions you asked me with the auditors.  I -- I can't

6  remember specific questions.  So, I mean, if you would want to

7  rephrase it with a "more likely than not" or something like

8  that.

9       I just can't imagine over, you know, what the auditors --

10  over the course of five and a half years, based on everything

11  we've looked at, that there was a question in their minds.  But

12  I can't speculate.

13      As far as my questions with Richard -- my -- my

14  conversations with Richard Janney, I can't recall any specific

15  conversation.  You know, I -- I'm not quite sure that -- he

16  would have taken my narrative and known what the process was.

17  You just saw it.

18      So, how we went from there, I kind of fell out of the

19  process, based on other, you know, issues.  So, I wish -- I

20  wish I knew.

21  Q    You received this e-mail, dated October 22nd.  That's a

22  Friday, according to the e-mail, is that right?

23  A    Right.

24  Q    He sent it to you and to Mr. Sabhlok, is that right?

25  A    To Mr. Sabhlok, and cc me, yes.

1   Q     Well, let's look at the next page, which is the first page

2   of the attachment to the e-mail.

3         (Document displayed)

4   Q     You will see bubbles over on the right-hand column that

5   says "Deleted."  Do you see that?

6   A     Yes, I do.

7   Q     Is it fair to say that the attachment to the e-mail in

8   Exhibit 312 reflects edits to the prior draft of the equity

9   cycle narrative?

10  A     I'm sorry; can you repeat that?

11  Q     Is it fair to say that by looking at the bubbles on the

12  right-hand column, and other edits in the document, that the

13  attachment reflects edits to the equity cycle narrative?

14  A     That's correct.  I know at this time, we had recently got

15  comments from PwC.  And so, we were incorporating their

16  comments into the document.  Or, Richard Janney was.

17  Q     If you look at the third page of the attachment, you see a

18  number of --

19        (Document displayed)

20        **MR. TASHJIAN:**  If we can blow up the right-hand

21  column, so that you can see what's been deleted in the bubbles.

22        (Document displayed)

23  **BY MR. TASHJIAN:**

24  Q     You will see in the fourth bubble down, the word

25  "proposed" was deleted.  Do you see that?

1   **A**    Yes.

2   **Q**    And then two bubbles down from that, the word -- the

3   phrase "and proper authorization of the proposed stock

4   award/option grants."

5       Do you see those words were deleted?

6   **A**    Yes, I do.

7   **Q**    And then, if you look in the text of the document, over on

8   the left-hand side, so, the -- the paragraph that begins "The

9   Controller forwards the Option Activity worksheet..." that

10  paragraph?

11  **A**    You've lost me, sorry, because I'm not on the screen.

12          **MR. TASHJIAN:**  Mr. King, if you could blow up the

13  entire paragraph, that would be helpful.

14          (Document displayed)

15          **THE WITNESS:**  Got it.

16  **BY MR. TASHJIAN:**

17  **Q**    (As read):

18          "The Controller forwards the Option Activity

19          worksheet to the CEO for..."

20      The word "verification" has been edited.  Do you see that?

21  **A**    I do.

22  **Q**    The word, the letters "re," or r-e, have been added in

23  front of "verification."  Do you see that?

24  **A**    Yes.

25  **Q**    Would you agree that that's one of the edits that was made

1   in Mr. Janney's e-mail, dated October 22, 2004?

2   **A**     It certainly appears to be, yes.  It would be helpful to

3   look at this in the context of the PwC comments.  I don't know

4   whether they commented on that specific piece.

5   **Q**     Now, if you --

6           **MR. TASHJIAN:**  Mr. King, if you could go to the front

7   page of the e-mail.  The first page of the Exhibit.

8           (Document displayed)

9   **BY MR. TASHJIAN:**

10  **Q**     You will see, the -- that October 22nd was a Friday.  Is

11  that right?

12  **A**     Yes.

13  **Q**     If we could take a look at Exhibit 424, which may or may

14  not be in your binder.

15  **A**     It is.

16  **Q**     It is?

17          **THE COURT:**  Not mine.

18          **THE CLERK:**  It's admitted.

19          **MR. TASHJIAN:**  I've got a copy.  Your Honor, may I

20  hand it up?

21          **THE COURT:**  I have it in my big binder here.

22          **MR. TASHJIAN:**  Okay, we have -- just as easy to look

23  at.

24          **THE COURT:**  Okay.

25          (Document handed up to the Court)

 1          **MR. TASHJIAN:**  Mr. King, if you could keep that

 2   e-mail on the -- 312, please.

 3          (Document displayed)

 4   **BY MR. TASHJIAN:**

 5   **Q**   All right.  Mr. Pattison, if you look at Exhibit 424 --

 6          **MR. TASHJIAN:**  I believe 424 was moved into evidence,

 7   perhaps yesterday.

 8          **THE CLERK:**  (Nods head)

 9   **BY MR. TASHJIAN:**

10   **Q**   It's the 8-K that was filed on October 27, 2004.

11          Do you see that?

12   **A**   Yes, I do.

13   **Q**   And there was a press release attached as part of the Form

14   8-K.  Do you see that?

15   **A**   Yes.

16   **Q**   Which is the press release that's titled "Embarcadero

17   Technologies Postpones Earnings Announcement," is that right?

18   **A**   Correct.

19   **Q**   And this was the announcement by which Embarcadero told

20   the public and its shareholders that it wasn't going to be able

21   to file the third quarter 10-Q on time.

22          Is that right?

23   **A**   That's right.

24   **Q**   And it makes a reference to the reference recognition

25   investigation.  Do you see that, in the text of the press

1  release?

2  **A**    Yes.  (As read):

3           "The audit committee this week commenced an

4           investigation on the revenue recognition

5           practices of its UK subsidiary."

6  **Q**    Right.  So it's the sentence that says (As read):

7           "The company also announced that its audit

8           committee this week commenced an

9           investigation of the revenue recognition

10          practices in the UK subsidiary."

11      Do you see that?

12  **A**    Yes, I do.

13  **Q**    October 27th I believe is a Wednesday.  Is that fair to

14  say?

15  **A**    I don't -- I don't know.

16  **Q**    Is it fair to say --

17  **A**    Tuesday?

18  **Q**    A Wednesday, I believe.

19  **A**    Okay.

20          **MR. TASHJIAN:**  We can call up Exhibit 653, that's the

21  stock price list.

22          **MR. RICHARD:**  I think we can agree, Wednesday.

23          **MR. TASHJIAN:**  Do you want to take judicial notice of

24  it?

25          **MR. RICHARD:**  Today's Tuesday still, right?

1          THE WITNESS:  Yeah, it's Wednesday.

2          MR. RICHARD:  Yeah.  I'm just going from the Friday,

3   October 22nd, and I did a little note, and it looks like it's

4   Wednesday the 27th.

5          THE COURT:  Maybe you all can stipulate to that.

6   How's that?

7          MR. TASHJIAN:  We can agree on something, Your Honor.

8          THE COURT:  Good, good.  Note that for the Record.

9          MR. RICHARD:  So stipulated.

10          THE COURT:  Okay.  Thank you.

11          MR. TASHJIAN:  Okay.

12  BY MR. TASHJIAN:

13  Q    So, would you agree, then -- well, in the very least, that

14  Mr. Janney sent you the revision to the equity cycle narrative

15  the week before the company made its announcement.

16       Is that fair to say?

17  A    Yes.

18  Q    Could I ask you to turn to Exhibit 22, Mr. Pattison.

19          MR. TASHJIAN:  I believe Exhibit 22 is already in

20  evidence.

21          THE CLERK:  (Nods head)

22          MR. TASHJIAN:  If we could flash it up.

23          (Document displayed)

24  BY MR. TASHJIAN:

25  Q    This is the e-mail that's dated September 16, 2004, about

1  the third quarter prospective grants.

2      Do you see that?

3  **A**    Yes, I do.

4  **Q**    September 16th is a couple of weeks before the end of the

5  third quarter 2004.

6      Is that right?

7  **A**    Yes.

8  **Q**    And if we look at the next page --

9          (Document displayed)

10 **Q**    You will see the grant list.  There's -- would you agree

11 that there are no dates or prices that are reflected in the

12 list that you sent Mr. Wong on September 16th?

13 **A**    Right.  It's a proposed prospective grant list.

14 **Q**    That's right.  And your note at the top of the spreadsheet

15 says (As read):

16          "TO BE ISSUED AT LOW IN THE QUARTER BUT NOT

17          BEFORE START DATE."

18      Do you see that?

19 **A**    Yes.

20 **Q**    That meant that the people that are listed on the

21 left-hand side in the column are the new-hire grants.

22      Is that a fair assumption?

23 **A**    That was the practice, so I'm assuming so, yes.

24 **Q**    And then the next batch of grants, you wrote, made a note

25 that says (As read):

1              "REQUIRES A COMP COMMITTEE MEETING TO GET

2              ISSUED."

3      Do you see that?

4  **A**   Yes, I do.

5  **Q**   Those were grants that were approved by the compensation

6  committee meeting of the board of directors.  Is that right?

7  **A**   Well, I don't know whether it had -- had taken place or

8  not taken place.  But, it would have required, what is I'm

9  saying.

10     I'm not quite sure under what, you know, premise it would

11  have been.

12  **Q**   The grants underneath the heading "TO BE ISSUED AT LOW IN

13  THE QUARTER," those are the performance grants for the third

14  quarter.  Is that fair to say?

15  **A**   Yes.

16  **Q**   So, taking a look at the fact that -- by the fact that

17  there are no dates or prices indicated in your spreadsheet, is

18  it a fair interpretation of this document that Stephen Wong had

19  not yet approved or decided on the grants that are reflected on

20  the list?

21  **A**   Yes.

22  **Q**   If I could ask you to turn to Exhibit 606.

23          **MR. TASHJIAN:**  Your Honor, Exhibit 606 is an e-mail

24  that the Defendant sent to E*TRADE on October 6th, 2004.

25

1    **BY MR. TASHJIAN:**

2    **Q**    Mr. Pattison, would you agree that Exhibit 606 reflects

3    the third quarter of 2004 grants that you sent?

4    **A**    Yes.

5              **MR. TASHJIAN:**  And I would ask that Exhibit 606 be

6    moved into evidence.

7              **THE CLERK:**  It already is.

8              **MR. TASHJIAN:**  It is?

9              **THE CLERK:**  606, yes.

10             **MR. TASHJIAN:**  What's great.  Thanks.

11             **THE COURT:**  That saves a step.

12             (Document displayed)

13   **BY MR. TASHJIAN:**

14   **Q**    So, Melisa Enke, she was your contact at E*TRADE at the

15   time, in the third and fourth quarter 2004, is that fair to

16   say?

17   **A**    Yes.

18   **Q**    And you're sending her the third quarter 2004 grant list.

19   **A**    Yes, I am.

20   **Q**    October 6th was six days into the fourth quarter of 2004,

21   is that right?

22   **A**    Yes.

23   **Q**    And if we look at the list, itself, on the next page,

24   you'll see the columns that were for "Account ID," those were

25   the IDs for the different grantees, the employees who were to

1  receive stock options, is that right?

2  **A**    Correct.

3  **Q**    And the "Option Date," there's a column for "Option Date,"

4  do you see that?

5  **A**    Yes, I do.

6  **Q**    The option date is August 13th, 2004.  Do you see that?

7  **A**    Yes, I do.

8  **Q**    The grant date -- the grant date market value, $5.95, do

9  you see that?

10 **A**    Yes.

11 **Q**    That was the exercise price for those options?  That's

12 what you're telling E*TRADE, is that right?

13 **A**    Right.  And the fair market value on that option date.

14 **Q**    I'm sorry, maybe -- the exercise price is the $5.95 in the

15 next column?

16 **A**    Yeah, I'm not sure what the distinction is between those

17 two columns.

18 **Q**    August 13th, 2004, is it fair to say that $5.95 was the

19 lowest stock price in the third quarter, 2004?

20          (Defendant examines document)

21 **A**    It's likely.

22 **Q**    If we could take a look at Exhibit 44, which your attorney

23 showed you yesterday.

24          **MR. TASHJIAN:**  I think that one -- I know that one's

25 in evidence.

1          **THE CLERK:**  Yes.

2          (Document displayed)

3   **BY MR. TASHJIAN:**

4   **Q**    At the top of Exhibit 44, you wrote to Mr. Sabhlok (As

5   read):

6          "I will get a summary for you by end of day.

7          I have discussed the VP issue with Stephen

8          Ferruolo."

9       Now, Stephen Ferruolo was the outside attorney for the

10  company?

11  **A**    Yes.

12  **Q**    You would occasionally ask him questions if you had

13  questions; is that fair to say?

14  **A**    Yes.

15  **Q**    And in fact, in this e-mail, you seem to suggest that you

16  -- that you talked to him about a particular issue.

17          Is that right?

18  **A**    Yes.

19  **Q**    And the summary -- the summary in your e-mail that you

20  referenced in the first sentence, is it fair to say that that's

21  a summary of the grants for the third quarter, 2004?

22          (Defendant examines document)

23  **A**    Sorry, if you could just help me with that.

24  **Q**    Sure.

25  **A**    Are you saying I included the summary or something?  Or --

1    Q    I'm -- no, I'm -- I'm just trying to ask questions here.

2    Somewhat successfully, and somewhat unsuccessfully.

3         Mr. Sabhlok wrote, in his e-mail --

4    A    Okay.

5    Q    "Do you have the specifics on the others?"

6         And you said, "I will get the summary for you by the end

7    of the day."

8         Is it fair to say that your summary -- that you're

9    referring to the summary of the stock options for the third

10   quarter, 2004?

11   A    I -- he states (As read): "Okay, do you have the specifics

12   on the others?"

13        I don't know if that means the others, meaning the group

14   that this whole e-mail discusses, which is, you know,

15   Mr. Lamvik and his group.  So, I'm not sure.  If I could read

16   through this to -- I'm not sure what he was referring to.

17   Q    Okay.  You are saying you don't have a recollection now as

18   to what you were referring to when he said "the summary."

19   A    No.  And, nor -- nor do I recall the VP issue with Stephen

20   Ferruolo.  It must have had to do either with Stephen's

21   delegation, or -- or Mr. Lamvik.

22   Q    Your attorney asked you yesterday about some -- an e-mail

23   that appears further down in the chain on the second page of

24   the exhibit.

25        Mr. Sabhlok forwarded you an exchange between Mr. Wong and

1    Mr. Lamvik.  Do you see that?

2    **A**    Yes.

3    **Q**    Mr. Lamvik was the head of sales at the time?

4    **A**    I believe he was, yes.

5    **Q**    And, in --

6              **MR. TASHJIAN:**  Mr. King, if you could blow that up

7    and -- blow up Mr. Wong's message.  The entire thing.

8              (Document displayed)

9    **BY MR. TASHJIAN:**

10   **Q**    He wrote to Mr. Lamvik (As read):

11              "Bryan and Duncan made out like bandits..."

12        Now, that's Bryan Fujimoto, is that right?

13   **A**    Yes.

14   **Q**    Duncan was Duncan Hoffman?

15   **A**    Yes.

16   **Q**    Their names appeared on the grant list that we saw that

17   was marked as Exhibit 22?

18   **A**    Well, in the e-mail prior to this one, as well.

19   **Q**    "...because they are not VPs, I have discretion to make

20   their grants."

21        That meant -- Mr. Wong was saying -- is it a fair

22   interpretation to say he had been delegated the authority to

23   grant stock options to non-VPs?  Or, to non-senior executives

24   of the company.

25   **A**    Right.  That, that, I agree with.  I'm not really quite

 1  sure.  I mean, he's talking about the delegation changing here.

 2  So, I don't remember the final change in the delegation,

 3  actually, so --

 4  **Q**   You would agree, though, that there were certain grants --

 5  certain grants that Mr. Wong had the authority to approve, and

 6  certain grants that the board had to approve.

 7      Is that right?

 8  **A**   Right.

 9  **Q**   He wrote (As read):  I have discretion to make their

10  grants."

11      And, he's referring to Mr. Fujimoto and Mr. Hoffman's

12  grants.  Is that a fair interpretation?

13  **A**   It appears to be, yes.

14  **Q**   He wrote (As read):

15          "By some strange coincidence, this happened

16          at the low price for the quarter, less than

17          $6."

18      Do you see that?

19  **A**   Yes.

20  **Q**   He contrasted that in the next sentence by saying (As

21  read):

22          "Unfortunately you and Jaywant have to go

23          through a different process..."

24      Do you see that?

25  **A**   Yes, I do.

 1  Q     And that different process, he described it as one "that
 2  gets recorded and validated."  Do you see that?
 3  A     Yes, I do.
 4  Q     And he's referring to the process at the board level.  Is
 5  that right?
 6  A     He must be, yes.  I mean, not his delegation, so it would
 7  be the board of the compensation committee.
 8  Q     And the one way that it got recorded and validated, there
 9  are minutes of those board meetings, is that right?
10  A     Yes.
11  Q     Mr. Ferruolo, from outside the company, would take those
12  minutes?
13  A     Yes.
14  Q     Those minutes would be kept in board books at the company,
15  is that right?
16  A     Yes, they would.
17  Q     And they would be opened to the auditors, is that right?
18  A     That's right, yep.
19          MR. TASHJIAN:  I think this is probably a good time
20  for a break, Your Honor.
21          THE COURT:  All.  Right we will take our 15-minute
22  break.  Come back at 10:15 and we will resume.  Thank you.
23          THE CLERK:  All rise for the jury.
24          (Jury excused)
25          (The following proceedings were held in open court

```
 1                  outside of the presence of the jury:)

 2            THE CLERK:  Please be seated.

 3            THE COURT:  How much longer do you expect your cross

 4   will go?

 5            MR. TASHJIAN:  Twenty-five minutes to half hour.

 6            THE COURT:  All right.  Because that -- that's going

 7   to be about the maximum, if we are going to be able to get in,

 8   as we talked about yesterday, taking Mr. Lehn out of order.

 9            Because I have given an hour and a half, and you may

10   have an hour, and that allows -- basically, allows about two

11   and a half hours.

12            Well, I added on an extra half hour today, didn't I?

13   All I'm saying is we only have so much time.

14            MR. TASHJIAN:  I will do my best to move this along.

15            MR. RICHARD:  I would waive my right to object on

16   recross to scope, if Counsel wants to --

17            THE COURT:  That's the other thing you can do, you

18   can also -- with that, I was going to suggest, you know, you

19   can also just stop, and then -- a little bit -- discontinous.

20            Or, if we're anxiously awaiting the right of scope on

21   recross, you can ask some of the questions you -- if you don't

22   quite get to finish -- in other words, we just say a half an

23   hour either way, then we can be sure that Mr. Lehn will get on.

24            MR. TASHJIAN:  I guess I would prefer to go forward

25   for the next 25 minutes to half hour.  If I can't finish it
```

PROCEEDINGS 2187

1    then, we can reconsider it then.

2              THE COURT:  Okay.

3              MR. TASHJIAN:  That's how I would prefer.

4              THE COURT:  Okay.  I'll watch that clock carefully.

5              Now, just to be clear, I'm allocating an hour and a

6    half, as I said yesterday, for you to do Mr. Lehn.  You have an

7    hour and 20 minutes left here.

8              And I assume your redirect -- I'm not giving you

9    extra time.  I mean, I'm going to give you time to do --

10   that'll come off the hour and 20.

11             MR. RICHARD:  I understand.

12             THE COURT:  That's separate from the hour and a half.

13             MR. RICHARD:  Yeah.  I expect, at the end of the day,

14   we'll sort out, and see where we are --

15             THE COURT:  Yeah.

16             MR. RICHARD:  -- on that.  I will try to finish

17   Professor Lehn in an hour, to save a few minutes for redirect.

18             THE COURT:  Okay.

19             MS. LaMARCA:  And just to alert the Court, there are

20   some -- I hope minor -- exhibit issues with Professor Lehn.

21             We learned late last night that there were some

22   documents that were sent to us the prior date as

23   demonstratives, which now the Defendant is calling exhibits.

24   They're not appropriate to be used as exhibits.

25             But, we also had problems with a couple of those

PROCEEDINGS                                    2188

```
 1  because they are not matters contained in Mr. Lehn's report.
 2           THE COURT:  Okay.  Then, we'd better talk about that
 3  now, because he's going to be on in a half an hour.
 4           THE DEFENDANT:  May I step down, please?
 5           THE COURT:  Yeah, I'm sorry.  Yeah, yeah.
 6           THE DEFENDANT:  Thank you.
 7           (Defendant excused from the witness stand)
 8           MS. LaMARCA:  So, I think I brought an extra copy of
 9  the ones that were sent to me last night.  I think it's easiest
10  to use the -- and I'll hand it up to the Court -- the exhibit
11  numbers that the Defendant provided.
12           I just want to make sure these are the right -- yeah.
13           (Document handed up to the Court)
14           THE COURT:  Does somebody have the copy of the
15  report, the expert report?  I don't have that with me.
16           MS. LaMARCA:  I have, one but it has markings.  I may
17  have another.
18           THE COURT:  Okay, we've got one.
19           MS. LaMARCA:  All right.
20           THE COURT:  Okay.
21           MS. LaMARCA:  So the first -- and, Counsel was good
22  enough to give us an e-mail this morning, or last night, that
23  pointed out places that they believed these tied to.
24           I think if we start at the back, the -- the very
25  final exhibit, 922, is the one that we have most heartburn
```

```
 1  over, because we don't see anything in Mr. Lehn's report

 2  remotely describing testimony that would fit with this exhibit,

 3  which is a description of, I guess, negotiations that were

 4  occurring between Embarcadero and an acquirer between June,

 5  2006 and September, 2006.

 6         And, Mr. Lehn says nothing about those negotiations

 7  in his report.  Or in his deposition.  But, I don't think the

 8  deposition counts, in any event.

 9         THE COURT:  Okay.  What's the response to that?

10         MR. RICHARD:  Well, one, to say that the deposition

11  doesn't count in any event I don't think is quite accurate.

12  We're here to talk about fair notice.

13         This exhibit, 922, refers to -- I think it's in his

14  -- appendix?

15         (Short off-the-Record discussion)

16         MS. LaMARCA:  We were told, depo at 174.  That was

17  what we were told.  And I looked at --

18         MR. RICHARD:  You know what, Your Honor?  I'm going

19  to just withdraw this at this point, because it's so much

20  information, it would cut into my time.

21         If we need to call Professor Lehn as a rebuttal to

22  the points that the Government may or may not make with

23  Mr. Mulcahey, we will revisit at that time.  But --

24         MS. LaMARCA:  Actually, that will shorten everything,

25  because all my -- the remainder of my objections, if we could
```

1    actually just hash that out.

2          We absolutely do not know whether we will call

3    Mr. Mulcahey, to be completely frank.  We want a shorter case.

4    So, we would object in general to the presentation by Mr. Lehn

5    of critiques of Mr. Mulcahey, which won't be in evidence.

6          And so, if -- If counsel would reserve those for, I

7    guess, surrebuttal, or rebuttal-rebuttal of Mr. Mulcahey, then

8    we would be fine.  Just, dealing with those exhibits later if

9    we need to.

10         And, I actually wouldn't stand on a protest about his

11   objections to Mr. Mulcahey at a later date.  But I would, at

12   this date.

13         **THE COURT:**  All right.  All right.  So that takes

14   care of this one.

15         **MS LaMARCA:**  Yes.  I think -- it also takes care of

16   slide -- I guess, 920?

17         **THE COURT:**  Okay.

18         **MS. LaMARCA:**  That's a later-events study that

19   apparently Mister -- Mr. Lehn must have done after we deposed

20   him, because he had only done some preliminary analysis at that

21   point.

22         **MR. RICHARD:**  And this is a very straightforward

23   point, Your Honor, that is referred to in his report and his

24   deposition.

25         The concept that, very generally, there's a run-up in

 1  stock price before a formal announcement of a merger.  This is

 2  absolutely no surprise.  It's an important part of this

 3  economist's observations.  And, there's no question he was

 4  asked about it in his deposition.

 5          So, I think that we're really trying to slice this a

 6  little too finely, in terms of what this witness should be

 7  permitted to explain to the jury on these important issues of

 8  -- of economics.  Especially in a case where the Government

 9  presented no expert in their own case in chief, we should be

10  entitled to tell --

11          **THE COURT:**  Where in the report is there some

12  reference to effective merger announcements and price effects

13  and stuff?

14          Is there something in here, some page you can direct

15  me to?

16          **MR. RICHARD:**  It's -- I believe he cites -- I don't

17  think it is in the particulars of his report, Your Honor.  He

18  attaches some information that he was then asked about in his

19  deposition.

20          He attaches a lengthy study on employee stock options

21  called -- *The Cost of Employee Stock Options.*

22          But, let me see if I can find it in the deposition,

23  Your Honor.  I believe it's --

24          **MS. LaMARCA:**  We were only pointed to the deposition,

25  not to any place in the report.

1              **THE COURT:**  I think he just said that.

2              **MS. LaMARCA:**  Oh, I'm sorry.

3              **THE COURT:**  What is run-up?

4              **MR. RICHARD:**  Oh, yes, Your Honor.  That, if you look

5    at Exhibit 920, the Government has tried to suggest to the jury

6    that if you look at the price of the company's stock a couple

7    days before, that should be the starting point of some

8    post-period analysis.

9              When, in fact, it's critical to look at when the

10   parties first started negotiating, which is in June.  And so,

11   it gives us a different price point, to put this in context.

12             So to the extent that the Government can go to the

13   jury and say, "Oh, let's look at the company's stock price a

14   couple of days before the merger was announced," and try to

15   draw some conclusion from that, that's contrary to sound

16   economics.

17             Study after study recognized, and it's a point beyond

18   debate that the market, either through leakage of information,

19   all the people who learn about the merger in the course of

20   those discussions, or the market, itself, analyzing that

21   whatever Thoma Cressey saw as additional value in this company,

22   the market also saw.

23             So, there's a creep-up from when the negotiations

24   began in June to when the merger was announced.  The point is

25   that simple.  It will take about two minutes of Professor

PROCEEDINGS                                                    2193

1   Lehn's testimony to explain that point.

2           I'll look for where that was discussed in his

3   deposition.  But, it's an issue that the Government has

4   presented to the jury without expert testimony.

5           So, to suggest that I can't respond because they

6   weren't required to comply with disclosure requirements for

7   experts, but, oh, Mr. Richard did comply, but now he's limited

8   to the exact text of his deposition --

9           **THE COURT:**  Well, it would be helpful -- if there was

10  any discussion of this in the deposition, that would be useful

11  to know.

12          **MR. RICHARD:**  Okay.

13          **THE COURT:**  Hold on for a second.

14          (A pause in the proceedings)

15          **THE COURT:**  I have to take a quick recess.

16          **MR. RICHARD:**  That'll give me an opportunity.  Thank

17  you, Your Honor.

18          **THE COURT:**  All right.

19          (Recess taken from 10:10 to 10:17 a.m.)

20          (The following proceedings were held in open court

21          outside of the presence of the jury:)

22          **THE COURT:**  All right.  Can we -- we need to resume,

23  because we need to bring the jury back in.  I don't want to

24  lose much more time.

25          **MS. LaMARCA:**  You meant the discussion?

1          **THE COURT:**  Yes.

2          **MS. LaMARCA:**  Okay.

3          **THE COURT:**  I --

4          **MR. MACAULAY:**  Sure, Your Honor.  All of Mr. Lehn's

5   discussion in this 2000 time frame -- 2006 time period, in both

6   his report and his deposition, focuses on the disclosures

7   beginning in November 10, 2006.

8          I can't find a specific reference to the pre-merger

9   discussions.  So, I don't know if we have a way to edit our --

10  I'll limit my questions.  We are going to remove Exhibit Slide

11  920, because I can't find a specific reference in --

12         **THE COURT:**  Yeah.  I have to say, after now rereading

13  his report, I mean, the gist of his testimony is about -- you

14  know, you've got all the information, it's not material, that's

15  not how -- it's the how-investors-decide kind of stuff that

16  you're -- and I don't see -- that's on a different track.

17         So, I'm inclined -- I would have been inclined anyway

18  to say it's --

19         **MR. RICHARD:**  He does address what confounding

20  information is, in both his report and in his deposition.

21         **THE COURT:**  Well, and he can talk about that.

22         **MR. RICHARD:**  Okay.

23         **THE COURT:**  But to get into this level is kind of a

24  different orbit, it seems to me.

25         **MR. RICHARD:**  Okay.

```
 1         THE COURT:  What about the rest of these things?

 2   What's wrong with these other slides?

 3         MS. LaMARCA:  I think that our objections -- if I

 4   could understand from Counsel, actually, I -- I'm guessing,

 5   based on what we were discussing a moment ago, that Exhibit 918

 6   is one of the -- is that -- is that not one of the -- I'm

 7   sorry.

 8         Is that one of the ones that is staying in?  Or is

 9   that one of the rebuttal ones?  I just want to know, because

10   I'm not sure I object to it.

11         MR. RICHARD:  Yes.

12         MS. LaMARCA:  It is staying in?

13         MR.RICHARD:  It's illustrative of the core of his

14   testimony about what an intrinsic expense is, over time, and

15   how that compares to a compensation expense.

16         MS. LaMARCA:  Okay.  Your Honor, with that, we

17   wouldn't object to it as a demonstrative, illustrative.  We

18   would object to any of these as evidence.

19         THE COURT:  Okay.

20         MS. LaMARCA:  But we don't object --

21         THE COURT:  So all these are okay as demonstratives.

22   Your objection is to actually admit these as evidence?  Is that

23   what you're saying?

24         915, -17, -16 or whatever it is -- yeah, -16, -18 --

25   918, 919 and 921?
```

1              MS. LaMARCA:  And to be clear, our objection would

2    be, in part, hearsay.

3              THE COURT:  Well, it's an expert.

4              MS. LaMARCA:  He is, but an expert can talk about

5    what he relies on, but it doesn't make it admissible evidence

6    that he -- his opinion, in words.

7              We never admit expert reports, except for

8    inconsistent statements.

9              MR. RICHARD:  So, two things.  We're not offering

10   these into evidence at this point.  We're not moving his expert

11   report into evidence.  I have done research on when

12   illustrative exhibits are admissible.

13             But, before we move these into evidence, I would

14   brief that distinction when illustrative evidence comes into

15   evidence.  But, for purposes of getting this witness on and off

16   the stand, I would like to show him these five slides, and --

17             THE COURT:  All right.  And you won't be moving

18   today, until we have a fuller discussion, if we so choose, to

19   move these into evidence --

20             MR. RICHARD:  Yes, Your Honor.

21             THE COURT:  -- at a later point.

22             MR. RICHARD:  Yes, Your Honor.

23             MS. LaMARCA:  Thank you, Your Honor.

24             THE COURT:  Let's bring the jury back.

25             MR. RICHARD:  Can I have two minutes, please?

```
 1              THE COURT:  Okay, all right.

 2              MR. RICHARD:  Thank you.

 3              THE COURT:  Can I hang onto this report for now, in

 4   case something comes up?  And I'll give you it back to you

 5   afterwards?

 6              MR. MARVIN:  Yeah.  It's an extra copy.

 7              (Recess taken from 10:22 to 10:25 a.m.)

 8              (The following proceedings were held in open court

 9              outside of the presence of the jury:)

10              THE COURT:  Okay.

11              (The following proceedings were held in open court in

12              the presence of the jury:)

13              THE CLERK:  Please be seated.

14              THE COURT:  Okay.  Welcome back, ladies and

15   gentlemen.

16              Sorry again for the delay, but we had some additional

17   matters to take care of.  But, we're working very hard, I can

18   assure you of that, to move this along.

19              So, let's pick up where we left off.

20              MR. TASHJIAN:  Thank you, Your Honor.

21                        CROSS EXAMINATION, RESUMED

22   BY MR. TASHJIAN:

23   Q    Mr. Pattison, can I ask you to look at Exhibit 24 in your

24   binder.  This is the e-mail that's dated -- the e-mail exchange

25   that's dated October 21, 2004.
```

 1         **MR. TASHJIAN:**  If we can show it on the screen, too.

 2         (Document displayed)

 3         **THE WITNESS:**  Got it.

 4 **BY MR. TASHJIAN:**

 5 **Q**    Now, there's been a fair amount of discussion about

 6 Mr. Ferruolo's response to Mr. Sabhlok's question.  And he

 7 wrote: "No.  Absolutely not."

 8         **MR. TASHJIAN:**  If we can scroll up, Mr. King?

 9         (Document displayed)

10 **BY MR. TASHJIAN:**

11 **Q**    You would agree that Mr. Sabhlok forwarded Mr. Ferruolo's

12 response to his question to you on the 21st of October.  Do you

13 see that?

14 **A**    Yes.  I agree.

15 **Q**    You don't dispute that you received this e-mail on

16 October 21st?

17 **A**    I don't dispute it.

18 **Q**    Would you agree that either in e-mail or on telephone --

19 by telephone, on the 21st of October, 2004, you did not tell

20 Mr. Ferruolo that in fact, the company had been selecting the

21 low price of the quarter for its stock option grants for the

22 prior four years.

23 **A**    I would agree with that, because I don't think I talked to

24 Mr. Ferruolo.

25 **Q**    And would you agree that we haven't seen an e-mail where

1   you told him that in an e-mail, either?  Is that fair to say?

2   **A**    That's right.  I mean, in context, I don't know why I

3   would have inserted myself into this process.  I wasn't on the

4   original e-mail.

5   **Q**   So, would you also agree that you didn't tell Mr. Ferruolo

6   on October 21st, that the third quarter 2004 grants had been

7   priced at the low of the quarter?

8   **A**    Yeah.  This doesn't have anything to do with the Q3

9   grants, or, you know, grants of options, as far as I -- I knew.

10  **Q**    Could I ask you to turn to Exhibit 311 in your binder.

11           (Request complied with by the Defendant)

12           **MR. TASHJIAN:**  Your Honor, the parties have the same

13  stipulation regarding this e-mail, and the attachment.  This

14  was an e-mail that Mr. Pattison received on October 21st, 2004.

15  **BY MR. TASHJIAN:**

16  **Q**   Mr. Pattison, would you, do you recognize the name

17  "Richard Janney"?

18  **A**    Yes, I do.

19  **Q**    And, would you agree that this e-mail has to do --

20  something with the equity cycle narrative?

21  **A**    Yes.

22           **MR. TASHJIAN:**  Your Honor, I would ask that 311 be

23  moved into evidence.

24           **THE COURT:**  Any objection?

25           **MR.RICHARD:**  No, Your Honor; thank you.

1          **THE COURT:**  Admitted.

2              (Trial Exhibit 311 received in evidence)

3              (Document displayed)

4          **MR. TASHJIAN:**  Could we blow up the date?

5              (Document displayed)

6   **BY MR. TASHJIAN:**

7   **Q**    You will see that Mr. Janney, he was the consultant at

8   Jefferson Wells who was working on the equity cycle narrative

9   with you?

10  **A**    Yes.

11  **Q**    He sent you this e-mail on October 21st.  Do you see that?

12  **A**    He sent it to Raj and I, yes.

13  **Q**    Okay.  To both of you.  I don't mean to focus only on you,

14  but you're here.

15  **A**    Okay.

16  **Q**    To Mr. Sabhlok, the CFO.  And he attaches an equity

17  narrative audit zip file, with a date, 10-21-04.

18       Do you see that?

19  **A**    Yes.

20  **Q**    And if you look at the attachment, you'll see another

21  draft of the equity cycle narrative that Mr. Janney sent you on

22  the 21st.

23       Do you see that?

24  **A**    Yes, I do.

25  **Q**    And if you look at the Page 2 of 11 on the draft --

1          **MR. TASHJIAN:**  The second page, Mr. King.

2          (Document displayed)

3     **BY MR. TASHJIAN:**

4     **Q**    Towards the bottom, you will see the language that uses

5     the words "Proposed."

6          So, for example, on the second paragraph up from the

7     bottom, it says (As read):

8               "On a quarterly basis, the Controller then

9               prepares the Option Activity worksheet

10              containing approved and proposed grants in an

11              Excel workbook."

12         Do you see that?

13    **A**    Yes, I do.

14    **Q**    And then in the final paragraph on that page, the first

15    sentence reads (As read):

16              "The Controller forwards the Option Activity

17              worksheet to the CEO for verification of

18              previously authorized stock option/award

19              grants and proper authorization of the

20              proposed award/option grants."

21         Do you see that?

22    **A**    Yes.

23    **Q**    And you received this e-mail -- you and Mr. Sabhlok

24    received this e-mail on the 21st of October, 2004.

25         Is that correct?

1  **A**    Yes I did.  It looks like a different format, at least

2  part of it, so I'm not sure if there were other changes or what

3  he was -- you know, working on here.

4  **Q**    Are you referring to the fact that there's no border

5  around the text on the second and third pages?

6  **A**    Right.  That's the first time I've seen that.

7        I know at this point -- you know, it's 8:00 on the 21st.

8  I'm knee-deep in, you know, the rev rec investigation.  So,

9  whether I received this or reviewed it at -- you know,

10 subsequent to this date, I don't know specifically.

11 **Q**    Fair enough.  Could I ask you to look at Exhibit 154.

12 **A**    Yes.

13             (Request complied with by the Defendant)

14        **MR. TASHJIAN:**  I believe Exhibit 154 is already in

15 evidence.

16 **BY MR. TASHJIAN:**

17 **Q**    This was an e-mail that -- an e-mail exchange between you

18 and Nichole Cerles McKenzie on October 25th, 2004.

19        Do you see that?

20 **A**    Yes.

21        **MR. TASHJIAN:**  If we could show it.

22 **BY MR. TASHJIAN:**

23 **Q**    Ms. McKenzie wrote on the second e-mail --

24        **MR. TASHJIAN:**  So if we could scroll up, Mr. King?

25             (Document displayed)

1    **BY MR. TASHJIAN:**

2    **Q**    I'm sorry.  Mr. Pattison, you wrote to Mister --

3    Ms. Cerles, on the 25th of October (As read):

4             "Here are the new grant templates as well as

5             the options and restricted stock awards to be

6             prepared in Q3."

7         Do you see that?

8    **A**    Yes, I do.

9    **Q**    Is it fair to say that you were referring to the third

10   quarter 2004 stock option grants?

11   **A**    And restricted stock awards.

12   **Q**    Sure.  Restricted stock is another form of equity that

13   company used to compensate its employees.  Is that right?

14   **A**    Yes.

15   **Q**    Different than stock options.  Is that right?

16   **A**    Yes.

17   **Q**    But your e-mail refers to the options, as well as the

18   stock -- restricted stock.  Is that fair to say?

19   **A**    Yes.

20   **Q**    And, is it fair to say that you were asking her to go

21   ahead and prepare the stock option letters and agreements for

22   the third quarter?

23            (Defendant examines document)

24   **A**    I think right before this time, we receive -- you know,

25   the 2004 plan was passed by the shareholders.  So I may just be

1  giving her -- these are the new templates.

2      I don't know if it was an instruction to complete the

3  templates, or whether or not the auditor -- or the attorney

4  sent it me and I'm sending them to her.

5      So, specifically, I'm not sure about that.

6  **Q**   Okay.  Well, those --

7  **A**   And then, she's asking for the schedule.

8  **Q**   Sure.  The -- those third quarter 2004 grants made it into

9  Equity Edge, right?  We saw your e-mail to E*TRADE.  Is that

10  right?

11  **A**   Okay.

12  **Q**   Is it correct to say that Embarcadero didn't take a

13  compensation charge for the in-the-money portion of the third

14  quarter 2004 stock options?

15  **A**   Hmm.  I believe the only stock option expense we took

16  would have been with respect to the restricted stock awards.

17  The -- the grants were at fair market value, so there was no

18  compensation charge.

19  **Q**   Okay.  Now, Embarcadero, in the fourth quarter, after the

20  beginning of the revenue recognition investigation, Embarcadero

21  suspended all exercises of stock options by employees in the

22  fourth quarter 2004.

23      Is that right?

24  **A**   Probably.  Whether it was part of -- I think I've seen

25  e-mails -- it was part of the investigation or just part of the

 1  regular quarterly blackout, I don't know, specifically, at this

 2  time.

 3  Q    Well, we've seen reference to this in some of the

 4  financial statements that we've reviewed with other witnesses.

 5       Embarcadero took a compensation -- or, extended the life

 6  of the options that were sent to expire in the fourth quarter

 7  2004.

 8       Is that right?

 9  A    I do recall that, yes.

10  Q    And because they -- they extended the life of those

11  options, they -- the company took a compensation charge for the

12  modification of those -- those option terms.

13       Is that right?

14  A    I think it was $11,000, or something like that.

15  Q    Right.  So, the company recognized a compensation expense

16  associated with the extension of those option terms.

17       Is that right?

18  A    That's -- that's right.

19  Q    Okay.  And, am I correct in thinking that you worked with

20  the auditors in calculating the $11,000 that the company

21  recognized, associated with that charge?

22  A    I -- I -- I believe I did.  We'd also brought in another

23  consultant at this time, to help us with that as well.

24  Q    But is it fair to say that while you're working with the

25  auditors, you and the consultant were working with the auditors

1  on calculating that charge for the extension of those options,

2  that you didn't tell the auditors that the third quarter 2004

3  options had been priced at the low of the quarter?

4  **A**    No.  We were talking about the extension of terminated

5  employees' exercises.

6  **Q**    And you worked with the auditors on the revenue

7  recognition investigation, is that right?

8  **A**    I did, yes.

9  **Q**    I mean, the auditors were involved in overseeing and

10 looking at the work that the company did to get the bottom of

11 what the problem was in the UK; is that right?

12 **A**    Well, as you've heard, I mean, they reviewed the -- the

13 outcome of, you know, our investigation.  And audited it.

14 **Q**    Did you communicate?  I assume you communicated with the

15 auditors, with what you found in the UK?  Is that fair to say?

16 **A**    I don't know if I did.  You know, they brought in Deloitte

17 and Touche, so -- or the Audit Committee did.  So, I probably

18 communicated to them, and they wrote a report.

19      I don't know if, specifically, you know, I gave any

20 conclusions.  It wasn't my job to give conclusions as to what

21 happened.

22 **Q**    Sure.  Deloitte and Touche is another audit firm; is that

23 correct?

24 **A**    Correct.

25 **Q**    And the audit committee hired a separate audit firm to

 1  help it with the investigation into the rev rec problems in the

 2  UK.

 3  **A**    Correct.

 4  **Q**    Is that what you're saying?  And you may have had some

 5  interaction with the Deloitte and Touche auditors, in

 6  connection with their work in getting to the bottom of it.

 7       Is that --

 8  **A**    No, I -- I know I had interaction with them.

 9  **Q**    And, is it fair to say during all of your work on the --

10  getting to the bottom of the revenue recognition problem, that

11  you didn't tell the PwC auditors at the same time that the

12  third quarter stock options had been priced at the low in the

13  quarter?

14  **A**    No.  I don't know why, you know, in the middle of a rev

15  rec, we would be talking about stock options.

16  **Q**    That's a good point.  You -- you testified about having a

17  Super Bowl Sunday office meeting with Betty Jo Charles.

18       Do you recall that testimony?  She was in the office,

19  looking, and she discovered the -- the problem with the tax

20  treatment of the pre-IPO stock options.

21       Is that right?

22  **A**    Yes.

23  **Q**    Is it fair to say that you worked with the auditors to

24  recalculate that, the number of the -- the true compensation

25  expense or the true tax effect for those pre-IPO stock options,

1  in early 2005?

2  **A**    The compensation expense didn't change.  You know, there

3  was no issue with compensation expense that was taken in the

4  cheap stock.  It was only the taxes associated with that

5  compensation.

6  **Q**    Sure.  But you worked with the auditors in figuring out

7  what the tax effect was on those pre-IPO stock options.

8       Is that right?

9  **A**    I did, but it's hard to believe.  We actually hired a tax

10  expert to come help us with our tax accounting, because it's

11  such a complex area.  So there was another consultant involved,

12  Randy Bradford, who really did most of the legwork on that

13  whole thing.

14  **Q**    You were still the controller at the time, right?

15  **A**    Yes, I was.

16  **Q**    And, the company ultimately published its third quarter

17  results in January, 2005?

18  **A**    Yes.  Middle of January.

19  **Q**    And it published its annual results for January of 2004 in

20  April, I believe.  Is that right?

21  **A**    That's right.

22  **Q**    And those financial statements, both -- both the annual

23  financial statements were audited, is that right?

24  **A**    They were.

25  **Q**    And the third quarter 2004 results that were filed in

 1   January, those were reviewed by the auditors, right?

 2   **A**    They were, yes.

 3   **Q**    And, at the time that they were doing the reviews and were

 4   audits, you didn't tell them that the third quarter stock

 5   options had been priced retroactively, did you?

 6   **A**    I don't think they were priced retroactively.

 7   **Q**    Okay.  Well, we saw that they were priced on October -- as

 8   of August 13th, 2004.  Do you recall that, seeing that in the

 9   e-mail that you sent to E*TRADE?

10   **A**    Yes.

11   **Q**    You would agree that Stephen Wong didn't make the

12   decision, on August 13th, 2004, to price those stock options?

13   **A**    The -- I would agree with that, but we weren't looking at

14   the date of decision.  I mean, we were looking at his

15   authorization.  And what he was authorizing.

16   **Q**    If I could ask you to turn to Exhibit 61 in your binder.

17   I think Counsel asked you about similar e-mails yesterday.

18           **MR. TASHJIAN:**  Your Honor, Exhibit 61 reflects an

19   e-mail exchange between the Defendant and, I believe, some

20   auditors, dated February 23rd, 2005.

21   **BY MR. TASHJIAN:**

22   **Q**    Mr. Pattison, you recognize the names on the e-mail

23   exchange?  Udit Tibrewal?

24   **A**    Yes, I do.

25   **Q**    And Saulius Bakas?

1    **A**     Yes.

2    **Q**     They were PwC auditors at the time?

3    **A**     Yes.

4              **MR. TASHJIAN:**  Your Honor, I would ask that Exhibit

5    61 be moved into evidence.

6              **THE COURT:**  Any objection?

7              **MR. RICHARD:**  No.  I think you talked about it

8    yesterday, but apparently it's not in, so no objection.

9              **THE COURT:**  Okay.  Admitted.

10             (Trial Exhibit 61 received in evidence)

11             (Document displayed)

12   **BY MR. TASHJIAN:**

13   **Q**    So, if we look at the bottom e-mail, this was an e-mail

14   that we saw in a different exhibit from Udit Tibrewal to you

15   and to Saulius Bakas, on February 23rd (As read):

16             "Hi, Michael, We need to test some of the

17             options for the periods Q1 through Q3 of

18             2004.  This includes grants, exercises and

19             cancellations."

20        We looked at a similar e-mail yesterday, is that right?

21        And your response at the top (As read):

22             "Are you kidding??"

23        Do you see that?

24   **A**     Yes, I do.

25   **Q**     "This is ridiculous."  Do you see that?

1   **A**    Yes, I do.

2   **Q**    The "Regards" I think was an automatic signature for you

3   at the time?

4   **A**    No.  I erased what I put there, and put "Regards."

5   **Q**    The "Are you kidding?? This is ridiculous," those were

6   your words, is that fair to say?

7   **A**    I then subsequently followed that with an e-mail to

8   Saulius.

9   **Q**    And, we saw some of those e-mails yesterday?

10  **A**    Right.  So, taken that out of context, looking at the date

11  and the attachments, and the fact that they had already tested

12  Q1, -2 and -3 prior to this, you know, kind of fills in the

13  blanks.

14  **Q**    Is it fair to say that in any of the e-mails that we've

15  seen, including this one, that you told -- that you did not

16  tell the auditors that, in fact, the third quarter 2004 grants

17  had been priced at the end of the quarter?

18  **A**    That's probably fair to say.  It's also fair to say that I

19  did exactly what they asked for.

20          **MR. TASHJIAN:**  I've got nothing further.  Thank you,

21  Your Honor.

22          **THE COURT:**  All right, thank you.

23          Now, normally, ladies and gentlemen, we would proceed

24  with redirect of Mr. Pattison.  But because of the scheduling

25  issue we have with a witness who's from out of town, we're

1    going to sort of interrupt -- we sort of did this before --

2    we're going to interrupt -- and I will do a pop quiz again to

3    make sure you are paying attention -- we're going to interrupt

4    the testimony of Mr. Pattison, and allow the Defendant to call

5    their next witness.  And then after that, we'll resume.  Okay?

6              So, you may step down.

7              **THE DEFENDANT:**  Thank you.

8              **MR. RICHARD:**  Thank you very much, Your Honor.  We

9    will call Professor Kenneth Lehn, L-E-H-N.

10             **THE COURT:**  All right.

11             (Witness placed under oath)

12             **THE CLERK:**  Thank you.  Please be seated, and speak

13   clearly into the microphone.

14             Please state your full name, and spell your last

15   name.

16             **THE WITNESS:**  Kenneth M. Lehn, L-E-H-N.

17             **THE COURT:**  Thank you.  You may proceed, Mr. Richard.

18             **MR. RICHARD:**  Thank you, Your Honor.

19                       **KENNETH M LEHN, Ph.D.,**

20   called as a witness for the Defendant herein, having been first

21   duly sworn, was examined and testified as follows:

22                       **DIRECT EXAMINATION**

23   **BY MR. RICHARD:**

24   **Q**    And, good morning.

25   **A**    Good morning, Mr. Richard.

1  Q    Can you tell us -- by the way, there's some water up

2  there, if you need a cup as we get going here.

3  A    Okay, great.

4  Q    Can you tell us what your profession is, sir?

5  A    I'm a professor of finance.

6  Q    And, where are you a professor of finance?

7  A    At the University of Pittsburgh.

8  Q    And, have you been retained as an expert by the attorneys

9  for Mr. Pattison in this matter?

10 A    Yes, I have.

11 Q    And before we get to those opinions, it might be helpful

12 to go through your background a little bit.

13      Can you tell us what courses you teach as the professor of

14 finance at the University of Pittsburgh?

15 A    Well, I've taught a variety of finance classes, mostly at

16 the graduate level, at the University of Pittsburgh, both in

17 the business school and in the law school.

18      In recent years, most of my teaching has been in the area

19 of business valuation, which encompasses how you value a

20 company, how you estimate the value of the company.

21 Q    And are the law school students a little slower than the

22 business school students?

23 A    (Laughter)  Not at all.

24 Q    All right.  And, for the courses you teach, are there some

25 common methodologies that you cover when it comes to valuing

1  companies, or the stock of companies?

2  **A**    There are.  There are a couple of methods that are widely

3  used, both in the academic community as well as in the business

4  communities.  And, the most prominent method is referred to as

5  the discounted cash flow method.

6      So, I teach an entire course that teaches students how to

7  use the discounted cash flow method of valuing companies.

8  **Q**    And, can you give us just an overview as to what that

9  method -- without getting down into the nitty-gritty, we're not

10  taking your course for credit today.

11      But if you can give us the overview, when you say "the

12  discounted cash flow method."

13  **A**    Sure.  It's almost universally accepted in the finance

14  profession that the value of a company is equal to the present

15  value of its expected cash flows.  And, its cash flows are

16  different from its earnings.

17      So, an important part of that course and an important part

18  of understanding how to value companies is understanding which

19  accounting variables are important and which are not important

20  for purposes of valuing a company.

21      You know, some accounting numbers are more of the

22  bookkeeping variety.  They don't really inform you about the

23  economic condition of the company.  And when you're valuing a

24  company, you are really trying to value the cash flows which do

25  measure the economic condition of the company.

1  Q    Okay.  Thank you for that overview.

2       And, do stock options arise in the context of your

3  valuation course work?

4  A    They -- they do.  Employee stock options represent a claim

5  on the assets of a company.  And because those options may be

6  exercised, they potentially will dilute the value of the

7  remaining shares.

8       So when one is trying to value the stock of a company,

9  i.e. estimated stock price, one has to take into account the

10 value of all the outstanding employee stock options.  Not just

11 the granted options over some period, but the total number of

12 outstanding options.

13 Q    And what's the word you use for that consideration?

14 A    Well, I think you're referring to the term "dilution."

15 That employee stock options potentially will dilute the value

16 of the outstanding shares.  And for that reason, one has to

17 take that into account when you value a company.

18 Q    Okay.  And before we talk about accounting variables, and

19 dilution, and how those things are similar or different, can

20 you describe your employment background, beginning with -- have

21 you ever been employed by the United States Securities and

22 Exchange Commission?

23 A    Yes.  I had two stints with the SEC.  From 1984 to 1985, I

24 was Deputy Chief Economist.  And from 1987 to 1991, I was Chief

25 Economist.

1  Q    And, can you describe for us what that entailed, what your

2  responsibilities were as either Deputy Chief Economist or Chief

3  Economist?

4  A    Well in both positions, I had certain supervisory

5  responsibilities, if you will.  And, our office served three

6  roles at the Commission.

7      A very important part of our function was to work with the

8  Division of Enforcement and the regional offices of the SEC.

9  And assist them in enforcement matters.

10     A second part of the position was to oversee the

11 publication of studies that our office would put out, that

12 would be of general interest concerning the operation of

13 securities markets.

14     And then, a third function was to evaluate policy

15 proposals, either proposals from the U.S. Congress or proposals

16 from within the SEC, to regulate securities markets.

17 Q    And, can you let us know -- when you were Chief Economist

18 for the United States Securities and Exchange Commission, the

19 first area you mentioned was Division of Enforcement.  What is

20 the Division of Enforcement?

21 A    The Division of Enforcement is an office within the SEC

22 that has responsibility for bringing enforcement actions

23 against those that might have violated securities laws.

24 Q    Enforcement action, like the one that brings us here?

25 A    Correct.  Technically, there are regional offices of the

1  SEC as well.  And, organizationally, whether that's part of the

2  Division of Enforcement or not, I don't know.

3  Q    But for those matters where you were working with the

4  Division of Enforcement, what would your role have been, as the

5  economist?

6  A    Well, it varied from case to case.  But I would say the

7  overwhelming majority of cases were ones in which either I or

8  the office that I directed was asked to determine whether

9  certain information would have been material to investors.

10 Q    And, when you say "whether information would have been

11 material to investors," what was your understanding of the

12 phrase "material information"?

13 A    Well, my understanding of "material information" is as

14 follows:  Information is material if it is likely that it would

15 significantly alter the total mix of information about a

16 security, and that it is information a reasonable investor

17 would consider in making a decision to buy or sell the

18 security.

19     And that was an understanding that I came to, based on a

20 Supreme Court case.

21 Q    And was that your understanding of "material information"

22 at the time you worked with the SEC?

23 A    Yes.

24 Q    And, can you briefly describe for us -- I don't think I

25 had you do this -- your educational background?

1  **A**    Sure.  I received a bachelor of arts degree in economics

2  from Waynesburg College, a small school in Pennsylvania, in

3  1975.  And then I received a master's of arts in economics from

4  Miami University in Ohio, in 1976.

5      And then, I received a Ph.D. in economics from Washington

6  University in St. Louis, in 1981.

7  **Q**    And, have you published any writings, any articles, books,

8  things of that nature?

9  **A**    I have.  I've edited one book, and published approximately

10  40 articles in academic journals or scholarly books.

11  **Q**    And what's the general subject matter of those 40

12  articles?

13  **A**    Most of them address issues related to corporate finance

14  or the workings of securities markets.  And then, I have a few

15  that look at the economics of Major League Baseball.

16  **Q**    Well, let's talk about those.

17      Do any of the publications, other than the ones having to

18  do with Major League Baseball, deal with issues related to this

19  case, as you understand it?

20  **A**    None of the publications deal with the specific issue at

21  hand in this matter.  But, several of the publications address

22  issues related to how information affects the valuing of

23  company stock.

24  **Q**    And what do you mean by that, "how information affects the

25  value of company stock"?

1  **A**    Well, how the release of new information would affect a

2  company's stock price, and conditions under which it might, and

3  conditions under which it might not.

4  **Q**    Okay.  And have you, for any of the professional journals

5  you referred to, have you served as an editor or on any of the

6  boards of those journals?

7  **A**    Yes.  I've been on the editorial board of approximately

8  six to eight journals.  And I also am the founding editor of a

9  journal called *The Journal of Corporate Finance,* which I, along

10 with someone else, started back around 1993.

11 **Q**    And what does it mean to be -- what does an editorial

12 board do, of these journals that you've identified?

13 **A**    Well, these are journals that are referred to as

14 peer-reviewed journals.  And what that means is when people

15 submit the paper to the journal, they ask to have it considered

16 for publication.  And the editorial board then will send those

17 papers out to peers, academic peers, who will review the papers

18 and make sure that the papers conform with accepted practice in

19 the profession, and that there's a scientific basis for the

20 conclusion's that they reach.

21     So, it largely is a supervisory role, if you will, to make

22 sure that the quality of the papers is what it should be.

23 **Q**    And, for the papers that you've had published, would those

24 have gone through that same peer-review process?

25 **A**    Most of them, yes.  That's right.

1  Q    Okay.  Have you ever been retained as an expert witness

2  before?

3  A    I have, yes.

4  Q    In what types of subject matters?

5  A    Well, there have been a variety of matters.  But I would

6  say most of them have involved issues related to whether

7  information is material.  And specifically, whether it's

8  material to investors.

9       And then, another group of cases has involved an issue

10 referred to as "loss causation," which examines whether alleged

11 misstatements caused losses to investors.

12 Q    Have you ever been retained by the United States

13 Securities and Exchange Commission in any of those matters?

14 A    I have, yes.

15 Q    On about how many occasions has the SEC retained you as an

16 expert in matters of economics?

17 A    Somewhere in the vicinity of ten to 12 times.

18 Q    And, those would be matters where you would -- the

19 expectation would be that you would be testifying, in

20 deposition or in court?

21 A    I can't speak to what the Commission's expectation was,

22 but certainly, in many of those cases, I did testify.  Both in

23 deposition and in court.

24 Q    And, when you worked with the United States Securities and

25 Exchange Commission, as an expert on issues of materiality in

1  other litigation, did you use a different definition of

2  "material information"?

3  **A**    No.  I, in those matters was asked by the SEC to assume

4  the same definition that I'm assuming in this matter.

5  **Q**    Okay.  Have you worked with any other branches of the

6  federal government, as an expert?

7  **A**    I've also been retained by the Department of Justice,

8  maybe five or six times.

9  **Q**    Would you say there's any relationship between the matters

10  you worked on for either the SEC and the Department of Justice

11  and the matter that brings you here?

12  **A**    Yes.  Most of the matters with the Department of Justice

13  involved the issue of whether or not information was material.

14  And as best as I can recall, all of the matters that -- on

15  which I have been retained by the SEC have been matters in

16  which I have been asked to form an opinion as to whether

17  information was material.

18  **Q**    When the SEC retains you, are you paid?

19  **A**    Yes, I am.

20  **Q**    And, are you being paid for your time here today?

21  **A**    I am, yes.

22  **Q**    Can you tell us what it was you were asked to do in this

23  particular matter?

24  **A**    I was asked to analyze the economic evidence concerning

25  the materiality of the accounting expenses that are at issue in

1    this matter.

2    **Q**    And sir, can you give us an overview -- did you reach any

3    conclusions in that regard?

4    **A**    I did, yes.

5    **Q**    And what -- what, in general, are your conclusions in this

6    matter?

7    **A**    I have three conclusions.

8          The first conclusion is that Embarcadero's SEC filings

9    contained all of the relevant information that investors would

10   want to know in order to assess the effect that Embarcadero's

11   employee stock options would have on the value of its stock,

12   and hence, its stock price.

13         Second, I concluded that market participants would not

14   have obtained any additional relevant information about the

15   impact of the employee stock options on its stock price --

16   Embarcadero's stock price -- if Embarcadero had used the

17   allegedly proper methodology for accounting for stock options.

18         And then, third, the economic evidence, in my opinion,

19   does not support the SEC's allegation that the alleged

20   misstatements in this matter were materially misleading.

21   **Q**    Okay.  Let's talk about your first opinion, if we could,

22   sir.

23         In general, do stock options affect the value of a

24   company's stock?

25   **A**    They do, yes.

1  Q    And, is it that concept of dilution you alluded to

2  earlier?

3  A    That's correct.

4  Q    Can you explain to us -- we've heard the phrase "dilution"

5  in this case.

6       Can you explain for us, from the perspective of an

7  economist looking at the economic evidence, what information

8  would one need to know about the employee stock options to make

9  that evaluation of dilution or potential dilution?

10  A    Well, the information about the stock options that one

11  would need to know is, what is the exercise price of the

12  options; how much time is left before the options expire, which

13  is sometimes referred to as the remaining contractual life.

14       And then third, you would need to know how many options

15  are outstanding.  Not just the number that were granted over

16  some period of time, but the total number of options that are

17  outstanding.

18  Q    Can you explain that difference between options

19  outstanding and options granted, briefly?

20  A    Sure.  In any given point in time, there's a total amount

21  of options outstanding.  And then over a course of some time,

22  let's say a year, a company may grant new options.  And, you

23  would then add those newly-granted options to those that were

24  outstanding at the beginning of the period.

25       And then also during the course of the year, some options

 1  will be exercised, which means they're converted from options

 2  to stock.  So you would subtract the amount that are exercised.

 3      And then finally, there are some options over the course

 4  of the year that are cancelled.  And you would then subtract

 5  those cancelled options as well.

 6      So, the bottom line is that over the course of a year, you

 7  would have to adjust the outstanding options at the beginning

 8  of the year for those options granted, those options exercised,

 9  and those options cancelled.

10  **Q**    Okay.  And -- thank you.

11      And with respect to the information about the exercise

12  price of the outstanding options, and the time left -- what you

13  called the remaining contractual life of those options, and

14  then the number of options outstanding, based on material you

15  reviewed, did Embarcadero Technologies disclose that

16  information to its shareholders or investors?

17  **A**    Yes.  All of that information was disclosed in its 10-K

18  filings.

19  **Q**    Do you have a binder there in front of you, sir?

20  **A**    I do.

21  **Q**    One of the exhibits in this case that I believe is already

22  in evidence is Exhibit 401.  The annual report for the year

23  2000.

24      Is this one of the documents you reviewed in this matter?

25          (Document displayed)

 1              (Witness examines document)

 2   **A**    Without vouching for every page, it appears to be, yes.

 3   **Q**    And, where would we find the information about the

 4   exercise prices, remaining contractual life, and number of

 5   outstanding options in this particular 10-K from Embarcadero

 6   Technologies from the year 2000?

 7              (Witness examines document)

 8   **A**    Yeah, that would appear on Page 46.

 9   **Q**    Okay.

10          **MR. RICHARD:**  Can we find that, Jonathan?  I think

11   it's up at the top there.  Thank you.

12              (Document displayed)

13          **MR. RICHARD:**  And now, can you go back to the

14   preceding page?  And there's a heading that will need to carry

15   over, I think, where it says "Options Outstanding, Options

16   Exercisable."

17              (Document displayed)

18          **MR. RICHARD:**  Right.

19   **BY MR. RICHARD:**

20   **Q**    Would it be helpful if we put all of that on the same

21   page?

22   **A**    Sure.

23          **MR. RICHARD:**  Okay.  Is that something you can cut

24   and paste, Jonathan?

25              (Document displayed)

```
 1              MR. RICHARD:  Some of that's a little small.  I don't

 2    know if you can all see that.

 3              Maybe you can enlarge just the heading up there,

 4    "Options Outstanding, December 31st, Weighted."

 5              Went away.

 6              (Document displayed)

 7              MR. RICHARD:  There we go.  Okay.  Then as we go

 8    through it, Jonathan, I may have you blow up the various

 9    headings.  But, let's get into the discussion.

10    BY MR. RICHARD:

11    Q    Can you explain what it is we're looking at in this annual

12    report filed with the SEC for Embarcadero Technologies for the

13    year 2000?

14    A    Sure.  And again, the three pieces of information that one

15    would need to know about the option in order to estimate the

16    effect of the options on the stock price would be first, the

17    number of options that are outstanding.

18    Q    Do you want to use the little pointer?

19    A    Sure.

20    Q    I would do it, but --

21    A    Try to shoot all the way across there?

22    Q    Let's see, if you can't do it --

23    A    There we go (Indicating).

24    Q    There we go.  Bulls-eye.

25    A    That's the total number of options outstanding as of the
```

1   end of the year 2000.  And, it's 3,944.  But those numbers are

2   expressed in thousands, as you see up there (Indicating), so

3   3,944 actually represents 3.944 million options outstanding as

4   of December 31st, 2000.

5   **Q**   Okay.

6   **A.**   The second piece of information is the exercise price.

7   And you see right there this column here is the

8   weighted-average exercise price.  And it gives you that

9   weighted-average exercise price for all of the options.  And

10  the total at the bottom is 10.01.

11       And then it breaks it out in a more granular way for

12  different options with different exercise prices.

13  **Q.**   And can you explain that for us?

14  **A.**   Sure.  What -- what Embarcadero has done here, and what

15  companies typically do, is they not only give you information

16  about all the options, but then they break it down into ranges

17  of exercise prices.

18       So here they're telling you there's a group of options

19  that have an exercise price of 5 cents.  There are 175,000 of

20  them.  They have a remaining contractual life of 7.2 years.

21  And they have a weighted-average exercise price of 5 cents.

22       And then you go down to the next one.  It tells you there

23  are options with an exercise price of 25 cents, and the same

24  type of information.

25       Then there's a group of options with exercise prices

1  between 50 cents and a dollar twenty-five.  And they give you

2  that information.

3      And, of course, all of that information ultimately totals

4  to one grand number down here.  So they give you the total

5  number, but then they give you a more granular description of

6  the options.

7      So they tell you the total number of options, which you

8  need.  They tell you the weighted-average exercise price, which

9  you need.  And then they also tell you the weighted remaining

10  contractual life; how much time is left before the options

11  expire.

12      And those are the three pieces of information about the

13  option that an investor would need to know in order to

14  determine the impact that the options have on the company's

15  stock price.

16  **Q.**   And can you explain that for us?

17  **A.**   Well, again, the options may be exercised.  And when

18  they're exercised, they will dilute the value of the

19  outstanding shares.

20      And there are ways to assess the value of the options.

21  And the three variables about the options that are necessary to

22  assess their value are the number of options; the

23  weighted-average exercise price; and the weighted remaining

24  contractual life.

25      And all of those are disclosed in Embarcadero's 10-Ks.

1  **Q.**    And why is it that, if stock options are actually used and

2  changed from a potential an actual share of stock -- why would

3  that -- when you say "dilute" the value, what is the thought

4  behind that?

5  **A.**    Well, when the holder of an option exercises the option,

6  they receive shares in exchange for their option.  So they will

7  pay the exercise price to the company, and then they will get a

8  newly issued share.

9       So when options are exercised, that increases the number

10  of shares that will be outstanding.  And that means,

11  effectively, that there is less value for the other

12  shareholders, because the equity value of the company is now

13  being divided among a larger number of shares.

14  **Q.**    And if one wanted to determine what the likelihood is of

15  the exercise price, an economist would look at this type of

16  information -- or an investor -- and make that determination?

17  **A.**    Yes.  There's a -- there are a number of option pricing

18  models, but the most prominent is one referred to as the

19  "Black-Scholes model."

20       And Black and Scholes developed a way to price options in

21  the early 1970s.  And Scholes won a Nobel prize for it.  It's

22  been widely recognized; widely embraced by not only the

23  academic community, but the business community.  And

24  individuals can actually use Black-Scholes.  There's a

25  Black-Scholes app. for your iPhone.  And you can --

1          **MR. RICHARD:**  I don't have that one.  Oh, that's

2    because I don't have an iPhone, but --

3          **THE WITNESS:**  You can use it in E*Trade.  It's a

4    complicated formula, but it's very easy to use.  It's sort of

5    like:  Understanding how to amortize your mortgage might be

6    complicated, but you can plug numbers in your computer and get

7    a very good estimate of that.

8          So the Black-Scholes model is widely used, and

9    certainly used by investment professionals that follow

10   companies and issue reports on companies.

11         And the three variables that are necessary in

12   Black-Scholes to estimate the value of the outstanding

13   options -- the three variables about the option are the number,

14   the exercise price, and the remaining contractual life.

15         And, as Mr. Richard describes, essentially the reason

16   those variables play a role is they tell you something about

17   the likelihood that the options will be exercised.

18   **BY MR. RICHARD:**

19   **Q.**   Have you looked at Embarcadero's annual reports for other

20   periods?

21   **A.**   Yes, I have.  In addition to the Year 2000 10-K, I also

22   looked at the 10-Ks for 2001 through 2005.

23   **Q.**   And is the same information regarding -- the same

24   information from which a reasonable investor could calculate

25   the impact of the outstanding stock options in the other annual

 1  reports?

 2  **A.**    Right.  The numbers, of course, are different year to

 3  year, but the very same type of information is disclosed in the

 4  other 10-Ks as well.

 5  **Q.**    And do you have Exhibit 225 in the binder in front of you,

 6  sir?

 7  **A.**    I have a 225A.

 8  **Q.**    This should be towards the back.  It's -- well, I'm not

 9  sure what it is.

10         **THE COURT:**  225A is the tab.  I don't know if that's

11  the same thing.

12         **MS. LAMARCA:**  It doesn't have it.

13         **MR. RICHARD:**  Yeah.  It should be in your binder

14  towards the back, right before Exhibit 434, your Honor, as we

15  get into the --

16         **THE COURT:**  The 434?

17         **MR. RICHARD:**  Right.  After 4-1; the one we were just

18  looking at.

19         **THE COURT:**  I don't have it.

20         **THE WITNESS:**  225A here?

21         **THE COURT:**  My binder is 225A.

22         **MR. RICHARD:**  Sorry about that.  I thought these were

23  extras.  Here's one for your Honor.

24         **THE COURT:**  I have it.

25         **MR. RICHARD:**  Very good.

 1            THE COURT:  It says "225A."

 2            MR. RICHARD:  That's what I keep trying to say on the

 3  record:  225A, which are the pages from the various 10-Ks.

 4            THE COURT:  That is in the binder.  Not 225.  225A.

 5            MR. RICHARD:  225A.

 6  BY MR. RICHARD:

 7  Q.  Can you tell us, sir, what 225A represents?

 8  A.  In 225A contains the similar disclosures that were made by

 9  Embarcadero in 10-K filings for years 2001 through 2004.

10  Q.  So these are portions from the 10-Ks that were filed with

11  the SEC?

12  A.  That's correct.

13            MR. RICHARD:  And, your Honor, we'd move this

14  collection into evidence as 225A.

15            THE COURT:  Any objection?

16            MS. LAMARCA:  We note that these are already in the

17  record but we don't object to this compilation.

18            THE COURT:  All right.  So it is a compilation of

19  different years.  Is that what it is?

20            MR. RICHARD:  Yes, your Honor.

21            THE COURT:  All right.  No objection.  Then 225A will

22  be admitted.

23            (Trial Exhibit 225A received in evidence)

24            MR. RICHARD:  Thank you.

25

1  **BY MR. RICHARD:**

2  **Q.**   And, rather than go through each of those years, let me

3  ask you, sir.  Are you familiar with the term "intrinsic value"

4  as it applies to employee stock options?

5  **A.**   Yes.

6  **Q.**   And in general, can you tell us what your understanding of

7  the term "intrinsic value" is for employee stock options?

8  **A.**   Sure.  If the stock price of a company is greater than the

9  exercise price of the option, the intrinsic value of the option

10 is simply the difference between the stock price and the

11 exercise price.

12      So, for example, if a company's stock price is $10, and

13 the exercise price of the option is $8, the intrinsic value

14 would be $10 minus $8, or $2.

15      And the information that conveys is that if the holder of

16 the option were to exercise it today, they would pay $8.  The

17 stock is worth 10, so they would make a profit of $2.

18      So effectively, the intrinsic value is telling you

19 something about the profitability of exercising the option if

20 the option was exercised today.

21      If the stock price of a company is equal to the exercise

22 price, the intrinsic value is zero.  So if the exercise price

23 is $10, and the stock price is $10, then there is no profit.

24 $10 minus $10 is zero.

25      And if the stock price is less than the exercise price,

1  the intrinsic value is zero, on grounds that if the stock price

2  was less than the exercise price, you wouldn't exercise the

3  option, so you wouldn't make a profit.

4      So if the stock price is $8, and the exercise price is

5  $10, the intrinsic value would be zero.

6  Q.   Okay.  And so what are the two pieces of information -- or

7  what would I need to know if I wanted to determine the

8  intrinsic value of my options on any given day?

9  A.   Yeah.  On any given day, there are only two pieces of

10 information you need to know to calculate intrinsic value.  You

11 need to know the exercise price of the option, and you need to

12 know the stock price on that day.

13 Q.   Wouldn't I need to know when the option was first

14 approved?

15 A.   No.  That would be completely irrelevant.

16 Q.   Wouldn't I need to know when the option was issued?

17 A.   No.  That also would be irrelevant.

18 Q.   How about when the option was born?

19 A.   No.  Never heard that expression, but that would not be

20 relevant as well.

21 Q.   All right.  Have you prepared something so we can follow

22 this a little bit easier, rather than me fumbling through?

23 A.   I have.

24 Q.   Can we take a look at -- I think it should be in your

25 binder -- Exhibit 915?  It should be the first slide.  Yeah.

1   There we go.

2       So we're looking at a slide on the screen that -- can you

3   just -- I think you've just explained this for us.  Can you

4   briefly walk us through these different examples?  You have

5   on -- you know, why are you talking about current information,

6   and measurement date, or historic information?

7   **A.**   Sure.  This is just a -- an illustrative example of why it

8   doesn't matter what the status of the option was at the time it

9   was granted for determining the intrinsic value at some later

10  date.

11      So, if you focus on the right side of the chart, you see

12  we have three options there.  Each row is a different option.

13  And you see that, based on current information, the company's

14  stock price is $40.  That's this column right here.  So $40.

15  And you see that the exercise price of the three options is

16  identical.  Each of them has an exercise price of $30.  So the

17  intrinsic value today is $10.  And that's true for each of the

18  three options.

19      And whenever the stock price is greater than the exercise

20  price, we claim that the option is in-the-money.  So, as of the

21  current information, all three options are in-the-money.  And

22  all three have the same intrinsic value of $10.

23      Now, if we go to the left-hand side of the chart, we see

24  that the stock price of this company was different when the

25  options were initially granted, based on the measurement date

1  that we have up here.  So you see, again, all three have

2  exercise prices of $30, but the first one was issued at a time

3  when the stock price was $10.  The second one was issued when

4  the stock price was $30.  And the third one was issued when the

5  stock price was $50.

6       And so the first one was out-of-the-money when it was

7  issued.  The second was in-the-money.  And the third -- I'm

8  sorry -- was at-the-money.  And the third was in-the-money.

9       But none of that information -- none of the information

10 about the status of those options at the time they were granted

11 is relevant for calculating the subsequent intrinsic value.

12      The only thing that affects the intrinsic value later is

13 what the stock price of the company was later, in comparison to

14 the exercise price.  How the stock price compared to the

15 exercise price at some earlier date is completely irrelevant.

16 **Q.**  Okay.  And could the investors of Embarcadero have

17 estimated that intrinsic value of Embarcadero's outstanding

18 stock options on any particular date, by using that information

19 you've already told us about?

20 **A.**  Yes.  All of the information to calculate the intrinsic

21 value was disclosed in Embarcadero's 10-K filings.

22 **Q.**  Okay.  And did you prepare a slide that can explain that

23 to us?

24 **A.**  Yes.

25 **Q.**  I think it's Slide 916.  Can you tell us what this is,

1  sir?

2  **A.**   Yes.  This is an example of how an investor would be able

3  to calculate the intrinsic value based on the disclosures that

4  Embarcadero made.  And this information is identical to the

5  information that we saw earlier from Embarcadero's 2000 10-K.

6  **Q.**   Mm-hm.

7  **A.**   And you see over on the far left, it tells you the source.

8  It's the 2000 10-K.  Embarcadero filed this with the SEC on

9  March 20th of 2001.  And Embarcadero's stock price on

10  March 20th, 2001, closed at $15 and 87 and a half cents; so

11  15.875.  That was its stock price when the market first

12  received this information.

13       What I then did was I took the information from the 10-K

14  that tells you how many options are outstanding.  And it tells

15  you the weighted-average exercise price for the different

16  ranges of exercise prices.

17       And then all I did was I calculated the intrinsic value

18  for each group of options.  I just took the stock price of $15

19  and 87 and a half cents, minus the weighted-average exercise

20  price of .05:  5 cents.  That gives you an intrinsic value per

21  option of $15 and 82 and a half cents.

22       So this column is simply the stock price on the filing

23  date, minus the weighted-average exercise price.  And then the

24  intrinsic value of $15 and 82 and a half cents times the number

25  of options -- 175,000 -- gives you an intrinsic value for this

1    range of $2.769 million.

2        And then you do the same for each other set of options.

3    You're always taking the difference between the stock price and

4    the weighted-average exercise price, multiplied by the number

5    of options.  That gives you the intrinsic value.

6        When you get down to this range of options, you see the

7    intrinsic value is zero, simply because the weighted-average

8    exercise price is now higher than the stock price.

9        And then, to get a sum of the intrinsic value for all of

10   the options, you just add up this very last column.  And you

11   see that as of 2000, an investor would be able to determine

12   that the intrinsic value of the outstanding employee stock

13   options was approximately $38 million.

14   **Q.**   And you did that calculation for March 20th, 2001.  Could

15   you have done that for some date -- some other date?

16   **A.**   Sure.  The only thing, again, you'd have to update is the

17   stock price.  The weighted-average exercise prices would remain

18   the same.  And, as the stock price of the company changed, then

19   the intrinsic value would change.

20   **Q.**   Okay.  So, based on your review of the economic evidence

21   from Embarcadero's own filings, did Embarcadero hide the fact

22   that it had millions of options outstanding at the end of any

23   given year?

24            **MS. LAMARCA:**  Objection, your Honor.

25            **THE COURT:**  Grounds?

 1          **MS. LAMARCA:**  Pardon?  The grounds are that this is

 2   beyond the expert's report; whether the company hid the fact

 3   that -- how it had a certain number of options outstanding.

 4          **THE COURT:**  All right.  Why don't you rephrase the

 5   question?

 6          **MR. RICHARD:**  Sure.

 7   **BY MR. RICHARD:**

 8   **Q.**   Could a reasonable investor have determined from the

 9   information you just walked through whether the company had

10   millions of stock options outstanding?

11   **A.**   Yes, they could have, rather easily.

12   **Q.**   Okay.  Could a reasonable investor have determined under

13   the methodology you've just described for us that those

14   outstanding unexercised options were potentially worth tens of

15   millions of dollars?

16   **A.**   Yes, they could have.

17   **Q.**   That's what I meant by "it wasn't hidden from the

18   investors," right?

19   **A.**   I understand.  Correct.

20   **Q.**   Okay.  So let's shift gears.  You talked about accounting.

21   I think you called them "accounting variables."

22          I want to ask you some questions about stock-based

23   compensation.  In general, can you give us your understanding

24   of what stock-based compensation is?

25   **A.**   Sure.  Stock-based compensation expense is an accounting

1  entry that companies record on their financial statements when

2  they grant options to employees.

3  **Q.**   Okay.  And does that expense reflect any cash expenditure

4  by the company at that point in time?

5  **A.**   No.  Stock-based compensation expense is a noncash

6  expenditure.

7  **Q.**   So, from an economic-materiality point of view, is a

8  dollar of stock-based compensation expense the same as a dollar

9  that's spent on something else?

10 **A.**   No.  A cash expenditure is an expenditure that reduces the

11 cash that a company has.  And at the end of the day, the value

12 of the company is the present value of the cash flows that it's

13 expected to generate.

14     So if a company, for example, goes to Office Depot and

15 buys $100 of pens, and writes a check for $100, that represents

16 a cash outflow of cash leaving the firm.

17     If a company records a stock-based compensation expense of

18 $100, no cash leaves the firm.  It's -- it's not a cash

19 expenditure, and it doesn't convey information about the

20 underlying economic condition of the firm.

21 **Q.**   Well, is there some relationship between the historic

22 compensation expense that a firm would record, and the

23 intrinsic value of the stock options you've been telling us

24 about?

25 **A.**   There's no relation whatsoever that -- the historical

1   stock-based compensation expense has no correspondence to

2   subsequent intrinsic value of the options, which is what

3   investors want to know.

4   **Q.**    And have you prepared a slide that can briefly illustrate

5   that point for us?

6   **A.**    I do.

7   **Q.**    I think it's Slide -- what is it?  917?  Is that right?

8   **A.**    That is correct.

9   **Q.**    And can you give us an overview?  I think you've made the

10  point, but tell us what it is you're showing on Slide 917.

11  **A.**    Well, again, this is similar to the first slide, where we

12  have these three options, all with the same exercise price of

13  $30.

14  **Q.**    Mm-hm.

15  **A.**    And the current information shows the company's stock

16  price is $40.  So the intrinsic value on this date of all three

17  options is $10.

18       Now, you might recall from the first slide that this first

19  option had an exercise price of $30, but the company's stock

20  price was $10 at the time it was granted, which means that that

21  was an out-of-the-money option, and there would be no

22  compensation expense recorded, because the intrinsic value,

23  when granted, was zero.

24       The second option has an exercise price of 30.  And when

25  it was granted, its stock price was 30.  So its intrinsic value

1  at the time it was granted was zero, and therefore, its

2  compensation expense would have been zero.

3      And then, finally, the last one was the option which had

4  an exercise price of 30, but it was granted when the company's

5  stock price was 50, so the intrinsic value of the this option

6  at the time of grant would have been 20, and the required

7  compensation expense on the income statement would have been a

8  $20 compensation expense.

9      But again, recall that at a subsequent date, the intrinsic

10 value of each of those options is $10, which means that

11 whatever the compensation expense is, measuring the intrinsic

12 value at some earlier date is completely irrelevant.  What

13 matters later is the relation of the company's stock price to

14 the exercise price.

15     And again, the intrinsic value for all three is $10 at the

16 later date, even though they had different compensation expense

17 reported on their income statement.

18 Q.  So can you put this in the context for us?  Assume that

19 Embarcadero awarded some stock options in 2003 with an exercise

20 price tied to the company's stock in July 2003, so that the

21 exercise price and the company's stock would have been the

22 same --

23 A.  Mm-hm.

24 Q.  -- as reflected in the stock option agreement.  Are you

25 with me?

1  **A.**    I am.

2  **Q.**    Can you walk us through the relationship between the

3  intrinsic value of those stock options going forward, and the

4  company's stock price compared to the compensation expense

5  you've been talking about?  And do you have an exhibit so we

6  don't have to do it twice?

7  **A.**    Right.  There is an exhibit in the -- in the notebook

8  here.

9  **Q.**    Okay.  Can we look at Exhibit 918?  So, in general, tell

10  us what's going on with this illustration.

11  **A.**    Well, what you see here is how the intrinsic value of a

12  group of Embarcadero options changed over time.  And if you

13  look at the horizontal axis of this line right down here

14  (indicating), that's just giving you different dates.  So it

15  begins over on the far left here -- July 2nd, 2003 -- and it

16  goes all the way out to April 2nd, 2007.  Actually, a little

17  beyond that, to May of 2007.

18      The vertical axis -- this line that goes up and down --

19  measures the intrinsic value of these options on these

20  different dates.

21      And these options have an exercise price of $6.79.  And

22  that exercise price was established based on Embarcadero's

23  stock price on July 1st, 2003.  So Embarcadero's stock price on

24  that date was $6.79, which means the intrinsic value of those

25  options on that date were zero, because the stock price was

1    $6.79; the exercise price was $6.79.  So you can see that the

2    intrinsic value on that date is zero.

3         You see that over time, the intrinsic value starts to

4    increase.  And it increases substantially over $3 million.

5         And the reason for that increase is that Embarcadero's

6    stock price was rising.  The exercise price isn't changing.

7    And, again, the intrinsic value is just the difference between

8    the stock price and the exercise price.  So as Embarcadero's

9    stock price increases the intrinsic value of these options

10   increases.

11        And then you see the intrinsic value decreases.  And the

12   reason the intrinsic value decreases is that the stock price

13   now is falling.  And --

14   **Q.**   So, yeah.  Let me stop you there.

15        So from your perspective, assume that the SEC is claiming

16   that the company should have recorded a compensation expense of

17   $1.34 million for these -- this batch of stock options.  Would

18   that compensation expense tell a reasonable investor anything

19   about the intrinsic value of those stock options at any

20   particular point in time?

21   **A.**   Absolutely not.  And that compensation expense is that

22   red, dotted line.  And you see that it appears.  There's maybe

23   only one day during this whole period where the intrinsic value

24   of these options would be equal to the compensation expense

25   that is being claimed; but on every other day, you see that the

1   intrinsic value is different than that compensation expense

2   number.  And that's why the compensation expense number on the

3   income statement conveys no information to investors about the

4   impact of the employee stock options on the company's stock

5   price.  And that's why that information is simply not material

6   to investors.

7   Q.   Okay.  If we had more time, I guess we could prepare for

8   the quiz with additional materials, but let's move on as we

9   approach the lunch hour.

10       You've told us about intrinsic value.  We've talked about

11  a historic compensation expense for this noncash item.  Are you

12  familiar with the term "time value," as it applies to stock

13  options?

14  A.   I am, yes.

15  Q.   And, in general, what is time value?

16  A.   Time value is additional value that an option may have,

17  simply because the stock price may increase further, in which

18  case the intrinsic value of the option would increase.

19  Q.   So can an option that has no intrinsic value have time

20  value?

21  A.   It can, because even though it may not have intrinsic

22  value today, it may have intrinsic value some time over the

23  life of the option, as the company's stock price increases.

24  Q.   And have you heard of the term "fair value" in connection

25  with employee stock options?

1  **A.**    Yes.  Fair value is simply the sum of intrinsic value and

2  time value.

3  **Q.**    So what's the relationship between fair value and

4  intrinsic value?

5  **A.**    Fair value will always be greater than or equal to the

6  intrinsic value.

7  **Q.**    Okay.  So I think you told us that intrinsic value of a

8  stock option doesn't depend on the price of the underlying

9  stock on the day the stock option was approved, issued, or

10  granted.  Did I get that right?

11  **A.**    That's correct.

12  **Q.**    Does the time value of an employee stock option on any

13  particular date depend in any way on what the price of the

14  company's underlying stock was on the date of approval, grant,

15  or issuance?

16  **A.**    No, not at all.

17  **Q.**    And can you explain that?

18  **A.**    Well, again, in estimating the fair value of the options,

19  one wants to know what the exercise price is and how much

20  remaining contractual life there is.  One then wants to know

21  what the stock price is on the date that you're trying to value

22  the option, and what the stock price was at any earlier date.

23  Whether it be a grant date, a measurement date, an approval

24  date, is completely irrelevant.  The only thing that matters on

25  the day you're trying to value the option is:  What is the

1  stock price on that day?

2  **Q.**   Did the company disclose information regarding the fair

3  value of its outstanding stock options?

4  **A.**   Yes, it did.

5  **Q.**   And do we find that also in the -- I think we looked at

6  Exhibit 401, which is the complete annual 10-K for the year

7  2000.  Do you have that in front of you still?  It looks like

8  on page 47, there's a section actually entitled, "Fair Value

9  Disclosures."  Is that where we might find the fair value

10  disclosures?

11  **A.**   That's correct.

12  **Q.**   Okay.  So there we go.  So can you just explain to us

13  what -- what this additional information tells us about the

14  employee stock options?

15  **A.**   Sure.  What Embarcadero did in this disclosure was they

16  provided information about its estimate of the fair value of

17  options that were granted to employees during that year.  And

18  they provide that -- you can see this header is "Fair Value

19  Disclosures."  And then they provide information about how the

20  net income of the company would have been affected if the

21  fair-value number had been entered as a compensation expense on

22  the income statement.  So it's clear as can be for investors to

23  see the impact of the fair value of the option grants on the

24  net income of Embarcadero.

25       And then on the next part of page 47 -- so the second page

1   in the notebook binder -- it provides you with the information

2   that went into its estimate of the fair value.  And then it

3   ends by telling you what the weighted average per share fair

4   value of common stock options granted were during 1998, 1999,

5   and 2000.

6        So it's giving you the fair value divided by the number of

7   shares, so that shareholders could see the per-share impact of

8   those fair value -- the fair value of the option grants.

9   Q.   So from your perspective, what additional information does

10  the fair-value calculation, including the *pro forma* numbers

11  that we see here, provide over the intrinsic value that you

12  talked about earlier?

13  A.   Well, again, the fair value is going to be larger than the

14  intrinsic value, because the fair value is the intrinsic value

15  plus the time value.  So this is actually a larger number than

16  the intrinsic value that allegedly should have been reported on

17  the income statement.

18  Q.   Okay.  And are you familiar with a study published by the

19  Congressional Budget Office that pertains to stock options?

20  A.   I am, yes.

21  Q.   And can you tell us --

22           **MR. RICHARD:**  You can take that down.

23  **BY MR. RICHARD:**

24  Q.   Can you tell us briefly:  What is the Congressional Budget

25  Office?

**A.**    The Congressional Budget Office is an arm of Congress that

publishes studies and projects budget deficits, and, in the

past, budget surpluses.

**Q.**    And sometimes referred to as "the CBO"?

**A.**    Correct.

**Q.**    Did you have any dealings with the CBO while you were with

the SEC?

**A.**    I had some interaction with CBO when I was at the SEC,

yes.

**Q.**    Okay.  And can you describe that briefly?

**A.**    Well, the CBO would often do studies for congressmen and

senators.  And while I was at the SEC, there were some

issues -- like corporate takeovers, and the stock-market crash

of 1987 -- that were big issues.  And my recollection is that I

had interaction with the Congressional Budget Office on some of

those issues.

**Q.**    Now, with he respect to the CBO study on employee stock

options, did that provide any comfort or input for the opinions

you've shared with us here today?

**A.**    I wouldn't necessarily say comfort or input; but it's

certainly consistent with -- with my testimony today, where the

Congressional Budget Office evaluated a proposal by the

Financial Accounting Standards Board to require fair-value

disclosures to be on the income statement.

      And, in a nutshell, what they concluded was that if

1  markets are efficient, which we presume they usually are, that

2  all of the information that's in the footnotes should already

3  be reflected in the company's stock prices, and then adding

4  additional information on the income statement would not add

5  any value relevant information to investors.

6       In addition to proffering that statement, the

7  Congressional Budget Office evaluated a number of studies.  And

8  their conclusion from the studies were that change in the

9  accounting rules to require more compensation-based

10 expenditures to be put on the income statement would likely

11 have no impact on the company's stock prices.

12 **Q.**   Okay.  Assume that a suggestion's been made in this case

13 that -- "but the income statement would be affected by the

14 amount of this noncash compensation expense; therefore, it

15 would impact earnings.  Doesn't that tell us that it is

16 material?"  Would you agree with that?

17 **A.**   Not at all.  And again --

18 **Q.**   Why not?

19      How's that for drama before we go to lunch?

20 **A.**   As I indicated before, you know, not all accounting

21 information is relevant for the valuation of companies; that

22 there is a fair amount of accounting information that is more

23 of the bookkeeping variety; that things have to be in order,

24 but they don't really tell you anything about the economic

25 condition of the company; namely, its ability to generate cash

1  flows, which is really what's going to drive the value of the

2  company.  And this is one of them.

3       And even if cosmetically the earnings were to become more

4  negative or even if they went from positive to negative, it

5  would have absolutely no bearing on the value of the company's

6  stock.

7  **Q.**  And is there any literature that supports your firm

8  observation in that regard?

9  **A.**  There is, you know, an abundant academic literature that

10  addresses these issues in general; and some that address the

11  issue of employee stock options, showing that the market does

12  pay attention to the footnote disclosures; and then, more

13  generally, a large literature in finance and accounting that

14  talks about accounting numbers that do matter, and accounting

15  numbers that don't matter.

16  **Q.**  And can you take a look at Slide 919 that you prepared,

17  and tell us what this means with respect to this relationship

18  between a company's earnings and their stock price?

19  **A.**  Well, this is just one of many examples that one could

20  point to, but it's an article by three prominent accounting

21  professors -- Kinney, Burgstahler, and Martin -- in the *Journal*

22  *of Accounting Research*, December 2002.  And it reads, quote,

23            "45 percent of firms' earnings

24            surprises are associated with returns with

25            the opposite sign."

1    Closed quote.

2        And what that means is that when companies announce

3    earnings, there is often a so-called "surprise element" to the

4    announcement.  And the way the surprise is measured is you look

5    at what the analysts were forecasting, and then you look at the

6    difference between what the company actually reports in

7    comparison to what the analysts were forecasting.

8        So if the company reports earnings of 50 cents a share,

9    and the analysts were forecasting 40 cents a share, that would

10   be viewed as a positive surprise.

11       If a company reports 30 cents a share, and the analysts

12   have been forecasting a 40 cents a share, that would be a

13   negative surprise.

14       Academics have looked at how companies' stock prices react

15   to unexpected earnings.  And what you find is that often, when

16   there's a positive surprise, there is a negative effect on the

17   stock price.  And often, when there's a negative surprise,

18   there's a positive effect on the stock price.

19       So -- and the reason is that -- often, the reasons for

20   these surprises have nothing to do with the economic condition

21   of the firm.  Every firm --

22   **Q.**   Can you explain that, when you refer to the "economic

23   condition of the firm," in relationship to its reported

24   earnings?

25   **A.**   Sure.  You know, a good example is:  Often announcements

1    of write-downs of assets.

2         So you all probably recall that during the so-called

3    "Tech Bubble," there were a lot of internet stocks that had

4    risen in value.  And then, with the stock market decline in the

5    early part of the millennium, a lot of these values fell

6    dramatically.  And there were a lot of companies that had

7    Internet properties.  And when they reported their earnings,

8    they would take write-downs to reflect the fact that the value

9    of those properties had declined.

10        The market had already recognized that.  And so when

11   companies would take these charges, their earnings would often

12   fall dramatically.  And yet the market was -- would often

13   ignore it; sometimes would actually react positively.  Even

14   though the earnings were coming down, it might react positively

15   because it recognized that already.  And it didn't think that

16   that write-down had any bearing on the future prospects of the

17   company.

18        So in that way, one has to be very discriminating in

19   understanding how earnings are related to stock prices.

20   There's not a mechanical one-for-one relation between earnings

21   and stock-price movements.

22   Q.   And when you refer to "future prospects of the company,"

23   what are you referring to, in general?

24   A.   The ability of the company to generate future cash flows.

25   Q.   Okay.  And are you saying that not every accounting

 1   bookkeeping entry provides economic information on the

 2   prospects of future economic cash flows?

 3   **A.**   That's correct.

 4   **Q.**   Okay.  I'd like to switch gears very briefly, if we could.

 5        We've heard testimony in this case about certain

 6   disclosures that were made in 2006 -- late 2006 -- regarding

 7   whether the company could timely file its required 10-Ks; its

 8   quarterly reports with the SEC.

 9        Have you -- have you looked at any of those announcements?

10   **A.**   I have.  Yes.

11   **Q.**   One of those was from November 10th, 2006.  It's

12   Exhibit 434.  I believe it's already in evidence.

13            **THE CLERK:**  Yes.

14   **BY MR. RICHARD:**

15   **Q.**   Do you have that in front of you, sir?

16   **A.**   I do.  Yes.

17            **MR. RICHARD:**  And if you could, enlarge --

18   **BY MR. RICHARD:**

19   **Q.**   So just tell us, for the jury, what is this document from

20   November 10th, 2006?

21   **A.**   This is a press release issued by Embarcadero

22   Technologies.  And it indicates that it submitted to the

23   Securities and Exchange Commission a notification of late

24   filing pursuant to Rule 13(b)(25) of the Securities Exchange

25   Act of 1934 related to its quarterly report on Form 10-Q for

1   the third quarter ended September 30th, 2006.

2   **Q.**   Sir, the press release also refers to the company's

3   accounting for certain stock option grants made in 2000 and

4   2001, right?

5   **A.**   That's correct.

6   **Q.**   Well, assume that the company's stock price dropped when

7   this press release came out.  Doesn't that tell us that that

8   historic APB 25 compensation expense must have been materially

9   relevant to reasonable investors?

10  **A.**   Not at all.

11  **Q.**   Why not?

12  **A.**   Well, there was other information contained in its press

13  release.  And the last line of the third paragraph of the press

14  release states,

15              "The company is currently unable to

16              determine the impact, if any, this filing

17              delay may have on the completion of the

18              proposed merger."

19              And about two months before this announcement,

20  Embarcadero announced that it agreed to be acquired by a

21  company named "Thoma Cressey"; a private equity firm.  And when

22  that announcement was made, Embarcadero's stock price rose

23  substantially, which is typically the case when companies

24  announce that they have agreed to be acquired.

25              When information subsequently comes out that

1  jeopardizes the acquisition, stock prices of those companies

2  typically fall, because the market -- i.e., investors -- now

3  believe that that takeover premium is less certain.

4        And the very likely reason for the decline in

5  Embarcadero's stock price on this date was the fact that the

6  market believed that the takeover had become less likely.

7  **Q.**   And why doesn't that tell us that this historic

8  compensation expense under APB 25 was therefore important, or

9  it would have been important to shareholders back in 2000

10 through 2004?

11 **A.**   Well, again, the stock-price reaction to this

12 announcement, in my opinion, was related to the fact that the

13 market believed the takeover was less likely; not because of

14 the information in this press release about accounting for

15 certain stock option grants.

16       At previous points in time, there was no takeover

17 proposal.  So it's completely irrelevant for understanding

18 whether or not the alleged accounting improprieties in this

19 matter would have had a material impact on Embarcadero's stock

20 price.

21 **Q.**   Does this announcement in November 2006 tell potential

22 investors whether there would be a restatement in connection

23 with stock options?

24 **A.**   No, there's no reference to a restatement.  There's no

25 reference to even which way some possible restatement may

 1    occur.

 2         At this point, there's just a vague reference to the fact

 3    that the company is evaluating its accounting for certain stock

 4    option grants made in 2000 and 2001.

 5    Q.   Okay.  And you mentioned uncertainty.  In general, is

 6    there a correlation between uncertainty of the type announced

 7    here, and stock price?

 8    A.   Well, as a general matter, the market does not like

 9    uncertainty, so uncertainty is not a good thing.  And

10    uncertainty of this sort certainly would not be a good thing

11    for Embarcadero.

12    Q.   Okay.  And when you referred to -- that there's other

13    information -- you've talked about the delay in filing, and the

14    unknown impact that might have on the proposed merger.  Is

15    there a word in your line of work for that type of other

16    information that's contained in this sort of news release?

17    A.   Well, in the academic literature it's referred to as

18    "confounding information."  When multiple pieces of information

19    hit the market at the same time, it becomes difficult to

20    understand which piece of information is the one that's

21    actually driving the stock price.

22    Q.   And have you looked at other disclosures regarding

23    Embarcadero Technologies that were submitted in press releases

24    after November 10th, 2006?

25    A.   Yes, I have.

1    **Q.**    And do those other disclosures also have elements of both

2    uncertainty and confounding information?

3    **A.**    They do.  Yes.

4    **Q.**    And what is it about uncertainty or confounding

5    information that makes it, in your opinion, inappropriate to

6    draw a connection between the disclosure of the information and

7    the response to the company's stock price?

8    **A.**    Well, again, the problem is, assuming one has a clean

9    announcement that pertains to the restatement, which we don't

10   have here, but assuming that there was such a clean statement,

11   if that was accompanied by other information, such as "The

12   takeover may not occur.  There's uncertainty about the

13   takeover," there would be no scientific basis to conclude that

14   the stock price declined because of the information about a

15   potential restatement.

16   **Q.**    Okay.  So I think that brings us back to -- can you tell

17   us how a reasonable investor looking at the economic

18   information between 2000 and 2004 could use or would use the

19   APB 25 noncash compensation expense when making investment

20   decisions?

21   **A.**    Yeah.  The APB stock-based compensation expense, in my

22   opinion, would be completely irrelevant to an investor in

23   attempting to measure the impact of the employee stock options

24   on the company's stock price.

25           **MR. RICHARD:**  Okay.  I think that's all I have at

 1   this point, your Honor.

 2             THE COURT:  All right.  We will go ahead and take a

 3   break:  Our lunch break.

 4             If I can ask you to come back and 12:30, slightly

 5   shorter than normal by five minutes; but I want to make sure

 6   we're able to complete this witness' testimony.  I appreciate

 7   it.

 8             THE CLERK:  All rise for the jury.

 9             (Jury out at 11:58 a.m.)

10             THE CLERK:  Please be seated.

11             THE COURT:  Okay.  What do we need to talk about?

12             We're going to complete this testimony.

13             It sounds like we're still going to have to go

14   through, tomorrow morning, the completion of Mr. Pattison's

15   testimony.

16             MR. RICHARD:  Just so I'm clear, the ball's in my

17   court on Mr. Pattison?

18             THE COURT:  Yep.  It's passed to you.

19             And then you will let counsel know whether you intend

20   to call another witness --

21             MS. LAMARCA:  Yes.

22             THE COURT:  -- in rebuttal.

23             And this will -- you need to let me know, because

24   that will inform the question of whether we have to have the

25   jury instructions ready.  And -- I mean, because if you don't,

1  and everybody rests, then -- then we've got to get the jury

2  instructions finalized, and you deliver your closing arguments.

3         So have you submitted anything?

4         These two instructions we've talked about -- have you

5  all had a chance to talk about it?

6         **MS. LAMARCA:**  We learned last night that one of

7  them -- I don't think we've gotten the edits -- but that the

8  defendant might have some editorial suggestions to one, but

9  would reject another.

10        **MR. RICHARD:**  I think we can probably talk it through

11 pretty quickly when we talk about the jury instructions.

12        The parties are talking, but you know, our view of

13 what's appropriate and what's overreaching and where you draw

14 that line is a challenge.

15        **THE COURT:**  Well, let's do this.

16        I mean, we can -- looks like we'll have to defer

17 until first thing tomorrow morning, in all likelihood, because

18 I have to leave right at around 2:30.  So I'd like to have your

19 final positions.  And if you'd stipulate, that would be a very

20 short conversation; if not, we'll have to have a more extended

21 conversation.

22        So why don't we get together again at 8:00 tomorrow?

23        **MS. LAMARCA:**  Thank you.

24        We should be back here at 12:30?

25        **THE COURT:**  Yes.  Yes.  Thanks.

1          (Whereupon there was a recess in the proceedings

2           from 12:01 until 12:30 p.m.)

3          (The following proceedings were held in open court,

4          outside the presence and hearing of the jury.)

5          **THE COURT:**  In terms of the time, you used about 70

6    minutes of your hour and a half.  So you've got about 15, 20

7    minutes on redirect.

8          **MR. RICHARD:**  Very good.  You notice I have my watch

9    out.

10         **THE COURT:**  Yes.  I noticed that.  That was the best

11   examination you've had.

12         (Jury in at 12:32 p.m.)

13         (The following proceedings were held in open court,

14         in the presence of the Jury:)

15         **THE CLERK:**  Please be seated.

16         **THE COURT:**  Okay.  Welcome back one more time.  We

17   are now in the process of --

18         Hold on.

19         Okay.  I was about to start the cross of

20   Professor Lehn, but in light of this note, what I think I'd

21   like to do is excuse you for a couple of minutes so I can talk

22   with the attorneys.

23         So why don't we take a very short break?

24         (Jury out at 12:33 p.m.)

25         (The following proceedings were held in open court,

```
 1                     outside the presence and hearing of the jury.)

 2              THE COURT:  All right.  Maybe we should have the

 3   witness excused for a moment, if he could step outside.

 4              THE WITNESS:  Sure.

 5              THE COURT:  Professor.

 6              THE WITNESS:  Sure.

 7              THE COURT:  Okay.  Very substantive question from

 8   someone on the jury.

 9                  "Professor Kenneth Lehn explained that

10                  Exhibit 916, total intrinsic value, was

11                  38,316,175, with the understanding that the

12                  exercise price was $30.  What impact, if

13                  any, does a lower or higher total intrinsic

14                  value mean for market participants looking

15                  at 10-K filing?  For example, $10 million

16                  versus $60 million?  What I'm trying to

17                  understand is:  Does picking the low for

18                  the quarter price have any impact on market

19                  perception?"

20              So I think, having read that, I'm going to just leave

21   it to you -- both of you.  I'm not a hundred percent sure I

22   totally understand it, but you probably do.  And -- to respond

23   to this, if you wish, in your cross and in your redirect.

24              MS. LAMARCA:  Sure.  I think that's fair, your Honor.

25              THE COURT:  Okay.  Anybody want me to read it again?
```

1          **MR. RICHARD:**  No.

2          **MS. LAMARCA:**  No.

3          **THE COURT:**  Okay.  All right.

4          I'm going to announce that I have shared this with

5   counsel.

6          **MS. LAMARCA:**  Certainly.  Thank you.

7          (Jury in at 12:36 p.m.)

8          (The following proceedings were held in open court,

9          in the presence of the Jury:)

10         **THE CLERK:**  Please be seated.

11         **THE COURT:**  Okay.  You're getting your exercise

12   today.  I have shared the question I received from one of the

13   jurors.  And I've shared that with the parties and counsel.

14         So -- well, so you'll see if it's answered or not,

15   but I have shared it.  So why don't we go ahead and resume and

16   start with cross?

17         **MS. LAMARCA:**  Sure.

18         (Witness resumes stand.)

19                      **KENNETH LEHN, PH.D.,**

20   called as a witness for the Defendant herein, having been

21   previously sworn, resumed the stand and testified further as

22   follows:

23                      **CROSS EXAMINATION**

24   BY MS. LAMARCA:

25   **Q.**   Good afternoon.

1  **A.**    Good afternoon.

2  **Q.**    I'm Suzy LaMarca.  I'm with the Commission.

3       And Wendy just handed you a binder of documents.  We may

4  go through some of them; we may not.  I recognize you want to

5  get out today, so I'm going to try to keep my questions snappy.

6  We're all about efficiency.

7  **A.**    Thank you.

8  **Q.**    So let me just ask you first about sort of the nature of

9  your opinions in this case.  If you -- if I understand right,

10 you do not have any opinions that you've expressed in this case

11 about whether Embarcadero's financial statements complied with

12 Generally Accepted Accounting Principles.  Is that right?

13 **A.**    That's correct.

14 **Q.**    Okay.  And you would also agree that you're not qualified

15 to give such an opinion, right?

16 **A.**    That is correct.

17 **Q.**    And you don't have an opinion about whether Embarcadero

18 accounted for the issuance of employee stock options in

19 accordance with APB 25 in the relevant time period.  Is that

20 right?

21 **A.**    That's correct.

22 **Q.**    Okay.  And you also don't have an opinion about whether

23 stock options in this case were backdated or granted

24 retroactively.  Is that right?

25 **A.**    That also is correct.

1  **Q.**   And you didn't find any language in Embarcadero's balance

2  sheet or its income statement or its statements of cash flows

3  or in any of its footnotes to its financial statements between

4  2000 and 2005 that actually disclosed that Embarcadero granted

5  stock options to employees in hindsight or at the end of the

6  quarter.  Is that right?

7  **A.**   I don't recall seeing that.

8       I never set out to look for that, but I don't recall

9  coming across that.

10 **Q.**   So that is not your opinion in this case.  Is that

11 correct?

12 **A.**   That's correct.

13 **Q.**   And so it's also not your opinion, if I understand

14 correctly, that Embarcadero's public filings accurately

15 disclosed the fair value of employee stock options pursuant to

16 FAS 123, right?

17 **A.**   That's correct.

18 **Q.**   And so, just to sort of orient us, that F-A-S or FAS 123

19 calculation -- that was what you were pointing to on exhibit

20 401:  The 2000 10-K, page 47.  Do you remember that in your

21 direct?

22 **A.**   I do.

23 **Q.**   Okay.  So that's the -- excuse me -- the calculation that

24 the company did, using the Black-Scholes model.  Is that right?

25 **A.**   I presume it was using the Black-Scholes model.  I don't

 1  recall whether they disclosed the methodology specifically that

 2  they used.  They certainly did list the other variables that

 3  would be necessary to implement Black-Scholes.

 4  **Q.**   And so if -- if I understand this right, they did that in

 5  2000, 2001, 2002, 2003, and 2004.  Is that right?

 6  **A.**   That's correct.

 7  **Q.**   Okay.  So I'll ask you.  I think this is in that white

 8  binder, but it's only a couple of select pages; pages from a

 9  longer Exhibit 409, if we could pull that up.  It should be, I

10  think, the very last tab in your binder, actually, because we

11  added it at the end.

12         Okay.  So this is the December 31, 2002, 10-K.  And

13  to make it a little easier to find, I just printed out for you

14  the pages.  Page 52, I think, is what we'd like to look at.

15         So actually, Mr. King, if you could, scroll to --

16  well, this is fine, actually, as it is.

17  **BY MS. LAMARCA:**

18  **Q.**   Now, do you see here the -- one of the tables that you

19  look at for your analysis:  The number of options outstanding?

20  **A.**   Yes.

21  **Q.**   Okay, but on this very same page --

22         **MS. LAMARCA:**   And if, Mr. King, you could blow up --

23  just show the whole page.

24  **BY MS. LAMARCA:**

25  **Q.**   Okay.  And that number of options outstanding is that

1   lower table that carries over to the second page.  Is that

2   correct?

3   **A.**   Yes.  The number of options outstanding appears twice.  In

4   that first set of numbers, if you look at the first column over

5   on the right-hand side, it's the number of options

6   outstanding --

7   **Q.**   Mm-hm.

8   **A.**   -- which is 4,419.  And again, that's in thousands.  So

9   it's 4.419 million.

10       It also appears at the bottom of the next set of numbers,

11  because that's the more granular description of the options.

12           **MS. LAMARCA:**   Okay.  So if you could roll up,

13  Mr. King, to the top of the page, to the top of page 52 --

14  right.  There we go.

15  **BY MS. LAMARCA:**

16  **Q.**   So on this same -- and this is all in the footnotes to the

17  financial statements, correct?

18  **A.**   Correct.

19  **Q.**   And it's your opinion, as an economist, that the market

20  uses all of the information in the financial footnotes.  Is

21  that right?  Incorporates that into the stock price?

22  **A.**   Any information that would be relevant for the valuation

23  of companies would be used.  That's correct.

24  **Q.**   But I think the literature you were pointing at was

25  literature that says the market incorporates information that's

1  in the footnotes.  Is that right?

2  **A.**    That is correct.

3  **Q.**    Okay.  So if we look up in that same footnote, we see in

4  prose, in just regular language, that second line.

5                "Since the date of the initial public

6           stock offering, all option grants made

7           during the year were at fair market value,

8           which is defined as the closing share price

9           on the day prior to the option grant date."

10      Do you see that?

11  **A.**    I do.

12  **Q.**    But that language -- that's not part of your analysis in

13  this case?

14  **A.**    Well, I'm not sure what you mean by it's not part of my

15  analysis.

16      That statement, in and of itself, has no relevance for the

17  valuation of the outstanding employee stock options at some

18  later date.

19  **Q.**    And so you would agree, then, that your analysis is

20  separate from that language, in that your analysis doesn't

21  change the truth or falsity of that statement?  Is that right?

22  **A.**    I have no opinion about the truth or falsity of that

23  statement; but regardless of whether that statement is true or

24  false, none of my opinions would -- would be affected by that

25  statement.

1            **MS. LAMARCA:**  Okay.  And, Mr. King, can we flip back

2    to the prior page?

3    **BY MS. LAMARCA:**

4    **Q.**   Okay.  I just wanted to point out that that is in that

5    stock options plan footnote, because I'm not sure that was in

6    your little cribbed book.

7         Did you review the testimony -- the trial testimony of

8    Mr. Wallace, the -- an accountant in this case?

9    **A.**   I skimmed it.  I didn't study it closely.

10   **Q.**   Are -- did you note his testimony about whether or not

11   that FAS 123 footnote information was accurate?

12   **A.**   I don't recall that offhand.

13   **Q.**   Okay.  Did you recognize that the company did its FAS 123

14   calculation purportedly on the date of the grant?  They

15   calculated the value of those stock options on the date they

16   said they were granted?

17   **A.**   I don't recall any specific statements in that regard.

18   **Q.**   But you would agree that you didn't use that FAS 123

19   calculation in your analysis.  Is that right?

20   **A.**   I don't -- I'm not sure I understand what you mean when

21   you say I didn't use it.

22        I make reference to the fact that the fair value

23   disclosures were made; even that fair value disclosure was a

24   disclosure about their estimated fair value of options granted.

25   And, as I've indicated before and as I indicate in my report

1  and in my deposition, what matters to the market is not even

2  the value of the grant options, but the value of all

3  outstanding options as of the date that one is doing the

4  valuation.  And none of that information would be affected by

5  whether or not the fair-value calculations of the notes were

6  correct or not.

7  **Q.**   And, just so I understand your -- just your general

8  methodology for your analysis, when you're looking at this

9  table of estimated price -- I mean, of prices -- and you

10 have -- you use a weighted-average price, and you apply that to

11 the number of options outstanding, this is all to achieve an

12 estimate.  Is that correct?

13 **A.**   That is correct.

14 **Q.**   Okay.  I think also on your direct you mentioned something

15 I think we've heard about options here; that that price -- that

16 the invests -- the person who gets the option receives --

17       I'm sorry.  Let me start over.

18       The price on the option is the price that person who gets

19 the option has to pay to exercise it, right?

20 **A.**   Just to clarify, when you say "the price on the option" --

21 I think you're referring to the exercise price of the option.

22 **Q.**   Yes.

23 **A.**   That's correct.

24 **Q.**   So they pay that price to exercise their option, right?

25 **A.**   And again, just so as not to be confused over who "they"

1  are, the holder of the option will pay the exercise price in

2  order to purchase the share.  That's correct.

3  **Q.**  Okay.  So I'm going to try to ask you a hypothetical

4  question.  These are always difficult, so bear with me.  And

5  tell me if you lose track of any of the data that's important.

6      But I'm going to ask you to imagine an executive is

7  granted options on January 7, 2002.  And assume that the

8  company says, somewhat I like we saw in this exhibit here, that

9  we do not grant options to executives below the fair market

10 value on the day that they are granted.

11     And also assume for this question that the fair market

12 value was $20 on this January 7 date.

13     So we have a $20 fair market value.  Is that --

14 **A.**  $20 fair market value of the option or of the stock?

15 **Q.**  Of the stock.

16 **A.**  Mm-hm.

17 **Q.**  Okay.  And the company says, "We don't grant options at

18 below fair market value."  Okay.

19     So also assume that the company reports that the executive

20 was granted options on October 2, 2001, a couple of months

21 earlier, when the market was $7.

22     So the company tells the public, "We gave him a $7 option

23 at fair market value," but it's actually lower than the fair

24 market value when it was granted, so a $13 difference.  Is

25 that -- do you get that from my hypothetical so far?

1  **A.**    I think I understand so far.

2  **Q.**    Okay.  So would you agree that if the company had used the

3  true fair market value of $20, the executive would receive less

4  compensation in that example?

5  **A.**    And when you say "if they had used the fair market

6  value" -- of $20 to establish the exercise price?

7  **Q.**    Yes.

8  **A.**    As of that date, I would agree, correct.

9  **Q.**    In fact, substantially less compensation?

10 **A.**    Well, "substantial" would be in the eye of the beholder.

11 It would depend on how many options, and so on and so forth.

12     As of that day, that's correct; but again, the issue that

13 I'm addressing is the information that investors would

14 subsequently have to allow them to value those options.  And

15 that information was all fully disclosed.

16     So the value as of a grant date or any earlier date would

17 be irrelevant to any subsequent valuation of those options.

18 **Q.**    I understand that.  It's irrelevant to your analysis of

19 the subsequent valuation.  Is that right?

20          **MR. RICHARD:**  Objection.  Vague, your Honor.

21          **THE COURT:**  Overruled.

22          You can answer the question.

23          **THE WITNESS:**  Not just my analysis, but it's

24 irrelevant for the subsequent valuation of the option.

25

BY MS. LAMARCA:

**Q.**   Okay.  And so -- but you would agree that shareholders care about executive compensation, right?

**A.**   As a general matter, I would agree with that, yes.

**Q.**   Okay.  And that they care that people in management can't unduly influence their own compensation?

**A.**   I -- I don't have an opinion as to that.

**Q.**   Well, you've seen that in the literature, correct?

**A.**   Well, when you get into words such as "unduly," that starts to take on legal connotations, and connotations that go beyond my expertise as an economist.

**Q.**   Well, let me ask you.  Have you seen that type of literature written in the context of how material this sort of information is to investors?

**A.**   I'm not sure what you mean by "this sort of information."

**Q.**   Executive compensation, and the ability of an executive to change the price on certain compensation that he receives.

**A.**   I don't recall any specific academic literature that analyzes the materiality of that information; but as a general proposition, I can imagine there are cases where that would be material to investors.

**Q.**   Okay.  So let me go back to this hypothetical.

         We got the $20 -- the $20 and the $7.

         You would agree, I think -- tell me if you don't -- that if this executive exercised the option, the company would be

1  paid $13 less than it would have been paid had those options

2  been granted with the actual fair market value on January 7th?

3  **A.**    By definition, that's correct.

4  **Q.**    Okay.  And so that would be money that the company had to

5  forgo when the executive exercised his option?

6  **A.**    I don't know what you mean by "forgo."  I mean, it's a

7  lower number than it would be if the exercise price has been

8  set at a higher level; but again, the key for valuation is

9  whether that exercise price is disclosed.  And when it comes to

10  executives, there's even more granular disclosure of the

11  exercise price.

12       So if we're talking about the chief executive officer or

13  one of the senior officers, you get the weighted-average

14  exercise price of their individual options.  So the market --

15  i.e., investors -- would know what that exercise price is.  And

16  on subsequent dates, they would always be able to value those

17  executive options.

18  **Q.**    Well, you mentioned what I think is an interesting fact;

19  that this information about executive options does get

20  disclosed separately.  Is that right?

21  **A.**    That is correct.

22  **Q.**    And so that's because -- I think you might agree -- people

23  care about how well compensated executives are.

24  **A.**    Yeah.  I think as a general proposition, that is correct.

25  **Q.**    So, for instance, when you were working at the SEC, you

1  know about the filings of these forms called Forms 4 and

2  Forms 5 describing executives' ownership stakes in the company,

3  right?

4  **A.**    That's correct.

5  **Q.**    Okay.  And among those are when an executive is issued an

6  option, he's supposed to file a form that tells the public that

7  he received that option, right?

8  **A.**    That is correct.

9  **Q.**    And among the information is the price, the date he got

10  that option, and the number of shares, right?

11  **A.**    It's been a while since I've looked at the Form 4s, but I

12  think that's correct.

13  **Q.**    And nowadays, that data is stuff that people can actually

14  sift through, right, and use for studies?

15  **A.**    It's widely available.  That's correct.

16  **Q.**    Okay.  Are you aware of your peers using that information

17  in academic studies?

18  **A.**    Yes.

19  **Q.**    So in arriving at your opinions in this case, you didn't

20  interview any investors at Embarcadero.  Is that right?

21  **A.**    That's correct.

22  **Q.**    Okay.  And you didn't think it would be relevant to your

23  opinions to interview investors, right?

24  **A.**    That is correct.

25  **Q.**    Okay.  Have you heard of investors who make downward

1  adjustments to reported earnings of companies that issue stock

2  options to employees when they're considering whether or not

3  they should invest in those companies?

4  **A.**   I'm not aware of any specific investors that do that, no.

5  **Q.**   Well, have you heard of investors who have either sold

6  their company's stock or decided not to buy a company's stock

7  because of such a downward adjustment that they made in

8  assessing this company?

9  **A.**   I don't recall hearing about any such investors, no.

10 **Q.**   Well, would you agree that if an investor did that

11 analysis -- you know, subtracted his considered valuation of

12 options from earnings -- it would be an indication that that

13 investor cared about those stock options, and the impact on

14 earnings?

15 **A.**   I'm not sure I understand the question, ma'am.

16 **Q.**   Okay.  Let me withdraw that question.  It was a bad one.

17      Are you familiar with Warren Buffett's annual letters to

18 shareholders for Berkshire Hathaway?

19 **A.**   I know he writes them.  I don't think I've ever read one.

20 **Q.**   Have you read his op-ed pieces?

21 **A.**   I probably have over the years.  None come to mind, but --

22 **Q.**   Well, he's sort of well known for his strong opinions.

23 Would you agree?

24 **A.**   He's very well known.  That's correct.

25 **Q.**   And he likes to share some of his investment opinions with

1  the rest of the nation?

2  **A.**    He does.

3  **Q.**    So did you ever read Warren Buffett's 1998 letter to

4  shareholders in the Berkshire Hathaway materials to

5  shareholders?

6  **A.**    Not that I recall, no.

7  **Q.**    Were you aware of Warren Buffett --

8           **MR. RICHARD:**  Your Honor, I'm going to object if

9  Counsel's going to read from a hearsay document that the

10 witness has not read, reviewed, relied upon, and which has not

11 been established as an authoritative treatise through this

12 witness.  It's absolutely not appropriate, if that was her

13 intent.

14          **MS. LAMARCA:**  I have a few more foundational

15 questions for the witness.

16          **THE COURT:**  Okay.

17 **BY MS. LAMARCA:**

18 **Q.**    Okay.  I think you mentioned you have read his op-ed

19 pieces, correct?

20 **A.**    Again, none specifically come to mind, but I'm sure that

21 if he's written some, I probably have read them.

22 **Q.**    And would you consider Warren Buffett to be a sort of

23 leading presence in the country about investor issues and what

24 is important to investors?

25 **A.**    What do you mean by "leading presence"?

1  Q.   Okay.  Let me ask you.  You know that he's a fairly

2  well-known, renowned investor, correct?

3  A.   That is correct.

4  Q.   And I think your opinions here are about what you think is

5  important to investors.  Is that right?  To reasonable

6  investors?

7  A.   That is part of my opinion.  That's correct.

8       MS. LAMARCA:  Okay.  So, your Honor, I think at this

9  stage we would offer some of Mr. Buffett's statements about

10 stock options.  I don't know whether there would be an

11 objection.

12      MR. RICHARD:  Yes, your Honor.  It's not appropriate

13 cross-examination for this witness.  It's not something he's

14 read, reviewed, or relied upon.  It's external hearsay.  And if

15 they wanted to call an expert to present this material, that

16 was available to them, your Honor.

17      MS. LAMARCA:  Let me respond to that.

18      We don't know whether or not Mr. Lehn read what I

19 would show him, unless he can tell us that he didn't, because

20 we do have, in one of the shareholder letters, an op-ed piece.

21      MR. RICHARD:  Well, your Honor, we do know what he

22 read, because he submitted a report.  Pursuant to Rule 26, he

23 listed every single --

24      THE COURT:  Let's just say this.  The foundation has

25 not been laid.  If a foundation is established of what you're

 1   about to introduce is something that has been seen or read or

 2   considered by this witness, that's one thing; but so far, that

 3   foundation's not been laid.  And the fact of --

 4            **MS. LAMARCA:**  Okay.

 5            **THE COURT:**  -- possibly seeing an op-ed piece, but

 6   nothing specific, is not enough foundation.

 7            **MS. LAMARCA:**  Well, let me also offer to the Court

 8   that with an expert, I think it's just as important what the

 9   expert didn't read, in light of the opinions he shares.

10            **THE COURT:**  Well, yeah.  I think proper way to do

11   it -- there are other ways of getting it in.  This is not one

12   of them.

13   **BY MS. LAMARCA:**

14   **Q.**    Then I will first ask you to turn and just see if you have

15   read one of these pieces.  And I will ask you to turn to what

16   we've marked as Exhibit 662 in your binder.  And, if you could,

17   go to the last page of that document.

18   **A.**    Okay.

19   **Q.**    This is a *Washington Post* article.  I think you can tell

20   at the bottom.

21   **A.**    Yes, I see that.

22   **Q.**    You read the *Washington Post* from time to time?

23   **A.**    Every now and then.

24   **Q.**    And it's by Warren Buffett.  Do you see that?

25   **A.**    I do.  Yes.

 1  **Q.**   Do you think you read this article, or heard about it at

 2  the time?

 3  **A.**   I don't recall having read it, nor do I remember any

 4  discussion about it; but having said that, it's possible that I

 5  might have seen it at the time it was published.

 6          **MS. LAMARCA:**   Okay.  We would ask, with the Court's

 7  indulgence, to publish this to the jury.

 8          **MR. RICHARD:**   Again, your Honor, this is not

 9  appropriate cross-examination.

10          **THE COURT:**   Sustained.

11  **BY MS. LAMARCA:**

12  **Q.**   Well, let me ask you.  During the early 2000s, you would

13  agree, there was a fairly robust debate about the expensing of

14  stock options, correct?

15  **A.**   There was, yes.

16  **Q.**   Okay.  And that included important investors weighing in

17  on their views, right?

18  **A.**   That is correct.

19  **Q.**   And it included the Congressional Budget Office, as you

20  mentioned, weighing in on their views?

21  **A.**   Correct.

22  **Q.**   And there were views shared completely contrary to the

23  views described in the Congressional Budget Office memorandum

24  that you discussed earlier today, right?

25  **A.**   I believe there were, yes.

1  Q.   So those were investors who thought they should expense

2  those stock options and they should put the full expense in the

3  income statement, correct?

4  A.   You know, I don't recall who those investors were, so I

5  couldn't possibly tell you the reason for their position.

6  Q.   Well, I guess my question to you really is:  Do you recall

7  that there were people calling for this sort of expensing?

8  A.   There were people calling for this expensing.  That's

9  correct.

10  Q.   And would you agree that this was indication that there

11  were people who thought this was very important to be reflected

12  in earnings of a company?

13  A.   Presumably, there were some that thought it was important.

14  That's correct.

15  Q.   Did you just -- and you don't know whether or not you saw

16  the op-ed piece I showed you at the time.  Is that correct?

17  A.   That's correct.

18  Q.   But you saw others, if you didn't see this one?

19  A.   Again, no specific ones come to mind; but insofar that

20  there were op-eds on this topic, I very likely would have

21  reviewed them.

22  Q.   Okay.  Okay.  And I think earlier today -- excuse me -- we

23  were discussing a little bit or heard your discussion a little

24  bit about peer review.  You work on certainly journals that

25  review the actual submissions before they're published in the

1   journals, correct?

2   **A.**    That's correct.

3   **Q.**    And it's sort of a process that vets your opinions, is

4   that right, or whatever it is that you're trying to express in

5   a paper?

6   **A.**    Now again, I would view it more as a check on the

7   scientific integrity of the studies.

8   **Q.**    And one thing that might come out of a peer-review

9   situation is:  You think you have a really good idea, but in

10  the peer-review process, someone's critiques may point to

11  errors or data that's not accurate or something like that.  Is

12  that correct?

13  **A.**    That's correct.

14  **Q.**    Now, you haven't submitted your opinions in this case to

15  that sort of peer-review process.  That's right?

16  **A.**    Well, I've never submitted an opinion in a court case to a

17  peer-review process.

18  **Q.**    Well, let me rephrase the question for you.

19        You haven't written a paper that's been peer reviewed that

20  includes the very same opinions that you are sharing with us

21  today?

22  **A.**    Well, as I indicated on direct, I've never published a

23  paper that deals with the specific issue at hand; but I have

24  published papers that look at the relation between releases of

25  information, and how the stock prices of companies change.

1  **Q.**   Okay.  But more specifically, you wouldn't find a paper

2  among those that you've published that describes using that

3  tabular information that we saw in the 10-K as a substitute for

4  disclosures about the dates on which stock options were

5  granted.  Is that accurate?

6  **A.**   I'm sorry.  Can you repeat the question?

7  **Q.**   Actually, I'll just withdraw it.  Sounded like it was

8  confusing to you.

9       But you would agree that many academics, and

10  professors at business schools, and economists around the

11  country have written about backdating of stock options,

12  correct?

13  **A.**   Some have.  That's correct.

14  **Q.**   And those academics would probably disagree with your

15  opinion that investors wouldn't find backdating material?

16  **A.**   I don't know that any academics have written as to whether

17  the stock-based compensation would be material.

18       I know there are several that indicate that there's no

19  reason to believe that stock-based compensation would have any

20  direct effect on stock price.

21       So again, the issue that I'm addressing in this matter is

22  whether that information is material.  And I'm not aware that

23  that has been directly addressed in the academic literature.

24  **Q.**   Well, in this academic literature that you're thinking

25  of -- let's see if we're on the same page.  Well, this is

1  peer-reviewed academic literature you're referring to, correct?

2  **A.**    Correct.

3  **Q.**    Okay.  And ultimately, though, those peer-reviewed

4  articles in the academic literature -- they made a pretty big

5  splash when they were picked up by some of the financial press.

6  Is that right?

7  **A.**    I don't know which ones you're referring to.

8  **Q.**    Okay.  So let me -- actually, let me show you an article.

9  If we could turn to Exhibit 663 in your binder, this is a news

10  article dated March 18, 2006, from *The Wall Street Journal*.

11  Have you seen this article before?

12  **A.**    I have.  Yes.

13         **MS. LAMARCA:**  Okay.  We would move 663 into evidence,

14  your Honor.

15         **MR. RICHARD:**  It's hearsay, your Honor.  And it's not

16  something he read, reviewed, relied upon in the course of this

17  engagement; but having read a newspaper article doesn't make it

18  admissible, your Honor.

19         **THE COURT:**  All right.  I'm not going to admit it at

20  this point.

21         You can use it.  You can question him on it, and I'll

22  make a decision later whether it comes in.

23         **MS. LAMARCA:**  Sure.

24  **Q.**  Well, let me ask you.  If you will, do you remember the --

25  the news being broadcast that academics had been helping *The*

1   *Wall Street Journal* in trying to sleuth out whether there was

2   backdating at certain companies?

3   **A.**   I don't recall that specifically, no.

4   **Q.**   What part of that sounds strange to you?

5   **A.**   Most of it.

6   **Q.**   Okay.  You don't -- you remember this *Wall Street Journal*

7   article, correct?

8   **A.**   You say I remember it.  I think you asked me if I had seen

9   it, and I said "Yes" --

10  **Q.**   Okay?

11  **A.**   -- but I don't really remember the details of it.

12  **Q.**   In your business school, you use a text that borrows from

13  this article.  Is that right?

14  **A.**   I believe the Brealey/Myers/Allen book includes this

15  article in one of the chapters, that's correct.

16  **Q.**   Okay.  And so that text is -- you would consider that a

17  leading text in business schools around the world, wouldn't

18  you?

19  **A.**   I do.

20  **Q.**   That's an "authoritative treatise," as they call it?

21  **A.**   It is.  Yes.

22  **Q.**   Okay.  And that's -- that article talks about what they

23  call "the perfect payday," right?

24  **A.**   The article from *The Wall Street Journal* does.  That's

25  correct.

1   Q.   And that's the article that's in the Brealey and Myers

2   text, correct?

3   A.   Right.  And I think it's included in the Brealey/Myers

4   text in -- under a topic, "Finance in the News," as an

5   illustration of topics related to finance that appear in the

6   newspapers.

7   Q.   Okay.  So let me ask you.  You're familiar with a peer of

8   yours named Erik Lie, correct?

9   A.   I am.  Yes.

10  Q.   And you recognize him as someone who has written quite a

11  bit in the options-backdating arena.  Is that right?

12  A.   That's correct.

13  Q.   In fact, he was one of the people who provided information

14  to *The Wall Street Journal* in the spring of 2005 about

15  companies that he thought might be backdating.  Is that right?

16  A.   I -- I don't know that firsthand.

17  Q.   Well, you're familiar with his -- his work, his

18  literature, his -- the articles he's authored?

19  A.   Right.  I'm familiar with the papers that he's published;

20  but beyond that, I'm not familiar with any interaction he might

21  have had with *The Wall Street Journal*.

22  Q.   Okay.  Let me ask you to turn to what we've marked as

23  Exhibit 227.  It's kind of a poor copy quality, as we like to

24  say here so often every day; but do you recognize this as the

25  22nd chapter of the Brealey and Myers corporate-finance book?

 1  **A.**    Again, without vouching for every page, it does appear to

 2  be Chapter 22 of that book.

 3  **Q.**    Okay.  If you could, turn to the page within there that's

 4  numbered 604.  And I tell you it's -- 603 has a number, but I

 5  don't see it on 604.

 6         Do you see that?

 7  **A.**    I'm sorry.  Which one, ma'am?

 8  **Q.**    604.

 9  **A.**    Yes, I do see it.

10  **Q.**    "Finance in the News"?

11  **A.**    Correct.

12  **Q.**    "The perfect payday"?

13  **A.**    Right.

14         **MS. LAMARCA:**  Okay.  We would offer, your Honor,

15  Exhibit 227.

16         **MR. RICHARD:**  Again, your Honor, this treatise is

17  hearsay.  It's not how experts are examined or cross-examined.

18  I can move into evidence a number of treatises, and that's just

19  not -- it's hearsay, your Honor.

20         **MS. LAMARCA:**  I will lay a further foundation,

21  your Honor.

22         **THE COURT:**  All right.

23  **BY MS. LAMARCA:**

24  **Q.**    Mr. Lehn, you used this treatise in forming your opinions,

25  didn't you?

1   **A.**    I believe I made reference to it.

2   **Q.**    Seven times, in your report?

3   **A.**    I don't recall the exact number offhand.

4   **Q.**    Well, in order to describe how it was that one could value

5   an option, you cited to the Brealey and Myers treatise; this

6   very chapter, 22, correct?

7   **A.**    That is correct.

8   **Q.**    And you described this as an authoritative treatise?

9   **A.**    That's correct.

10          **MS. LAMARCA:**  We would move it in evidence,

11  your Honor, as an authoritative treatise.

12          **THE COURT:**  Are you talking about the entirety of

13  227?

14          **MS. LAMARCA:**  Yes.

15          **MR. RICHARD:**  Your Honor, all she's established is

16  that she can now ask him questions out of the treatise.  It

17  doesn't make the treatise itself admissible.  This is pretty

18  basic cross-examination of an expert.  It doesn't make the

19  entire treatise admissible.

20          **MS. LAMARCA:**  Your Honor, this treatise and this

21  chapter were used by this expert.  And that wouldn't even be

22  the requirement for an authoritative treatise under the federal

23  rules.

24          **THE COURT:**  Well, now, just because an expert relies

25  on a particular treatise or whatever -- unless you can convince

 1  me otherwise, I'm not convinced that that automatically results

 2  in, per se, admissibility.

 3          **MS. LAMARCA:**  Well, it is admissible when the expert

 4  relies on it and he recognizes it as an authoritative treatise,

 5  which Mr. Lehn did.

 6          **THE COURT:**  Is there something you want to ask him

 7  about this piece?

 8          **MS. LAMARCA:**  Sure.  Yes, I do.

 9          **THE COURT:**  Why don't you do that first?

10          **MS. LAMARCA:**  Okay.

11  **BY MS. LAMARCA:**

12  **Q.**   Can you turn to page 604?

13  **A.**   Sure.

14  **Q.**   And this is the description of the perfect payday.  Do you

15  see that?

16  **A.**   I think it's actually the article, if I recall correctly.

17  **Q.**   Well, this is sort of an excerpt from it.  If you -- if

18  you look at the description at the top of the page.  Do you see

19  that?

20  **A.**   Yes.  Okay.

21  **Q.**   Okay.  And so you would agree with me that, in balancing

22  out all of the information that this text wants to deliver to

23  finance students or business students, they've chosen to talk

24  about this stock -- how stock-options backdating sort of hit

25  the market?  Is that right?

1  **A.**   Well, I'm not sure what you mean by:  To illustrate a

2  point, they chose this article.

3       I, as a teaching method, very frequently -- almost every

4  day -- bring in articles from *The Wall Street Journal* that

5  address topics in finance that can be a springboard for

6  discussion.  And it doesn't mean you endorse everything in the

7  article.  And, quite the contrary, I often distribute articles

8  that have things in there that I think are incorrect, and it

9  makes for good class discussion.  And you want students to read

10 things that will get them to think about the topic.

11      So I think the fact that they included this *Wall Street*

12 *Journal* article under a category called "Finance in the News"

13 is more of a teaching tool than, necessarily, an endorsement of

14 what was in that article.

15 **Q.**   Well, if I could ask you actually to take a look at the

16 article that we looked at a moment ago, I think you might agree

17 with me that this is not simply a copying of that article,

18 which is Exhibit 663, into the textbook.  It's the textbook's

19 consideration of the article.  Is that right?

20 **A.**   It -- just to read the book, what it says -- it says,

21            "The following extracts are taken from

22       the article."

23            And then it goes on and includes those extracts.

24 **Q.**   Yeah.  And you're familiar with how the -- these "Finance

25 in the News" sort of describe the -- they excerpt it, and talk

1  about what's important about the article?  Is that accurate?

2  **A.**    I don't know whether it's what's important about the

3  article, or something that would be provocative that, after

4  reading a chapter about the theory of options, it would inspire

5  students to think about the application of that theory to these

6  topics.  And I think it is more in that spirit that textbooks

7  include articles from newspapers.

8  **Q.**    Okay.  Well, let me ask you a few questions.  Would you

9  agree that a key purpose of stock options is to give recipients

10 an incentive to improve their employer's performance, including

11 the employer's stock price?

12 **A.**    In many cases, I would agree with that.

13       In some cases, I think that's probably less of a reason to

14 grant stock options.

15 **Q.**    Well, would you agree that authoritative literature

16 considers that a key purpose of stock options?

17 **A.**    Yes, I think the literature generally would recognize that

18 that is a key reason for granting stock options.

19 **Q**    And so the effect is, if there's no stock gain for a

20 person who gets an in-the-money stock option, then there's no

21 profit on the options.

22 **A**    I would disagree with that.

23 **Q**    That if there's no -- there is no stock gain, that there's

24 no profit on the options when you get an in-the-money -- I mean

25 at-the-money option.

1          MS. LaMARCA:  I'm sorry; did I say "in-the-money"?

2          THE COURT:  Yes.

3          MS. LaMARCA:  I apologize.  Let me withdraw the

4   question.

5   BY MS. LAMARCA:

6   Q    The premise of granting options to employees at the money

7   is that they will work to build the value of the share price.

8   Is that correct?

9   A    Again, I think it is a little more complicated.  There

10  certainly are many, many cases where that may be a primary

11  motivation for granting options.  But, it also is the case

12  companies, especially young companies, are cash-constrained,

13  and they're growing.

14       And again, as we indicated, when stock options are granted

15  to employees, that represents a non-cash expense, if you will.

16  So for companies that are cash-constrained, granting options to

17  new employees can be a way to compensate them without

18  necessarily paying them cash.  And, that would be separate from

19  any incentive effect.

20  Q    So that's a way that the company can have lower cash

21  outlay, by granting options to employees.  Is that correct?

22  A    Well, again, the way I would phrase it is if a company is

23  cash-constrained, as a lot of young growing companies are, then

24  employee stock options can be very attractive, because it

25  allows you to attract good workers without paying any immediate

 1  cash outlay.

 2  Q    So, and whether or not they happen to be cash-constrained,

 3  a company can choose to give options instead of cash

 4  compensation.  Correct?

 5  A    That is correct.

 6  Q    So, backdating options so that they carry a lower price

 7  would run counter to the goal, that key goal that we mentioned

 8  a moment ago, the incentive.  Is that right?

 9  A    No.  Quite the contrary.  That, if an employee is granted

10  an in-the-money option, then they have even more to lose if the

11  stock price declines.  So, granting an in-the-money option

12  could actually strengthen the incentives that the employees

13  face.

14  Q    Well, you would agree that many academics wouldn't share

15  your opinion that that aids the incentive value of a stock

16  option, wouldn't you?

17  A    I can't speak for all academics.  I'm not aware of any, as

18  I sit here, that would -- would disagree with that.

19  Q    That would disagree with your opinion?

20  A    Correct.

21  Q    Okay.  Well, as you sit here, can you think of

22  authoritative texts that might disagree with that opinion?  For

23  instance, Brealey and Myers?

24  A    As I sit here, I don't recall that they disagree with what

25  I just said.

1  Q    You don't recall one way or the other, but you haven't

2  read this (Indicating) recently.  Is that right?

3  A    "This" being *The Perfect Payday*?

4  Q    This portion of this chapter, yes.

5  A    I haven't reviewed it all that recently, so I don't recall

6  specifically what they say about that.

7  Q    Okay.

8       So, if we cold go back a moment to these academics who

9  were doing studies about stock options backdating, you were

10 aware of their work at the time.  Is that correct?

11 A    Some of their work, that's correct.

12 Q    And Erik Lie is one of the people whose work you were

13 aware of?

14 A    That's correct.

15 Q    Were you also aware of a gentleman named Professor

16 Yermack, at NYU?

17 A    I'm familiar with his work, yes.

18 Q    And that was earlier in 1998.

19 A    I don't specifically recall his work on the so-called

20 backdating of stock options, but I'm familiar with his work,

21 generally.

22 Q    I'm sorry; I didn't mean to suggest that his work was

23 about backdating specifically, but about stock options that

24 appeared to be low-priced.

25 A    I -- I generally remember.  I don't remember the details

1  of his work, but I do know that he worked in that area.

2  **Q**    Well, would you agree that one of the things these

3  academics were writing about was they were trying to figure out

4  how it was these options were so low-priced, these executive

5  options?

6  **A**    You know, I would have to go back and look at the articles

7  and read the motivation to see what the objective of what they

8  were doing was.  I don't recall specifically, as I sit here.

9  **Q**    Well, you understood that Erik Lie's work was aimed at

10  looking at executive compensation, and trying to figure out how

11  it was that they seemed to have favorable stock prices for

12  their option grants.

13      Is that correct?

14  **A**    Yeah, well, my general recollection is that Erik was

15  identifying that the exercise prices of executive options were

16  often close or equal to the low price over some period prior to

17  the granting of the option.  And, he was curious as to why that

18  was.  And that led to his empirical research.

19  **Q**    So, that's very helpful.  So, he was curious about why

20  these options were granted -- seemed -- how they arrived at

21  those low prices.

22      Is that right?

23  **A**    That's correct.

24  **Q**    And so, he did research to try to sleuth it out or figure

25  it out; is that accurate?

1  **A**    That is accurate.

2  **Q**    Would you agree that it wouldn't make a lot of sense to do

3  that kind of research if you didn't think that it would be

4  important to the investing public?

5  **A**    Well, this is where I don't recall that Erik addressed the

6  issue as to whether stock-based compensation expense was

7  material, which is a separate issue from identifying that the

8  exercise prices tended to be close to the low price during a

9  quarter or a year.

10      And again, based on my testimony earlier today, it doesn't

11 really matter what the intrinsic value of the option was at the

12 grant date or measurement date or approval date.  All of that

13 is historic information.

14      In assessing the materiality of the accounting expenses at

15 issue here, all that matters is that the market participants

16 have the information that would let them independently value

17 the options at a subsequent date.  And all of that information

18 was disclosed in Embarcadero's SEC filings.

19      So, what Professor Lie was doing is quite different than

20 what I'm doing in this particular matter.

21 **Q**    So, well, let's just back up a little bit to Professor

22 Lie's research.

23      They were dealing with executive stock options, right?  As

24 opposed to all types of employee stock options?

25 **A**    I don't recall.

1   Q    Well, you would agree that they have access to the dates

2   on which executive stock options were supposedly granted, from

3   those Forms 4 and other sorts of filings that you've pointed

4   to.  Correct?

5   A    That's correct.

6   Q    But they don't have access to that kind of granular detail

7   for employee stock options, right?

8   A    Well, they would from companies' 10-K filings.  Just as

9   Embarcadero discloses that information, so do other companies.

10  Q    Well, you would agree that they did not do these sorts of

11  analyses on employee stock options, did they?

12  A    As I sit here, I don't recall.

13  Q    Do you remember what happened to the stock prices of the

14  companies that were described in these *Wall Street Journal*

15  articles, when the news hit about potential for backdating at

16  those companies?

17  A    My -- my recollection is that they declined when the

18  newspaper article was published.

19  Q    Would you agree that the matter was drawing concern from

20  investors at the time?

21  A    I'm not sure what you mean by "the matter."

22  Q    The matter of whether or not these stock options that

23  these companies had granted to executives had been backdated.

24  A    I -- I think you would have to look company by company to

25  determine whether or not it was of concern to investors in

 1   those companies.

 2        But, again, one can't confuse the issue of the accounting

 3   for the stock options with the fact that when revelations are

 4   made that there might have been so-called backdating, that

 5   there are other collateral effects separate from the accounting

 6   expenses that may cause the stock price to decline, such as the

 7   cost of a restatement, possible litigation, possible management

 8   turnover.

 9        And all of these issues may be related to the issue of

10   so-called backdating, but they're completely separate from

11   whether or not the accounting had a material effect on the

12   company's stock price.

13   **Q**    So, you mentioned many collateral effects.  Would you

14   consider -- have you heard of the phrase "agency costs"?

15   **A**    Yes.

16   **Q**    And, tell me if you would agree that this is a relatively

17   fair description of "agency costs":  The costs of shareholders

18   having to rely on other persons -- management -- to manage the

19   assets.  The costs of actually monitoring that.

20   **A**    Monitoring costs would be one component of agency costs.

21   **Q**    Uh-huh.

22   **A**    But I think more broadly, agency costs are loss of value

23   when a principal -- in this case, the stockholder -- hires

24   someone else -- in this case, a manager -- to look after his

25   capital, if you will.

1  Q    So agency costs, according to the academic literature,

2  increase when you have questions about how the managers -- the

3  agents -- are performing the tasks that they describe to you,

4  such as granting stock options.

5       Is that accurate?

6  A    I don't think that is accurate.

7  Q    Well, let me ask you this.  Do you think that the -- there

8  is academic research about agency costs related to the

9  backdating of stock options?

10  A    There -- there probably is.  And again, I don't recall

11  specific studies.  But there have been a few that have been

12  published, and they probably looked at different so-called

13  corporate governance variables in their analysis.

14  Q    Well, you wouldn't consider those agency costs to be

15  collateral effects, would you?

16  A    When you say "those agency costs," I'm not sure which ones

17  you are referring to.

18  Q    Let me just take it a step back.

19       Agency costs are not what you were referring to when you

20  were talking about collateral effects.  Is that right?

21  A    I -- I wouldn't include agency costs as part of the

22  collateral effects.

23  Q    You would include agency costs as part of the valuation

24  that the market makes for the company's stock.  Right?

25  A    Yes.  Presumably, the company -- the market, the

1  investors, would incorporate agency costs in their valuation of

2  a company.

3  **Q**    Okay.  So, I noted on your direct that your opinion is

4  founded in part on how many options the company has

5  outstanding, at a given point.  Correct?

6  **A**    That -- that's one of the variables that investors would

7  want to know in assessing the impact that employee stock

8  options have on the company's stock price.

9  **Q**    And when you say that's one of the variables they would

10  want to know, I mean, without that variable, without that

11  number, they can't arrive at your estimate, can they?

12  **A**    Well, I wouldn't quite put it that way.  I mean, an

13  estimate is an estimate, and we use models to estimate the

14  impact that employee stock options have on companies' stock

15  price.

16      Black-Scholes is one model.  There are other models.  All

17  models entail an estimate.

18      One of the inputs into the models is the number of

19  employee stock options.  If one were to substitute a different

20  number, everything else equal, you would presumably get a

21  different number.  But whether it was materially different is

22  not at all clear.

23      That -- whenever you do an estimate, there's a confidence

24  interval around that estimate.  And so, just changing the

25  numbers, in and of itself, would not necessarily change your

 1  overall estimate.

 2  **Q**    Well, whether changing the numbers changed your overall

 3  estimate -- let me step back a second.

 4       So, your estimate leaves room for quite a bit of error for

 5  the number of options outstanding?  Or not?

 6  **A**    Well, I don't know what you mean by "error for the number

 7  of options outstanding."  That you would take the number of

 8  options outstanding as disclosed by a company, and incorporate

 9  that as an input into your model.

10  **Q**    Do you know whether the number of options outstanding as

11  reported by Embarcadero was accurate?

12  **A**    From a valuation point of view, there is reason to believe

13  that the numbers that are reported would be more accurate than

14  the numbers that the SEC would have wanted them to report.

15       For example, in a company's 10-K filing, hypothetically,

16  if, in fact, options were granted to employees, and the grant

17  date was the end of December on a given year, and the

18  allegation is that the company should have used a different

19  grant date, a subsequent grant date that spilled over to the

20  next year, and if, hypothetically, a company were to restate

21  their financials, the requirement would be to show that there

22  were fewer options outstanding in the relevant year.

23       If a company were to restate their financials, it would be

24  less informative to the market, because by the time the market

25  receives the 10-K in March, what the market wants to know are:

 1  How many options are there outstanding?

 2      And if, in fact, a restatement caused that number to be

 3  lower, then the market would have less information about the

 4  number of options outstanding when it received the 10-K.

 5  Q   And your example that you just shared with us implied

 6  certain select known options granted shortly after this cutoff

 7  date of 12-31.  Is that right?

 8  A   Under my hypothetical, that's correct.

 9  Q   But it didn't include any other options that could have

10  been granted in the swing period, that investors don't see.  Is

11  that accurate?

12      For instance, let me expand upon your hypothetical.  In

13  addition to these grants that should have had a later date,

14  under your hypothetical, if the company continued to grant

15  stock options before they filed their 10-K, well, that wouldn't

16  be reflected in the 10-K, either, would it?

17  A   Can you repeat that?  I'm sorry.

18  Q   Sure.  So, your hypothetical dealt with options that

19  should not have been included, as of 12-31 of a given year.

20  Correct?

21  A   Correct.

22  Q   Because those options were actually granted later.  Right?

23  A   That's correct.

24  Q   And, if the company did grant other options later as well,

25  but before they filed their 10-K for that 12-31 period, but

1  after that 12-31 cutoff, those wouldn't be included in the 10-K

2  either, would they?

3  **A**    If I'm following your hypothetical, that's correct.

4  **Q**    So, 10-Ks have a cutoff date so that people can see

5  information as of a given date, and they know that they could

6  compare that information to other periods and other companies.

7        Right?

8  **A**    That -- that's part of it.  But again, what matters is

9  that when the 10-K is disclosed, which would be typically two

10  to three months after that fiscal year is ended, what investors

11  really want is the most recent, up-to-date data they can

12  obtain.

13  **Q**    So, I know that you focused on options outstanding,

14  overall.

15  **A**    Uh-huh.

16  **Q**    But you also looked at options granted during a given

17  period.  Correct?

18  **A**    Well, again, with -- with the -- to place this in proper

19  context, what matters for purposes of estimating the impact of

20  employee stock options on a company's stock price is the total

21  number of options outstanding.

22        With respect to this stock-based compensation expense that

23  is at issue in this matter, it's the value of the options that

24  were granted over some period of time.  And for purposes of

25  addressing that issue, I make reference to the intrinsic value

1  and the fair value of the options granted.

2       But in my opinion, that's not even important to investors

3  in assessing the impact that employee stock options have on a

4  company's stock price.

5  **Q**    Well, certainly, any -- the number of options granted in a

6  given period affects, obviously, the options outstanding at the

7  end of that period.  Correct?

8  **A**    Right.  But assuming that the options outstanding are

9  already disclosed, that particular number adds no additional

10 relevant information.

11 **Q**    I'm not certain I understood your answer.  Let me rephrase

12 my question.

13      The amount of options granted during a period is added to

14 the amount outstanding from the prior period.  Correct?

15 **A**    That is correct.

16 **Q**    And then the other options that are either cancelled or

17 exercised are subtracted, as you described earlier.  Right?

18 **A**    That's correct.

19 **Q**    So it's important to know -- in order to know what the

20 options outstanding are at the end of a period, it's important

21 to be confident that the number granted is accurate.

22      Correct?

23 **A**    That is correct.

24 **Q**    Are you aware of or have you seen any evidence in this

25 case of overstatement, at times, of options granted during a

1  given period?

2  **A**    I'm not -- not aware of that.

3  **Q**    Are you aware of the deletion of options that were never

4  formally provided to employees in a given period?

5  **A**    No.  But again, what I focused on was the accounting

6  expenses at issue.  And if there are other dimensions of the

7  stock option granting process that are at issue, those are not

8  ones that I considered in my analysis.

9  **Q**    So, your analysis is limited to the compensation -- the

10 effect of the compensation charges that were not recorded as an

11 expense.

12 **A**    Right.  As I indicated this morning, my assignment was to

13 analyze the evidence as it pertains to the materiality of the

14 accounting expenses at issue here.

15 **Q**    Okay.  And so --

16          **MS. LaMARCA:**  I don't want to take too much longer,

17 sorry.

18 **BY MS. LAMARCA:**

19 **Q**    In this case, I think defense counsel asked you if you had

20 been compensated for your work in forming these opinions.

21          Is that right?

22 **A**    That's correct.

23 **Q**    Okay.  And so, your compensation is $950 an hour for your

24 time here?

25 **A**    That's correct.

 1  **Q**    And that includes working on the report, if you did; is

 2  that accurate?

 3  **A**    That's correct.

 4  **Q**    And that includes looking at any of the data that we've

 5  talked about.  Is that right?

 6  **A**    That's correct.

 7  **Q**    And then appearing at trial, et cetera?

 8  **A**    That's correct.

 9  **Q**    Okay.  And then, other persons who work with you at a

10  company called Lexecon, they're also compensated for their work

11  in this case.  Right?

12  **A**    I -- I presume they are.  I don't have firsthand knowledge

13  of that.

14  **Q**    Well, I should have phrased it differently.

15       That they prepare bills that are paid for work in this

16  company -- in this case.  Is that correct?

17  **A**    I don't get involved in any of that, so I don't know

18  firsthand.  But I presume that's the case.

19  **Q**    Well, correct me if I'm wrong, but you are receiving a

20  percentage of those billings, aren't you, for your efforts?

21  **A**    I haven't yet, but I -- my contractual arrangement is that

22  I -- that I do.  But I haven't, and I don't -- I'm not privy to

23  what those billings are.

24  **Q**    Is the percentage that you are going to receive about

25  15 percent of those billings?

1  **A**    It's either 15 or 20.  I don't recall, offhand.

2  **Q**    And, you don't know how much they've billed yet?

3  **A**    No.

4  **Q**    Would it surprise you to learn that by the time that your

5  report was prepared, that they had billed, I believe, more than

6  -- or roughly $200,000?

7  **A**    I didn't know that, but it wouldn't surprise me.

8  **Q**    Is there any reason why you don't know what those billings

9  are, if you're contractually entitled to those monies?

10  **A**    Time is scarce, and I just haven't inquired about it.  I

11  haven't looked at it.

12  **Q**    Do you know whether there -- excuse me.  Has anyone from

13  Lexecon mentioned to you whether or not those billings have

14  exceeded $500,000 yet?

15  **A**    I've never had any discussion with people at Lexecon as to

16  the billings.

17  **Q**    And, someone at Lexecon drafted your report.  Is that

18  correct?

19  **A**    They -- the initial draft, under my direction, was

20  performed by a staff member.

21       And it's similar to processes that I've used when I have

22  been retained by the SEC.  That I have discussions with the

23  consultants; I tell them the outline.  I describe to them the

24  type of analyses that I would like to have done.  We have many

25  discussions about the analyses.

1        And then, depending on my schedule, I may ask them to do

2    some initial drafting, which they do.  They send to me, and

3    then I aggressively edit it.  And it goes back and forth.  And

4    it ultimately becomes a final report, and it's my report.

5    **Q**   And those persons at Lexecon, to arrive at those opinions,

6    they provide you that draft report, and that's what you use to

7    edit.  Is that correct?

8    **A**   No; I think you're being very unfair.  The process that

9    I've used in this matter is identical to the process that I've

10   used when I have been retained by the Securities and Exchange

11   Commission.  They're my opinions, and it's my report.  There is

12   some initial drafting by staff members, but it is my report.

13       It's not unlike when you do an academic paper, and there

14   might be some research assistant.  You ask them to draft

15   certain sections where they collected data.  They then edit it.

16   It's your report, but there is some assistance in the initial

17   drafting.

18       And the procedure is identical to what I've done when I've

19   been retained by the SEC.

20   **Q**   Let me ask you this.  Has it been several years since

21   you've been retained by the SEC?

22   **A**   I was retained by the SEC in a matter as recently as a

23   year ago.  And I'm presently working with the SEC in four

24   matters, in which we're distributing money to investors of

25   mutual funds who were hurt by alleged wrongdoing.

1        So, I continue to work with the SEC.

2   **Q**    That was a matter where you were hired several years ago,

3   I think, based on your disclosures in this case?

4   **A**    Which ones, ma'am?  I'm sorry.

5   **Q**    The one that you were referring to about the mutual fund

6   shareholders.

7   **A**    Well, the mutual fund, I'm actually retained by mutual

8   fund advisors, but subject to approval by the SEC.  And there

9   are four such matters.  And I work closely with Commission

10  staff on those matters.

11       And there was a matter involving litigation where, as

12  recently as a year ago, the SEC had asked me to form an opinion

13  as to whether certain information was material.  And that

14  matter settled.  And I think it was a year ago, August.

15       So, I continue to work with the SEC.

16  **Q**    So, in this case, just so I get a feel for what you -- you

17  did to arrive at your opinions, you weren't looking at the

18  information about how stock options were backdated to arrive at

19  these opinions.  Is that correct?

20  **A**    Again, my focus was on whether the accounting expenses at

21  issue were material.

22  **Q**    So, would the answer to that be no, that wasn't part of

23  the materials that you were looking at?

24  **A**    That's correct.

25  **Q**    Okay.

1              **MS. LaMARCA:**  I think that's what we have, Your

2   Honor.

3              **THE COURT:**  Thank you.  Any redirect?

4              **MR. RICHARD:**  A couple questions.

5                        **REDIRECT EXAMINATION**

6   **BY MR. RICHARD:**

7   **Q**    Professor Lehn, do you know what Ms. LaMarca means when

8   she keeps referring to "backdating"?

9   **A**    It's -- in a vague sense.  But, that requires knowledge

10  about the distinctions between grant dates and measurement

11  dates and approval dates, which, as an economist, I view as

12  largely a legal issue.

13         So, I think I know what she means by it, but I don't have

14  any precise definition as to what constitutes backdating.

15  **Q**    Are you aware of any stock option agreement in this case

16  where anyone changed a date from one point in time to another

17  point in time?

18  **A**    I'm not aware of that.

19  **Q**    You were asked a number of questions about your

20  compensation, and people you've worked with.  Have you given us

21  your honest opinions today?

22  **A**    Yes, sir.

23  **Q**    Would your opinions be different, if your billing rate was

24  different?

25  **A**    Not at all.

1  Q    When you work with the SEC, do you charge them the same

2  rate you're charging my client?

3  A    I'm not -- the last case I worked on, as I indicated to

4  Ms. LaMarca, was a year or so ago.  And, at the time, I was

5  charging the SEC the same rate that I charge other clients.

6  Q    Okay.  And, you were asked -- see if I have this right --

7  about discussions you've had, whether your opinions in this

8  matter have been peer-reviewed.

9       Prior to being retained in this case, did you share your

10  opinions about the materiality of stock option expenses with

11  the SEC?

12  A    I did, yes.

13  Q    And can you explain the context of that, even though it

14  wasn't peer-reviewed?

15  A    Yes.  About -- probably about three years ago, I received

16  a call from a staff member with whom I had worked at the SEC,

17  telling me they had a large number of backdating cases, and

18  they were looking for some experts to form opinions as to

19  materiality.  And, would I be interested.  And I told them I

20  would be happy to look at materials.

21       They sent materials.  And I told them the same thing that

22  I've effectively told the Court today.  That, because of the

23  disclosures in the footnotes, investors have all the relevant

24  information they need to understand the impact that employee

25  stock options have on the company's stock price.  And, the

1   information on the income statement about stock-based

2   compensation expense is not material.

3       And we had two or three phone conversations to that

4   effect.  And the Commission and I agreed that, you know, I

5   would not pursue any work with the SEC on this particular

6   issue.

7           **MR. RICHARD:**  I think that's all I need, Your Honor.

8           **THE COURT:**  Thank you.  Any recross?

9           **MS LaMARCA:**  No, Your Honor.

10          **THE COURT:**  All right, thank you.

11          Professor Lehn, you may step down.  Thank you.

12          **THE WITNESS:**  Thank you, Your Honor.

13          (Witness excused)

14          **THE COURT:**  Okay, then, we can resume at this point.

15  We still have some time, with the -- the redirect, I believe it

16  is, of Mr. Pattison.

17          **MR. RICHARD:**  I think we're -- I guess I can check my

18  notes, but I think we will leave the Record where it stands.

19          **THE COURT:**  Okay.

20          **MR. RICHARD:**  Call it a day on that.

21          **THE COURT:**  All right.  And then, you had no further

22  witnesses, then, at this point?

23          **MR. RICHARD:**  Well, there's a matter we -- not at

24  this point, Your Honor.

25          **THE COURT:**  All right.  All right.

1          So, the testimony of Mr. Pattison has been concluded

2   at this point, and therefore -- and it appears that defense

3   doesn't have another witness to call?

4          **MR. RICHARD:**  I think that's right, Your Honor.

5          **THE COURT:**  Okay.

6          **MR. RICHARD:**  In light of the -- some considerations

7   we've discussed, I think that's correct.

8          **THE COURT:**  All right.  The ball passes back to the

9   Commission, whether the Commission wants to call any rebuttal

10  witnesses at this point.

11         **MS. LaMARCA:**  And at this point, we -- to be

12  completely frank, we need time to make that determination.  And

13  we were -- the persons who we would call, if we call anyone,

14  are not available yet because we were told they -- wouldn't be

15  called until tomorrow.

16         **THE COURT:**  Okay.  All right.

17         **MS. LaMARCA:**  But we will certainly be able to inform

18  the Court today.

19         **THE COURT:**  All right.  Okay.

20         Well, we are going to call an early recess today.

21  All that marching in and out paid off, so you can leave 15

22  minutes early.  We will return tomorrow, and we may or may not

23  have witnesses.  If we do, we'll hear further testimony and

24  examination.  If not, we are actually approaching the point

25  where we would begin instructing you and having the attorneys

1    prepare their closing arguments.

2            So, there you go.  Thank you.  And please remember,

3    do not do any independent research; do not discuss this case

4    with anyone; and don't form any opinions.  Thank you.

5            **THE CLERK:**  All rise for the jury.

6            (Jury excused)

7            (The following proceedings were held in open court

8            outside of the presence of the jury:)

9            **THE CLERK:**  Please be seated.

10            **THE COURT:**  Okay.  When will you have your decision,

11   Ms. LaMarca?

12            **MS. LaMARCA:**  I think we would know by 5:00 today,

13   Your Honor.

14            **THE COURT:**  Okay.

15            **MS. LaMARCA:**  Is that early enough to inform the

16   Court?

17            **THE COURT:**  That's fine with me.  And, as long as you

18   -- by close of business.

19            **MS. LaMARCA:**  Certainly.

20            **MR. RICHARD:**  What -- what time?

21            **MS. LaMARCA:**  Five.

22            **MR. RICHARD:**  Okay.

23            **THE COURT:**  And, same rules about disclosing the

24   exhibits and that sort of thing.

25            **MS. LaMARCA:**  Yes.

 1          **THE COURT:**  Now, so now, the jury instruction matters

 2   is going to be accelerated.  Let me just tell you what my

 3   intent is at this point.

 4          I've given the parties two sets of jury instructions.

 5   One was the -- I called them preliminary, which I've already

 6   read.  The other is the final instructions, which I provided

 7   with cross-outs and commentary.  I have now cleaned those up,

 8   and removed all commentary, and sources, and this sort of

 9   thing.

10          The only one, in reviewing this, that I have removed

11   so far is there was one about interrogatory answers, which

12   doesn't seem to apply here.  I removed that.

13          And so, subject to the instruction -- you call it the

14   empty-chair instruction -- empty-chair?

15          **MS. LaMARCA:**  Yes, I heard you.  Sorry.

16          **THE COURT:**  And the question about what the Court

17   should say about any consequence, since there's nothing here

18   about damages or anything else, --

19          **MS. LaMARCA:**  Uh-huh.

20          **THE COURT:**  -- those are the only two things I'm

21   thinking about adding.

22          Now, I know Mr. Richard had raised a comment about

23   the inappropriateness of giving instructions -- perhaps coupled

24   with the motion for judgment as a matter of law, their position

25   that some of these instructions don't apply because essential

PROCEEDINGS

 1  elements have not been made out.

 2       I -- my initial view on that is that it is a

 3  close-enough question that I've taken this matter under

 4  submission, and I think to not give a jury instruction would

 5  preempt that JMOL matter.  And therefore, I'm not inclined to

 6  remove a substantive instruction, at this point, on that basis.

 7       But I'll hear any comments, since we're going to have

 8  to decide this quickly.

 9       **MR. RICHARD:**  Sure.  And, the only two areas that I

10  think -- and there may be others, but the two that come to mind

11  immediately that the evidence would not support the giving of

12  the instruction would be an instruction based on recklessness,

13  because there was no testimony as to what ordinary care for a

14  controller would be.

15       And, we've attached the *Shanahan* discussion from

16  another SEC stock options case.  And so, I think that's one

17  that's worth taking a look at, especially in light of the

18  Government's position immediately before trial, that they would

19  be pursuing only intentional-based claims.

20       But, to give an instruction on recklessness when

21  there's absolutely no evidence as to what an ordinary,

22  responsible -- or any controller would or wouldn't do should be

23  looked at.

24       All we've had is the testimony of some folks saying,

25  "I would have expected Mr. Pattison to know x, Y and Z."  But

PROCEEDINGS

1  that doesn't give the jury any guidance as to what the standard

2  is from which there has been this gross departure.  And we can

3  discuss that further in the context of that specific

4  instruction.

5        The other instruction that comes to mind upon which

6  there has been no evidence to justify it would be this

7  deliberate-ignorance instruction that has been engrafted solely

8  from criminal cases, having nothing to do with the civil

9  allegations.  I didn't like the instruction when it was

10  offered.  I didn't think there would be evidence to support it.

11        To try to cobble together a deliberate -- a

12  deliberate-ignorance notion that is not even supported in these

13  types of cases, let alone on the evidence here, to show a

14  witness an 80-page PowerPoint and say, "Doesn't this say this?"

15  It -- he gave whatever testimony he gave about that PowerPoint.

16  That doesn't rise to the level of some deliberate ignorance

17  under the criminal cases that -- from which that construction

18  is borrowed.

19        So, I think, those two.  And again, I've been

20  somewhat preoccupied, so I haven't focused on Your Honor's last

21  batch of jury instructions, but will be -- you know, those are

22  two that I think are worth discussing.

23        **THE COURT:**  Let me hear the Commission's response.

24        **MS. LaMARCA:**  To just respond to those two, we do

25  believe that there's plenty of evidence for each of those.

1           And I think that it has -- it was not our position,

2    pretrial or during trial, that recklessness is not at issue

3    here, because that is the standard under 10b, as well as

4    intentional conduct.

5           **THE COURT:**  The argument there, that there's been no

6    evidence -- Mr. Richard is implying there needs to be evidence,

7    not just -- the instruction talks about extreme departure from

8    ordinary care.

9           **MS. LaMARCA:**  Exactly.

10          **THE COURT:**  And, I think his argument is that there's

11   no been no evidence about ordinary care, in this context, for a

12   controller.

13          **MS. LaMARCA:**  And we believe there has been.

14          **THE COURT:**  What would that be?

15          **MS. LaMARCA:**  Among the evidence that we've seen  is

16   -- especially today, there was a focus on the time period when

17   Mr. Pattison was preparing a document for the company's

18   internal control processes.  He was supposed to be describing a

19   process that he was following on a routine basis.  And he was

20   working with other professionals.

21          And he did not disclose key pieces of that process

22   that included what we like to call -- I know, not uniformly

23   accepted -- "backdating," or picking the low price and picking

24   the matching date.

25          And, that kind of information was -- the information

1  surrounding this was being sought by those professionals.  And

2  at least, at a very least, required a question from the

3  Defendant: "What do you mean?  What are you talking about?"

4          And not asking that question is a departure, an

5  extreme departure from the standards of ordinary care.

6          **THE COURT:**  Well, that's the question.  What's the

7  evidence of ordinary -- I mean, obviously, in some cases -- if

8  it's a banana peel, it's kind of obvious.

9          But in the case of a controller, what's your legal

10 position?  Need there be specific evidence of ordinary care in

11 the context of this particular job in, you know, corporation,

12 or --

13         **MS. LaMARCA:**  Our position is this.  That in the

14 context of a case where we learn of what the -- the Defendant's

15 job is, as controller, and how he is to perform it, and who

16 relies on him, including audit committee members, accountants,

17 and other persons at the company, and even consultants helping

18 to prepare something like a 404 narrative, that those persons

19 interactions and their description of what they were doing and

20 expected from the Defendant are evidence of what he -- what his

21 legal duty was.

22         In other words, the standard by which he would be

23 measured.

24         **THE COURT:**  Okay.

25         **MR. RICHARD:**  All right.  And I guess our response

 1  would be two-fold, Your Honor.

 2          One, the SEC has never cited any legal authority,

 3  whatsoever, for the argument that a layman can determine the

 4  standard of care for accountants.

 5          Point two, there are at least four cases that we're

 6  aware of, describing the need for standard-of-care evidence.

 7  We cited the *SEC v. GLT* --

 8          **THE COURT:**  Is this in your JMOL brief?

 9          **MR. RICHARD:**  I think it is Page 14 of our motion,

10  yes.  So there's three SEC cases, including *Guenthner* and

11  *Pasternak*, as well as the *Vernazza* case from the Ninth Circuit,

12  *Vernazza versus SEC*, regarding the need for expert testimony as

13  to industry practice relevant to show the standard of care

14  that's necessary on a recklessness inquiry.

15          So --

16          **THE COURT:**  So your position is absent expert

17  testimony, in this context of an accountant or a controller,

18  that -- that the evidence, all the factual evidence would fail,

19  as a matter of law.

20          **MR. RICHARD:**  I think that's correct.  But I think

21  that Your Honor doesn't need to necessarily reach the issue of

22  whether you need expert testimony, although most cases say you

23  do, because in this case there's no testimony as to what an

24  ordinary controller or a reasonable controller or ordinary

25  accountant or reasonable accountant should or shouldn't do,

 1  under these circumstances.

 2          So --

 3          **THE COURT:**  Well, why isn't there enough -- if there

 4  is no per-se rule, why isn't there enough for the jury to

 5  infer, hearing what they did about what his duties were, what

 6  he did, whom interacted with him, and as Ms. LaMarca says, who

 7  turned to him for documents, drafting, information, et cetera,

 8  et cetera --

 9          **MR. RICHARD:**  Because if you don't have the standard

10  set as to "Here's the bar" (Indicating), it's impossible to

11  judge a gross departure from that bar.

12          To say, "Here's how did I my job," and then leave it

13  to the jury to guess whether that's a gross departure from

14  ordinary care for a controller or accountant is -- I mean,

15  that's why the cases do say you need to start with establishing

16  the standard of care.

17          And that's usually done through expert testimony.

18          **THE COURT:**  Do you have a response to these cases

19  that he says establishes, almost, a per-se rule?

20          **MS LaMARCA:**  Yes.  As our -- our reading of those

21  cases is the opposite.  That they do not establish a per-se

22  rule.  In fact, that they are weighted against over-emphasis on

23  expert testimony about a person's duty under the securities

24  laws.  They will permit expert testimony at times if it's

25  helpful, but they certainly don't require it.

PROCEEDINGS                                                    2322

1          And in fact, we don't know of any authority that

2    requires that we present evidence of the standard of ordinary

3    care for a controller.  In fact, we had this argument pretrial,

4    and we thought it had been resolved.

5          **THE COURT:**  All right.  I'll look at these; I'll look

6    at that issue.  And with respect to the -- the deliberate

7    ignorance, we did debate that, and I ruled on that.

8          And I find that, again, if -- assuming this is a

9    legally proper instruction, which you take issue with, but

10   which I've decided, I think there's enough -- I'm not going to

11   take it away from the jury at this point.  So, I'm going to

12   keep those instructions in.

13         I will look at the recklessness to see.  And my

14   inclination is to take a good hard look.  If I'm absolutely

15   convinced that the Ninth Circuit says you've got to have expert

16   evidence on this, that's one thing.

17         If it doesn't say that, or if I don't see it saying

18   that, for the reasons stated by the Commission, I think

19   there's, again, enough to at least allow this instruction to go

20   to the jury.

21         Without prejudice to the JMOL action, which we can

22   still argue at greater length, if necessary -- if the jury

23   comes back, that motion is under submission.  So, we can deal

24   with it at that point.

25         So, what would be helpful are those two other

PROCEEDINGS

```
 1  instructions.

 2          MS. LaMARCA:  Certainly.

 3          MR. RICHARD:  So we can deal with that tomorrow,

 4  around 8:15.

 5          MS LaMARCA:  Okay.  So, just to be clear, we will

 6  again approach the defense about our -- the ones that we have

 7  drafted, see if there's any agreement.

 8          And then, if so, we will file those tonight.  If not,

 9  we will file the competing ones.

10          THE COURT:  Okay.

11          MR. RICHARD:  And, Your Honor, it takes ten seconds

12  to kind of express the view that if -- if there's a general

13  instruction that says the jury is not to consider the wit- --

14  the people who are not present, witnesses who are not present,

15  or did not testify, did not appear in these proceedings, that's

16  fine.

17          But to instruct the jury that there were other

18  Defendants, and go on in any greater detail -- so that --

19  that's -- there is a general instruction that would simply say

20  that people who didn't testify or appear, you're not to draw

21  any -- you're not to consider that.  And we wouldn't argue

22  that.

23          But to go beyond that, and say other -- "There were

24  other Defendants, and how matters turned out, you're not to

25  consider" --
```

```
 1              THE COURT:  Or you can do something in between.

 2   "You're not to consider what may or may not have happened with

 3   respect to other people, including the people we keep hearing

 4   about."

 5              MR. RICHARD:  And, that's fine.  I think it's the

 6   calling them "Defendants," or suggesting that there was an

 7   outcome in some other proceeding --

 8              THE COURT:  Well, that might -- yeah, well, that may

 9   be a concern.  But, I suspect there's something in between,

10   other than "Don't worry about witnesses who weren't here," and

11   stating sort of the more obvious.

12              I want you to think about that.

13              MR. RICHARD:  That's helpful.

14              MS. LaMARCA:  Thank you.

15              THE COURT:  Good.  Thank you.

16              (Proceedings concluded at 2:02 p.m.)

17

18

19

20

21

22

23

24

25
```

2325

**INDEX OF WITNESSES**


<u>**DEFENDANT'S WITNESSES**</u>

**PATTISON, MICHAEL**
(PREVIOUSLY SWORN)                                    2125    11
Cross-Examination, Resumed by Mr. Tashjian           2125    11
Cross Examination, Resumed by Mr. Tashjian           2197    11


**LEHN, KENNETH M.**
(SWORN)                                              2212    11
Direct Examination by Mr. Richard                    2212    11
Cross Examination by Ms. LaMarca                      2263    11
Redirect Examination by Mr. Richard                  2310    11

**INDEX OF EXHIBITS**

| TRIAL EXHIBITS | IDEN | VOL. | EVID | VOL. |
|---|---|---|---|---|
| 483 | | | 2144 | 11 |
| 495 | | | 2148 | 11 |
| 566 | | | 2149 | 11 |
| 311 | | | 2200 | 11 |
| 61 | | | 2210 | 11 |
| 225A | | | 2232 | 11 |

### CERTIFICATE OF REPORTERS

WE, BELLE BALL and LYDIA ZINN, Official Reporters for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C 08-4238 EMC, Securities and Exchange Commission v. Michael C. Pattison, were reported by us, Certified Shorthand Reporters, and were thereafter transcribed under our direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by us at the time of filing.

The validity of the Reporters' Certification of said transcript may be void upon disassembly and/or removal from the court file.


_____/s/  Belle Ball_____

Belle Ball, CSR 8785, RMR, CRR


_____/s/  Lydia Zinn_____

Lydia Zinn, CSR 9233, RPR, FCRR


Tuesday, September 21, 2010