1

2

3

4

5                    UNITED STATES DISTRICT COURT

6                   NORTHERN DISTRICT OF CALIFORNIA

7

8  SECURITIES & EXCHANGE                No. C-08-4238 EMC
   COMMISSION,
9
            Plaintiff,                  **CORRECTED ORDER DENYING
10                                      PLAINTIFF'S MOTION TO STRIKE;
                                        DENYING DEFENDANT'S MOTION
      v.                                FOR JUDGMENT AS A MATTER OF
11                                      LAW; AND DENYING DEFENDANT'S
   MICHAEL C. PATTISON,                 MOTION FOR A NEW TRIAL
12
            Defendant.
13
   _____/    **(Docket Nos. 324, 327, 338)**
14

15

16        After a vigorously contested three week trial held in September 2010, the jury concluded that

17  Defendant Michael C. Pattison violated § 13(b)(5) of the Exchange Act of 1934 and Exchange Act

18  Rule 13b2-1.  The jury rendered a verdict in favor of the Defendant on three other claims brought by

19  the Securities and Exchange Commission (the "SEC"), including a count for securities fraud under

20  Rule 10(b)(5).  Pending before the Court are Defendant's post-trial motions for (1) Judgment as a

21  Matter of Law by which Defendant seeks to overturn the jury's verdict, pursuant to Rule 50, or, in

22  the alternative, (2) a New Trial pursuant to Rule 59.[1]  Having considered the parties' briefs and

23  ///

24  ///

25  ///

26  ///

27  _____

28        [1] The SEC also moved for entry of final judgment and a permanent injunction.  That motion
    is the subject of a contemporaneously issued but separate order.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

accompanying submissions, as well as the oral argument of counsel and all other evidence of record, the Court hereby **DENIES** both motions for the reasons set forth herein.[2]

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Embarcadero Technologies, Inc. ("Embarcadero") is a Delaware corporation headquartered in San Francisco, CA.  Ans. ¶ 11 (Docket No. 51).  In April 2000, Embarcadero held an Initial Public Offering ("IPO"), and remained a publicly traded company through June 2007.  *See* Joint Proposed Pretrial Order ("Joint Stip.") at 5 (Docket No. 161); Jury Instructions at 9 (Stipulations of Fact).  From approximately April 2000 to January 2007 Embarcadero co-founder Stephen R. Wong served as its chief executive officer ("CEO").  Raj P. Sabhlok was hired as a Senior Vice President in January 2000, and served as Embarcadero's chief financial officer ("CFO") through October 2005.  Sabhlok Ans. ¶ 9 (Docket No. 50).  Defendant served as Embarcadero's "Controller" from approximately January 2000 through July 2005.  *Id.*  As Controller, Defendant was responsible for many day-to-day accounting functions, (Ans. ¶ 58), and for "recording all equity account activity," including options activity.[3]  *See* Ex. 546 at EMBT 0258264.

Embarcadero's Compensation Committee authorized CEO Wong to grant options to employees, and he regularly granted stock options to its employees and executives from late 2000 until the third quarter of 2004.  *See* Joint Stip. at 6.  The options were issued pursuant to the "Amended and Restated Embarcadero Technologies, Inc. 1993 Stock Option Plan," ("the Plan" or "the Options Plan") which was approved by the Board of Directors and stockholders in February

///
///
///
///
///

---

[2] The citations to the record herein are intended to be illustrations of relevant evidence at trial and not an exhaustive and complete listing of all the evidence on stated issues.

[3] "A stock option is the right to purchase a share of stock from a company at a fixed price . . . on or after a specified vesting date." *United States v. Reyes*, No. 08-10047, 2009 U.S. App. LEXIS 24575, *3 (9th Cir. Nov. 5, 2009).

**United States District Court**

For the Northern District of California

2000.[4] They generally vested over a four-year period and could not be exercised for at least one year after the grant date. *Id.*

Defendant personally prepared or directed the preparation of documentation for option grants from late 2000 through 2004. He would receive recommendations for employee option grants and compile them into a list. Near the end of each quarter, he would send that list to CEO Wong via email, along with proposed grant dates. *See, e.g.,* Ex. 562 (Sept. 29, 2003 email with attached list); Ex. 567 (Oct. 6, 2003 email with modified list). As discussed in greater detail below, Defendant selected grant dates retrospectively, based on the lowest share value of the previous or expiring quarter. *See, e.g.,* Ex. 562 (Sept. 29, 2003 email to Wong proposing July 1, 2003 as a grant date, noting that it was the "Low for the Q."). After receiving approval from CEO Wong, Defendant transmitted the list of grants to E*Trade, the company that maintained Embarcadero's options data, using an "Equity Edge" template provided by E*Trade. Trial Tr. (henceforth "Tr.") 2007-09 (Pattison testimony regarding procedure for entering data concerning option grants); Ex. 501 (April 2002 email from Pattison to E*Trade reflecting grants for the first quarter of 2002). One field on that template called for entry of the "date the option was granted." *See* Ex. 568 (Oct. 6, 2003 email) at ETRADE_008520.0006. E*Trade thereafter entered the data provided into "Equity Edge," a database used to track stock options. Tr. 2007:18-2008:3 (Pattison testimony); Ex. 655 (Equity Edge report listing all Embarcadero option grants through January 2007). Each employee's stock option agreement was prepared based on the data as reflected in Equity Edge, and thus reflected the date entered by Defendant as the "date of option." Tr. 920-922. Each quarter, Defendant would compile a list of options granted to new employees and options granted as a performance bonus into a spreadsheet, which he would send to Wong for approval. Tr. 2158:6-2160:17. He would also

---

[4] The amendment and adoption of the Plan occurred before the April 2000 IPO, but the Plan was extended by the Board of Directors in June 2003, with amendments not alleged to be relevant to this case. *See* Trial Exs. 409 at 450 (2002 Form 10-K); 418 at 441 (2003 Form 10-K). At trial, the version of the Plan in effect as of Nov. 1, 2003 was admitted as Exhibit 138. The parties do not contend that any of the June 2003 amendments are relevant to the matter *sub judice*. The Court therefore considers the terms of the Plan as stated in Exhibit 138 to be equally applicable during the entire time period relevant here.

United States District Court

For the Northern District of California

1 provide summaries of new option grants and option exercises to Embarcadero's auditor,

2 PricewaterhouseCoopers ("PWC").

3      None of these documents stated the date of actual approval by CEO Wong; all of the grant

4 dates recited in the quarterly summaries, the Equity Edge templates, and the stock option agreements

5 and documentation provided to PWC were selected retrospectively, based on the low of the previous

6 or expiring quarter.  PWC was not aware that grant dates for options were retrospectively chosen

7 and reported no expense in connection with the options on Embarcadero's financial statement which

8 were publicly filed with the SEC.  Nor was the Board of Directors aware of the backdating.  *See,*

9 *e.g.,* Tr. 311:1-312:9 (Haroian testimony noting, in the context of 10-K filings, that he was unaware

10 of any backdating for the third quarter of 2004).

11      In 2006, Embarcadero's Audit Committee asked PWC to review past option grants.  Upon

12 receiving PWC's report, the Audit Committee retained O'Melveny & Myers LLP to conduct an

13 internal investigation.  Shortly thereafter, Embarcadero's Board of Directors formed a "Special

14 Committee" to analyze the company's past stock options practices, "including all option grants from

15 the Company's initial public offering in April 2000 to August 2006 . . . ."  *See* Trial Ex. 440 at 403

16 (Embarcadero's FY2006 Form 10-K, henceforth, the "Restatement").  The Special Committee

17 concluded that "about half of the grants under review, or two thirds of the number of shares covered

18 under option grants, were misdated and mispriced from the time of the initial public offering until

19 March 2005."  *Id.*  On December 18, 2006, Embarcadero issued a press release announcing the

20 Audit Committee's conclusion that the company's previously issued financial statements should not

21 be relied on.  *Id.*  Embarcadero thereafter filed a Restatement of its consolidated balance sheet as of

22 December 31, 2005 along with amended statements covering ten quarters from 2004 to 2006

23 ("Restatement").  *Id.*  The Restatement explained that a result of the revised accounting for the

24 options in question, Embarcadero's stock based compensation expense figures through December

25 31, 2005 were understated by a total of $14.6 million.  *Id.*

26      On September 9, 2008, the SEC brought this enforcement action, asserting twelve claims for

27 relief based on, *inter alia*, options backdating practices over sixteen quarters from 2000 to 2004.  *See*

28 Compl. ¶ 2.  According to the SEC, between 2000 and 2004, Defendant, together with CFO Sabhlok

4

and CEO Wong, engaged in a fraudulent scheme to issue backdated options and hide millions of dollars in compensation expenses in violation of federal securities laws. *Id.* ¶ 1. The SEC further alleged that Defendant and CFO Sabhlok concealed the scheme from shareholders, auditors, and the government. *Id.* ¶¶ 4, 14, 53, 78. After two years of pretrial motion practice,[5] a three week jury trial was held. On September 15, 2010, after the SEC concluded its case in chief, Defendant moved for judgment as a matter of law pursuant to Rule 50. Docket No. 290.

Five claims were submitted to the jury.[6] As the Table below indicates, the jury returned a verdict in favor of Defendant on three claims, and found him liable for two violations of § 13(b) of the Exchange Act of 1934 (the "Act"): § 13(b)(5), 15 U.S.C. § 78m(b)(5), and Exchange Act Rule 13b2-1, 17 C.F.R. § 240.13b2-1. Docket No. 315 (Sept. 24, 2010 Jury Verdict). Thereafter, Defendant timely filed the motions at hand.

### TABLE 1: SUMMARY OF JURY VERDICT

| No. | CLAIM | VERDICT IN FAVOR OF |
|-----|-------|---------------------|
| I | Exchange Act Rule 10b-5 | DEFENDANT |
| II | Aiding & Abetting a Violation of Rule 10b-5 | DEFENDANT |
| III | Aiding & Abetting a Violation of Exchange Act § 13(a) | DEFENDANT |
| IV | Exchange Act § 13(b)(5) | SEC |
| V | Exchange Act Rule 13b2-1 | SEC |

---

[5] On December 20, 2009, District Judge Charles R. Breyer denied Defendant's motion for summary judgment. Docket No. 135. The parties thereafter filed a dozen motions in limine. While these motions were pending, the case was reassigned to the undersigned for all purposes. Docket No. 194. In separate orders issued in July and August 2010, the Court ruled on the pretrial motions, including Defendant's motion to exclude the "Restatement" of Embarcadero's financial statements. The Court ruled that the Restatement was admissible subject to certain redactions, which Defendant repeatedly contested. *See* Docket Nos. 209, 255, 261.

[6] The Court engaged in successive rounds of briefing on jury instructions and verdict forms. Specifically, the Court (1) invited and reviewed proposals from the parties (Docket Nos. 159, 160), (2) issued a set of proposed instructions and invited objections (Docket Nos. 165, 217, 241, 249, 250, 252, 259), and (3) issued a final, revised set of jury instructions after reviewing the objections (Docket No. 268).

United States District Court
For the Northern District of California

**United States District Court**

For the Northern District of California

## II.   PLAINTIFF'S MOTION TO STRIKE

As a preliminary matter, the Court takes note of the SEC's motion (Docket. No. 338) to strike the declaration of Defendant's counsel Patrick J. Richard (Docket No. 336-15), which accompanies Defendant's brief opposing the SEC's Motion for Entry of Final Judgment (Docket No. 336).  As the SEC points out, the declaration is replete with statements of opinion and argument irrelevant to the SEC's motion.  *See, e.g.,* Richard Decl. ¶¶ 3, 11-16 (alleging attorney misconduct during trial).  However, parts of it are relevant to Defendant's opposition to the remedies or penalties the SEC requests.  *See, e.g.,* Def.'s Opp'n at 6-7 (Docket No. 295) (citing Richard Decl. ¶¶ 2, 4, 5 as evidence of Defendant's cooperation with the Special Committee and SEC).

A declaration is a vehicle for bringing admissible facts, based on personal knowledge, before the Court.  *See* Fed. R. Civ. P. 54(c).  It is not an avenue for argument.  Local Civ. R. 7-5(b).  To the extent Mr. Richard wields his declaration as a shoehorn for forcing argument, speculation, or irrelevant commentary into the already weighty docket of this case, he does so improperly.  The Court therefore has authority to strike Mr. Richard's declaration, in whole or in part, for its noncompliance with applicable procedural rules.  *Id.*; *Ready Trans., Inc. v. AAR Manufacturing, Inc.*, 627 F.3d 402, 404 (9th Cir. 2010).  The Court declines to do so, however, since the declaration is not completely devoid of relevant factual statements, the undersigned is capable of parsing through it, and the SEC has not identified any prejudice.  Nonetheless, the Court encourages counsel to be mindful of ethical obligations, as well as procedural rules, in his practice going forward.

## III.   DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW

A.   Legal Standard

Federal Rule of Civil Procedure 50 governs motions for judgment as a matter of law.  Under Rule 50(a),

> [i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient basis to find for the party on that issue, the court may:
>
> (a)   resolve the issue against the party; and
>
> (b)   grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can

United States District Court

For the Northern District of California

be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1).  The motion must be made before the case is submitted to the jury and "specify . . . the law and facts that entitle the movant to the judgment."  Fed. R. Civ. P. 50(a)(2).

Under Rule 50(b), if the court denies the motion for judgment as a matter of law under Rule 50(a), "the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59."  Fed. R. Civ. P. 50(b).  "A post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion."  Fed. R. Civ. P. 50(b), 1991 advisory committee notes; *see also* 9-50 Moore's Fed. Prac. – Civ. § 50.43[3][a] ("A pre-verdict motion serves as a predicate to a post-verdict motion only if the pre-verdict motion includes the specific grounds asserted in the second motion.").

If there is substantial evidence to support a jury verdict, the court must deny a motion for judgment as a matter of law.  *See Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007) ("A jury's verdict must be upheld if it is supported by substantial evidence.").  "Substantial evidence is such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence."  *Maynard v. City of San Jose*, 37 F.3d 1396, 1404 (9th Cir. 1994); *see also Wallace*, 479 F.3d at 624 ("Judgment as a matter of law may be granted only where . . . the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict.").  Notably, "the court must not weigh the evidence, but should simply ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion."  *Id.*  Moreover, "[t]he evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party."  *Id.*  The court "must disregard all evidence favorable to the moving party that the jury is not required to believe."  *Id.*

B.    Violations of Exchange Act § 13(b)(5) & SEC Rule 13b2-1

1.    Options Backdating

Options backdating is "the practice of recording an option's grant date and exercise price retrospectively."  *Reyes*, 2009 U.S. App. LEXIS 24575 at *3.  Where the backdating results in an

United States District Court
For the Northern District of California

exercise price that is lower than the fair market value on the date of the actual grant, the option is "in the money" since it has immediate positive value as of the date of the actual grant. *See SEC v. Berry*, 580 F. Supp. 2d 911, 913 n.2 (N.D. Cal. 2008). If the exercise price is equal to the fair market value ("FMV") on the date of the actual grant, the option is "at the money." Backdating of stock options resulting in the "in the money" options is not, in and of itself, illegal. *Reyes*, 2009 U.S. App. LEXIS 24575 at *3. To violate securities laws, backdating options below FMV generally must be accompanied by a failure adequately to record commensurate compensation expenses. *Id.* ("Backdating is not itself illegal, provided that the benefit to the [grantee] is recorded on the corporate books as a non-cash compensation expense . . . in accordance with an accounting convention promulgated in 1972 referred to as the Accounting Principles Board Opinion No. 25.").

Accounting for employee stock options is governed by prescribed methodology and measurement standards. Embarcadero adopted the "measurement principles of Accounting Principles Board (APB) Opinion No. 25 and related interpretations" with regard to "deferred stock based compensation" (*i.e.*, options). *See* Ex. 418 at 15 (Embarcadero FY2003 Form 10-K stating "We account for [deferred stock-based compensation] under the recognition and measurement principles of Accounting Principles Board (APB) Opinion No. 25 and related interpretations.") Embarcadero's 10-K statements noted that "[d]eferred stock-based compensation is reflected in net income (loss), [where] options and stock awards granted . . . had an exercise price less than the fair value of the underlying common stock on the date of grant . . . ." *Id.* The date of the grant is sometimes referred to as the measurement date. *See* Ex. 35 at EMBT0147198-99 (PWC presentation noting that, under APB 25 "[m]easurement date = grant date [f]or virtually ALL awards"). The measurement date is the date both the number of shares and the price are known and the grant is approved. *See* Tr. 356:22-357:6 (Sept. 8, 2010 testimony of Gary Haroian); 429:4-432:12 (Gary Haroian explaining: "The measurement date is the date when you know who is to receive the option. You know how many shares are to be received. And you know what the price is. And . . . it's been approved. All of those things have to have happened."); *see also id.* 1462:15-1467:15 (Sept. 16. 2010 testimony of Daniel Wallace).

United States District Court

For the Northern District of California

2.    Falsification of Records

Section 13(b)(5) of the Exchange Act provides that "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in paragraph (2)"[7] 15 U.S.C. § 78m(b)(5).  Rule 13b2-1 provides that "no person shall, directly or indirectly, falsify or cause to be falsified, any book, record or account" maintained pursuant to § 13(b)(2)(A). 17 C.F.R. § 240.13b2-l.

Defendant argues that the SEC failed to present evidence that he falsified any book, record, or account. Mot. at 12-13.  In response, the SEC points to several documents (which Defendant authored) admitted at trial indicating that option grants were not actually approved on what were represented as their grant dates.  For example, the stock option grant list for the second quarter of 2001 states that the options are "approved as of April 5, 2001" and are "[a]pproved by  Stephen Wong on the grant date."  Ex. 478.  Yet emails between Defendant and CEO Wong reveal that Wong did not approve the grants until months after April 5, 2001.  *See, e.g.,* Exs. 20 and 477 (June 27, 2001 email from Pattison to Wong reminding him that "performance grants" made in March were "pushed back to April" and stating: "The April 5, 2001 grants are comprised of three distinct blocks – (1) Performance grants made in March that were pushed back to April; (2) New hire grants if they were hired in March; and (3) Performance grants (existing employees) that were made in the 2nd Q were deemed to have been made on April 5, 2001 regardless of when the manager requested them (this can be revised is [*sic*] necessary).").

What occurred in this instance was consistent with Defendant's regular practice of waiting until the end of each quarter to pick the date on which the share price was the lowest for that quarter, designating that date on the "grant date," submitting the list (with the retrospectively selected grant dates) of option grants to CEO Wong for approval, and then sending the list of grantees with the backdated grant dates to E*Trade for processing.  *See, e.g.*, Ex. 473 (April 18, 2001 email from Pattison to E*Trade employee explaining that "adjustments" were made to the "first q" options); Ex.

---

[7] As defined in the Act, "records" include "accounts, correspondence, memorandums, tapes, discs, papers, books, and other documents or transcribed information of any type, whether expressed in ordinary or machine language."  15 U.S.C. § 28c.

United States District Court

For the Northern District of California

562 (Defendant email dated Sept. 29, 2003 identifying July 1, 2003 share price of $6.79 as the "Low for the Q"); Ex. 568 (Defendant email dated Oct. 6, 2003 transmitting Q3 grants dated July 2, 2003 and priced at $6.79). In not one instance did Defendant state the actual date of approval by CEO Wong on any of these documents. Moreover, the PWC audits and the Board's special investigation confirmed the practice of backdating options. *See* Restatement (Ex. 440) at 3 (the "record grant date was not the date of determination as defined by the Company's stock option plans and applicable accounting rules . . . .").

The jury could reasonably conclude that CEO Wong and Defendant represented that CEO Wong approved the grants on the grant dates listed on the grant approval summaries and other grant documents, rather than on the actual date of approval (*i.e.*, the measurement date). In short, the jury could have concluded that as a factual matter, the grant dates recital in documents prepared by Defendant were false and misleading. Indeed, the PWC auditors all testified they were so misled. They were not told by Defendant that the option grants were backdated. As a result, the financial statements of Embarcadero during this period assumed there were no backdated "in the money" grants and hence did not record a compensation expense for the options.

Indeed, a July 1, 2002 memorandum from Defendant, like the subsequent 10-Ks, explains that "since the IPO[,] no option has ever been issued at below fair market value. Therefore, there have been no additional deferred comp charges. The Company does not intend to issue below fair market value options in the future." Ex. 546 at EMBT0258268. This memorandum and the public filings falsely imply that all option grants were at FMV and not "in the money" such that no additional compensation charges need be taken. These statements, drafted and reviewed by Defendant, were false. Further, Defendant never sought to correct these misstatements or disabuse to the PWC auditors of their mistaken assumption that there were no backdated options below FMV.

Defendant argues that technically, these representations about grant dates were not false because Embarcadero's Stock Options Plan (the "Plan") defines "date of grant of an option" as "the date on which the Administrator makes the determination to grant such Option *unless otherwise specified by the Administrator*." Ex. 138 (the Plan) at 3 (emphasis added). Defendant argues that under the Plan, the grant date is not necessarily the date the Administrator (*i.e.,* CEO Wong)

United States District Court

For the Northern District of California

1    approves the option (*i.e.*, the actual grant date), but may also be a date "otherwise specific by the

2    Administrator."  He reasons that under the Plan, CEO Wong could by fiat designate a retrospectively

3    selected date (*e.g.*, low of the quarter) as the grant date, and hence Defendant's documents reciting

4    that grant date were technically accurate.  But whether Defendant's representations regarding grant

5    dates were consistent with the Plan is besides the point.  The central point of the SEC's backdating

6    claims is that the representations about the dates of *actual* approval (not the date "deemed" approved

7    by CEO Wong under the Plan) were in fact false, and that these falsities had accounting

8    consequences which rendered Embarcadero's public filed financial statements inaccurate.  Thus,

9    even if the grant dates deemed by CEO Wong were consistent with the Plan, that does not negate the

10   falsity of the actual representations made by Defendant about the actual grant or approval dates.  At

11   least the jury could so find based on the trial record.

12          In addition, there is evidence of other false statements made by Defendant.  For example,

13   Defendant testified at trial that he, at CEO Wong's request, "parked" options, holding them in

14   reserve to distribute later.  Tr.. 1919, 2022; Ex. 27 (April 2, 2002 email from Wong asking

15   Defendant to "sock away" some options).  A grant of 75,000 options to Kent Scantland was included

16   in the spreadsheet that Defendant sent to E*Trade for loading into the Equity Edge database that

17   quarter. *See* Exs. 501 (e-mail dated April 3, 2002); 538B (grant summary); 655 (Equity Edge report)

18   at 27.  Falsity of the grant summary and Defendant's communications with E*Trade can be inferred

19   from subsequent correspondence in the record.  For example, there was evidence that Defendant

20   knew Mr. Scantland was no longer an employee at the time he conveyed the grant summaries to

21   E*Trade.  Exs. 502 (email to E*Trade dated April 4, 2002 requesting that Scantland be designated as

22   a "restricted employee"); 506 (April 19, 2002 email); 512 (July 3, 2002 email to E*Trade).  Later

23   correspondence indicates that Defendant used the Scantland account to "sock away" 75,000 shares

24   worth of options rather than granting them to Mr. Scantland. *See, e.g.,* Exs. 538, 538B (FY2002

25   PWC Workpapers for Embarcadero including a 1Q grant summary listing a 75,000 share option

26   grant to Kent Scantland with a March 29, 2002 grant date).  There was other evidence of

27   falsification of records.  In May 2004, Lorraine Gnecco, Embarcadero's Vice President of Human

28   Resources, asked to speak with Defendant regarding an allegation that he "put some options in an

United States District Court
For the Northern District of California

employee's account for another employee." Ex. 597 (email dated May 3, 2004). Defendant

responded:

> No, that is right. It was in there when the window was closed. We
> issue options when the window is closed, i.e. at the end of the quarter.
>
> There are certain things which I must have prepared for the auditors
> when they are here. One being the option grants. Because of
> conditions outside of my control – which I have voiced to others
> several times – they are not always ready. In haste, I make do.

*Id.* Ms. Gnecco responded, "It is just wrong on so many levels." *Id.*

    3.    Materiality

Defendant argues that any misrepresentations about grant and approval dates were

inconsequential and hence there was no falsity within the meaning of § 13(b)(5) or Rule 13b1-2.

According to Defendant, the options dating practice was no different from the common situation

where parties to a contract recite a retrospective "effective date" date of a contract.  But Defendant

cites no authority to import a materiality requirement under § 13(b)(5) other than the requirement

that Embarcadero's books, accounts, and records "accurately and fairly reflect [its] transactions and

[] dispositions of assets." 15 U.S.C. § 78m(b)(2)(A).  There is no materiality requirement. *See* 44

Fed. Reg. 10967 (Feb. 23, 1979) (New Section 13(b)(2)(A) . . . . is intended, among other things . . .

to insure that corporate transactions and dispositions are properly recorded. . . .  It bears emphasis, in

this context, that the new requirement is qualified by the phrase 'in reasonable detail' rather than by

the concept of 'materiality.'").

The SEC points out that the option grant dates reflect corporate transactions and disposition

of assets within the meaning of § 13(b)(5).  Options with purported grant dates chosen with

hindsight so that their price is below FMV (*i.e.*, "in the money" grants) have an accounting

consequence – they must be reported as an expense and be reflected in Embarcadero's financial

statements – a fact of which Defendant was well aware. *See, e.g.,* Tr. 2050:6-21 (Defendant's trial

testimony), 311:1-312:9 (Haroian testimony regarding need to disclose compensation expenses in

SEC filings); Ex. 467 (Jan. 26, 2001 email from Cain of PWC to Pattison, Sabhlok, and

Haberberger).  Whether grant dates were selected with hindsight was important to the auditors. *See,*

*e.g.,* Tr. 1218:2-1219:2 (testimony of PWC partner Betty Jo Charles); *see also* Ex. 538D at PWC-

United States District Court
For the Northern District of California

EMBT-SEC_0003296 n.A (PWC workpaper for FY2002 noting "Per Michael Pattison, Steve Wong, the CEO has the authority to grant 200,000 options per quarter. . . .  PWC verified that options were properly authorized by Steve Wong or the Board.  No exceptions noted. . . .  *PWC also verified that the options were priced at a price on the day before the grant (consistent with past).*") (emphasis added).  It was also important to the Board which decided to initiate an internal investigation and restate its financial statements.  *See, e.g.,* Tr. 319:24-320:10 (Gary Haroian testimony).  An accurate grant date or "measurement date" is thus necessary to "accurately and fairly reflect [its] transactions and [ ] disposition of assets."  The records prepared by Defendant failed to do so.

Even apart from accounting consequences, there are other financial ramifications to backdating option grants.  Where the exercise price is retrospectively selected from the low of the quarter, the price paid by the employee upon exercising the option is less than what she would otherwise have paid were the grants priced "at the money."  The net result is less money paid to Embarcadero upon exercise.  This adversely affects the disposition of Embarcadero's assets.  Furthermore, the enhanced value of in the money grants increases likelihood that employees will exercise their options; this dilutes the equity pie and potentially affects share values.  Moreover, failure to accurately record and report grant option dates can have tax implications.  *See* Restatement (Ex. 440) at 3-5 ("Tax Impact of Restatement" section noting, *inter alia*, that "the restatement resulted in a total increase to our gross deferred tax assets of approximately $2.4 million as of December 31, 2005.").  Thus, in these additional ways, the falsities facilitated and approved by Defendant adversely affected Embarcadero's transactions and disposition of assets and prevented their accurate reporting.

Therefore, the jury could reasonably have concluded that the financial documents prepared and/or reviewed by Defendant contained false and misleading data and did not accurately and fairly reflect Embarcadero's transactions and disposition of assets in violation of § 13(b)(5) and Rule 13b1-2.

4.    Substantial Evidence Established that Defendant Acted Knowingly

Defendant also argues that the SEC failed to provide substantial and admissible evidence that he knowingly falsified any record.  It was established at trial that Defendant, as Controller, and as

United States District Court

For the Northern District of California

the only licensed CPA in Embarcadero's Finance Department, was responsible for the "rolling up the books" at the end of each quarter.  Tr. 500-01 (testimony of Caitlin Haberberger, Embarcadero's Director of Financial Reporting from 2000-2003); 1818 (Pattison testimony describing "rolling up" process).  His duties included communicating with auditors and preparing financial statements that were filed with the SEC and reported to the public.  Tr. 503 (testimony of Caitlin Haberberger), 527-530 (Haberberger describing Defendant's role in preparing earnings releases describing Embarcadero's financial results for the most recent quarter).  He was also responsible for recording all equity account activity, including options activity.  Ex. 546 (March 14, 2003 "Internal Control Memo") ("Due to their sensitivity, the Controller is responsible for recording all equity account activity."); Ex. 131.

Furthermore, Defendant knew that under APB 25 "in the money options" granted below FMV had to be reported as a compensation expense.  *See, e.g.,* Ex. 467 (Jan. 26, 2001 email from auditor Richard Cain to Pattison, Sabhlok, and Haberberger describing taxation of deferred stock compensation); *id.* at EMBT 0097342 (attachment to email explaining "Requirement to Issue at Fair Market Value" and "Tax Consequences if Option Price is Less than FMV"); Ex. 546 at EMBT 0258268 (March 2003 Memorandum noting that Embarcadero "does not intend to issue below fair market value option [*sic*] in the future.").  Indeed if anyone should have known this, as a certified public accountant and Controller of the company, it was Defendant.

Furthermore, the SEC introduced evidence that auditors informed Defendant of the implications of the grant date and fair market value of options.  *See* Ex. 467 (Jan. 26, 2001 email from auditor Richard Cain).  There was evidence that Defendant, along with CFO Sabhlok, communicated with legal counsel about options backdating and was advised that the company could not grant stock awards retroactively.  *See* Tr. 1904:3-1099:21 (Stephen Ferruolo testimony).  Moreover, Defendant's repeated correspondence with CEO Wong shows that backdating of stock option grants was purposeful.  *See, e.g.,* Ex. 22 (Sept. 16, 2004 email from Defendant to Wong with attached list of "prospective grants" "TO BE ISSUED AT LOW IN QUARTER"); Ex. 44 (email from Wong to Defendant regarding options and Q2 "meltdown" and noting that some employees "made out like bandits.").  Indeed, as noted above, every stock option grant during the period in

1   question had a grant date selected with hindsight, yet Defendant *never* expressly disclosed the date

2   of actual approval by CEO Wong on any document.  Nor did Defendant ever explicitly communicate

3   to PWC auditors Embarcadero's practice of selecting grant dates with hindsight.  This begs the

4   question, why?  A reasonable inference is that Defendant consciously intended to hide the actual

5   grant approval dates from the auditors and keep backdated options from being publicly reported.

6   Certainly, the jury could have so found.

7        As to "socking away" or "parking" options, Defendant's knowledge that his records were

8   false can be inferred from his misleading explanation to PWC auditors.  *See* Exs. 502 (April 4, 2002

9   email requesting that Scantland be designated as a "restricted employee"); 506 (April 19, 2002

10  email); 512 (July 3, 2002 email to E*Trade); 597 (May 2004 email exchange between Pattison and

11  Gnecco).  This evidence is sufficient to establish that Defendant acted "knowingly."  *See SEC v.*

12  *Berry*, 580 F. Supp. 2d at 923 (noting that the defendant need only make an intentionally deceptive

13  contribution to an overall fraudulent scheme to face liability).

14  C.   Circumvention of Internal Controls

15       According to Defendant, the SEC "presented no evidence at trial as to any internal control

16  Defendant allegedly circumvented . . . ."  Reply at 2.  Defendant argues that he "faithfully applied

17  the Board-approved definition of "date of option" and "date of grant of an Option . . . ."  *Id.* at 1.

18  However, the SEC points out that "Defendant was the author of 'internal controls' memoranda,

19  which "act as the policies and procedures for the applicable cycle."  *See* Ex. 546 (March 14, 2003

20  memo forwarding other memoranda regarding the "Internal Controls Policies and Procedures

21  Manual").  Importantly, that memo states that there would be no option grants below FMV (and thus

22  no reportable compensation expenses).  *Id.* at EMBT0258268 (March 2003 Memorandum noting

23  that Embarcadero "does not intend to issue below fair market value option [*sic*] in the future.").  The

24  SEC also points to Embarcadero's FY2003 Form 10-K, which likewise confirms: "Since the date of

25  the initial public offering, all stock options grants made during the year were at fair market value,

26  which is defined as the closing share price on the day prior to the option grant date."  Ex. 418 at 47.

27       Thus, it is clear there were internal controls, embodied by Defendant's own memorandum

28  describing internal controls as well as public filings, which prohibited granting options below FMV

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  (*i.e.*, no "in the money" options).  Defendant's actions, in facilitating and documenting backdated

2  options, and failing to insure their proper accounting, was "contrary to the process that was

3  disclosed" in the Form 10-K filings and contravened Embarcadero's internal controls.  *See*, *e.g.*, Ex.

4  409 [FY2002 10-K]").  Given the extensive documentation of the false and misleading grant dates,

5  for the reasons stated above, there is substantial evidence that Defendant's circumvention of internal

6  controls was done knowingly.

7          Defendant argues there was no circumvention of internal controls because the Options Plan

8  allows the option grant date to be "the date on which the Administrator makes the determination to

9  grant such Option *unless otherwise specified by the Administrator*."  There was substantial evidence,

10  however, that the Plan did not rescind the internal controls against backdated options described

11  above.  The very point of the internal control embodied in Defendant's memorandum on internal

12  controls and in publicly filed documents described above was to prohibit the grant of backdated

13  options below FMV which would trigger reporting a compensation expense on Embarcadero's

14  financial statements.  Other than there bare language of the Plan, there was no evidence that

15  Embarcadero rescinded its internal controls to implement the "otherwise specified by the

16  Administrator" alternative under the Plan, particularly in view of the adverse accounting

17  consequences of backdating option grants.  Certainly the jury could have reasonably concluded that

18  the internal controls against below FMV grants stood, notwithstanding the flexible language in the

19  Plan.

20          Defendant also argues that internal controls asserted by SEC were too general to constitute

21  internal controls circumvention of which is proscribed by § 13(b)(5).  He argues that to be

22  actionable, the internal controls circumvented must be specific – akin to checklists used by pilots or

23  copilots before a flight – they must set forth with particularity a set of minimum requirements to be

24  met and verified prior to taking certain action.  But Defendant cites no authority for this proposition

25  that internal controls under § 13(b)(5) requires a discrete and specific checklist.  The aspect of the

26  internal control at issue – prohibiting backdated grants resulting in below FMV options – is clear

27  and specific enough for purposes of § 13(b)(5).

28

United States District Court

For the Northern District of California

1    The opinions cited by Defendant to the contrary are inapposite.  In *SEC v. Leslie*, 2010 U.S.

2  Dist. LEXIS 76826 (N.D. Cal. 2010) (unpublished), the court granted summary judgment in favor of

3  the defendant on a § 13(b)(5) claim because the evidence did not show that the defendant *knew* he

4  had failed to implement internal controls.  *Id.* at *80.  Here, the jury could have reasonably inferred

5  that Defendant knowingly circumvented the internal controls as noted above.  Defendant also relies

6  on *SEC v. Berry*, 580 F. Supp. 2d 911 (N.D. Cal. 2008).  In *Berry*, the SEC failed to adequately state

7  in its complaint what controls were circumvented.  580 F. Supp. 2d at 924-5.  Here, internal controls

8  against granting below FMV "in the money" grants were clear and concrete.

9    D.    Standard of Care

10    Citing a hearing transcript from *SEC v. Shannahan,* No. 07-cv-270 (E.D. Mo. 2010),

11  Defendant complains that the SEC never provided evidence of the applicable standard of care.  The

12  cited passage from *Shannahan* refers to the "recklessness" standard with regard to proving scienter

13  under §§ 17(a)(1) and 10(b) of the Act, not Section 13(b).  It is therefore inapposite.  Defendant also

14  refers to § 13(b)(2)(A)'s requirement that books, records, and accounts fairly and accurately reflect

15  "in reasonable detail," and that the record lacks evidence of what constitutes "reasonable detail."

16    However, the reasonable detail standard was never a disputed issue at trial.  Tellingly, Mr.

17  Pattison never asked for a § 13(b)(5) jury instruction that defined "reasonable detail."[8]  In fact, the §

---

[8] At trial, the jury was instructed:

> To prove [the § 13(b)(5)] claim, the SEC must show by a
> preponderance of the evidence that the defendant knowingly either:
>
> 1. falsified any of Embarcadero's books, records, or accounts that
> reflect the transactions and disposition of Embarcadero's assets; or
>
> 2. circumvented Embarcadero's system of internal accounting
> controls; or
>
> 3. failed to implement a system of internal accounting controls at
> Embarcadero.
>
>   The term "knowingly" as used in § 13(b)(5) means
> intentionally; recklessness is not sufficient.
>
>   The terms "books, records, or accounts" mean accounts,
> correspondence, memoranda, tapes, discs, papers, books, and other
> documents or transcribed information of any type, whether expressed

United States District Court

For the Northern District of California

1   13(b)(5) jury instruction that was given was based largely on an instruction that was submitted

2   jointly by the parties which did not include any definition of reasonable detail.  *See* Docket No. 217

3   (Stipulated Instruction No. 48) (not including any language defining "reasonable detail").

4           In his papers, Mr. Pattison suggests that the reasonable detail standard was in dispute

5   because he applied a definition of grant date that was accepted by hundreds of other companies;

6   thus, he acted with the "'level of detail and degree of assurance as [a great many] prudent officials

7   [did] in the conduct of their own affairs.'"  Docket No. 288 (Mot. at 23-24) (quoting 15 U.S.C. §

8   78m(b)(7)).  The problem with this argument is that its focus is on Mr. Pattison having acted with

9   reasonable *assurances*, not with reasonable *detail*.  *See* 15 U.S.C. § 78m(b)(7), (providing that "the

10  terms 'reasonable assurances' *and* 'reasonable detail' mean such level of detail *and* degree of

11  assurance as would satisfy prudent officials in the conduct of their own affairs") (emphasis added).

12  Mr. Pattison cannot argue that the issue at trial was whether he provided a sufficient level of detail

13  about the backdating; instead, the question was whether he failed to report the backdating at all.

### IV.   DEFENDANT'S MOTION FOR A NEW TRIAL

15  A.   Legal Standard: Rule 59

16          Under Federal Rule of Civil Procedure 59(a), "[a] court may, on motion, grant a new trial to

17  all or some of the issues – and to any party – . . . (A) after a jury trial, for any reason for which a

18  new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P.

19  59(a)(1)(A).  As is clear from the above language,

20          "Rule 59 does not specify the grounds on which a motion for a new
            trial may be granted."  Rather, the court is "bound by those grounds

21          that have been historically recognized."  Historically recognized
            grounds include, but are not limited to, claims "that the verdict is

22          against the weight of the evidence, that the damages are excessive, or

23  _____

24          in ordinary or machine language.  The SEC must prove that the book,
            record, or account does not, *in reasonable detail*, accurately and fairly

25          reflect the transactions and dispositions of the company's assets.

26                  The phrase "system of internal accounting controls" means a
            system sufficient to provide reasonable assurances that transactions

27          are recorded as necessary to prepare financial statements that conform
            to generally accepted accounting principles and to account for assets.

28  Docket No. 321 (Jury Instruction No. 21) (emphasis added).

1    that, for other reasons, the trial was not fair to the party moving."
2    [The Ninth Circuit] has held that "[t]he trial court may grant a new
     trial only if the verdict is contrary to the clear weight of the evidence,
     is based upon false or perjurious evidence, or to prevent a miscarriage
3    of justice."

4    *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007).

5    B.    The Verdict was Against the Weight of the Evidence

6         Defendant argues that the verdict is against the clear weight of the evidence due to the same

7    evidentiary deficiencies alleged in his Rule 50 motion. R. 59 Mot. at 3. Fully aware of the standard

8    applicable to a motion for a new trial, the Court rejects this argument for the reasons discussed

9    above. The weight of the evidence established that Defendant systematically backdated stock option

10   grants on a regular basis, misrepresented the dates of actual approval by CEO Wong, failed to

11   affirmatively disclose the practice to the Board and PWC auditors, and failed to insure that an

12   accounting expense was taken for the below FMV "in the money" grants he facilitated. The weight

13   of the evidence also shows that he thereby circumvented internal controls against backdated options.

14   The weight of the evidence also establishes that the Defendant took these actions knowingly. Thus,

15   the jury's verdict was supported not only by substantial evidence, but by the weight of the evidence

16   as well. Indeed, the Court fully concurs in the jury's verdict.

17   C.    The Restatement was Properly Admitted

18        Defendant also contends that he is entitled to a new trial because (1) the 2007 Restatement is

19   inadmissible hearsay that cannot support the verdict, (2) the 2007 Restatement is inadmissible

20   "paper expert" testimony that cannot support the verdict, (3) he was prejudiced by the inadmissible

21   testimony of an undisclosed witness, and (4) he was prejudiced by the SEC's mischaracterization of

22   the level of intent applicable to Claims 4 and 5.

23        1.    Embarcadero's "Restatement" was Properly Admitted

24        Before trial, Defendant moved to exclude Embarcadero's 10-K for FY2006 (the

25   "Restatement"), which, as described *supra*, contains revisions of company's financial statements.

26   Defendant argued that the Restatement was unfairly prejudicial under Federal Rule of Evidence 403

27   and it constitutes inadmissible hearsay under Federal Rule of Evidence 804. In a series of three

28   pretrial rulings, the Court denied that motion in part and granted it in part by admitting the document

as an exception to hearsay and ordering redaction of information prejudicial to Defendant, including

anything blaming Defendant for purported errors.  *See* Order (July 23, 2010) at 9-10 (Docket No.

209); Order at 11-12 (Aug. 17, 2010) (Docket No. 255); Order (Aug. 26, 2010) (Docket No. 261)

(citing *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1257 n.3 (9th Cir. 1984) ("Although a

financial statement audit is based in part on hearsay, it is generally admissible as a business record

of the audited entity under Fed. R. Evid. 803(6).").

In so ruling, the Court held the Restatement was admissible under the business record

exception of Fed. R. Evid. 803(6).  *See Huddleston v. Herman & MacLean*, 640 F.2d 534, 553 (5th

Cir. 1981), *aff'd in part and rev'd in part on other grounds* 459 U.S. 375 (1983) (holding that

"portions of [a Form 10-K] may be admissible as a record of regularly-conducted activities, *i.e.*,

business records, Rule 803(6), Fed. R. Evid., if a proper foundation is laid"); *SEC v. Jasper*, No. C-

07-6122-JW Slip op. at 7-8 (July 21, 2010) (admitting a 10-K containing restated financial figures as

a business record); *Deutsche Bank A.G. London Branch v. WorldCom, Inc.* (*In re WorldCom, Inc.*),

357 B.R. 223, 229 (S.D.N.Y. 2006) (noting that a restated balance sheet is admissible as a business

record); *In re WorldCom, Inc. Securities Litigation*, 2005 U.S. Dist. LEXIS 2215 (S.D.N.Y 2005)

(10-K admissible as a business record exception).  The Court found *Paddack v. David Christensen,*

*Inc.*, 745 F.2d 1254 (9th Cir. 1984) was distinguishable and, in fact, supported this Court's

conclusion.  *See* Docket No. 261 at p. 1 (citing *Paddack*, 745 F.2d at 1257, n.3).

Nothing at trial occurred to undermine the Court's in limine ruling.  Defendant elicited

nothing to suggest the Restatement was unreliable even though he had an ample opportunity to

cross-examine the key players involved in the special investigation and subsequent audit that led to

the Restatement.  He also had the opportunity to depose them before trial.  Defendant elicited no

evidence suggesting that the Board had any incentive in restating Embarcadero's financials other

than to comply with applicable accounting principles and the law – as noted in this Court's earlier

order, having to restate its financials, if anything, was akin to a statement against interest under Fed.

R. Evid. 804(b)(3).  This is particularly so in light of the timing of the Restatement which

predictably disrupted Embarcadero's attempt to sell its business.

United States District Court

For the Northern District of California

The Court also ruled in its in limine ruling that the Restatement was admissible under the residual hearsay exception of Fed. R. Evid. 807.  *See* Docket No. 261 at p. 2.  At trial, the evidence affirmed that as a 10-K filing, the Restatement was prepared under circumstances providing equivalent guarantees of trustworthiness to those under the other hearsay exceptions of Rule 803. *See In re WorldCom, Inc.*, 357 B.R. at 229 (finding  restated balance sheet admissible under Rule 807 and describing the bankruptcy court's finding "that the intense public scrutiny involved in the restatement of WorldCom's financials adequately ensured that the results were trustworthy.").  *Cf. Schnelling v. Thomas (In re Agribiotech, Inc.)*, 2005 U.S. Dist. LEXIS 6465 (D. Nev. Mar. 2, 2005) (ruling that an unsigned, undated document with "tenuous" evidence of authorship does not fall under the residual exception to the hearsay rule).  Moreover, Defendant failed to raise an objection at or before trial to the Court's pretrial order invoking the residual hearsay exception under Fed. R. Evid. 807.

Even if the Court erred in admitting the Restatement, Defendant suffered no substantial prejudice from its admission in connection with two claims on which liability was found.  For each, the critical question was whether Defendant knowingly falsified records or circumvented internal controls.  As previously discussed, there was substantial evidence of Defendant's wrongful conduct independent of the Restatement's findings.  Furthermore, Defendant never contested the validity of the Restatement's conclusion that the financial statements had to be restated because of the option grant practice.  He presented no evidence or proffer challenging the conclusion that option grants were not properly accounted for.  Any disagreement as to the quantitative analysis of the restated financial statements or precise dollar amounts restated, while perhaps relevant to materiality on the § 10(b)(5) claim, were not material to the § 13(b)(5) or Rule 13b2-1 claims.  Moreover, the Court's redaction of material in the Restatement that cast blame on Defendant further reduced any possible prejudice to Defendant.[9]

---

[9] Hence, any argument that the Restatement should have been inadmissible under Rule 403 is without merit.

**United States District Court**
For the Northern District of California

2.     "Paper Expert" Argument

Defendant next argues that the Restatement constitutes the testimony of a "paper expert" that should have been subject to a *Daubert* hearing.  Mot. at 14-15.  Since the information underlying the Special Committee Report is privileged, he argues, it could not survive such scrutiny and should have been excluded as impermissible opinion testimony.  In response, the SEC contends that the report does not constitute opinion testimony, but is just a public statement of (1) the company's financial condition and (2) amendments to previous factual statements.  The SEC further points out that Defendant failed to raise this argument in its pretrial motions or at trial.

Defendant's argument is meritless.  The fact that a financial statement contains analyses, opinions, or conclusions does not render it an expert opinion. If that were the case, all 10-Ks and 10-Qs would be considered expert reports.  Defendant cites no authority for this proposition.  Finally, as noted above, any error in admitting the Restatement was harmless.

D.     Percipient Witness Testimony

Defendant argues that he is entitled to a new trial because he was prejudiced by testimony improperly elicited from undisclosed expert witnesses.  He states that "the trial record is replete with testimony from the SEC's 'percipient witnesses' who drew on their 'specialized training, education and experience' to tutor the jury on their views of the accounting literature and applicable law and who offered opinions about how that law and literature applied to the facts of this case."  Mot. at 19.

The Court addressed this argument in its Final Pretrial Order, ruling on Defendant's Sixth Motion in Limine.  *See* Docket No. 209 at 6-9.  The Court denied the motion without prejudice because auditors were not expected to testify about the interpretation and application of accounting rules in general.  "Rather, the auditors will testify about their role auditing Embarcadero's financials and their personal interactions with Defendant."  *Id.* at 9.

According to the SEC, Defendant made only one objection at trial – when Gary Haroian was on the stand.  Opp'n at 11-12.  Defendant does not argue that Haroian's testimony constituted expert testimony (Reply at 13), but he asserts that he did raise other objections based on Fed. Rule of Evid. 701.  Defendant is correct.  Objections were raised at trial with regard to the testimony of  Edward Jackson (Sept. 9-10, 2010) and Betty Jo Charles (Sept. 14, 2010).  *See* Tr. 675:13; 740:18-20; 742:1-

United States District Court

For the Northern District of California

3; 1201:23-5.  The record does not reflect an objection to the testimony of Daniel Wallace (Sept. 15,

2010).  As to the objections that were raised, the Court overruled the objections because the

testimony was integral to the witness' explanation as percipient witnesses as to what he/she saw,

knew and did in the context of auditing Embarcadero.  The Court did not admit purely expert

testimony not tied to facts or events observed by the witness.  Moreover, as to those witnesses who

provided testimony which arguably approached the limits of Rule 701, they had been deposed before

trial and were subject to full cross-examination, and the substance of their testimony was disclosed

before trial.  Thus, even if the objected to testimony were deemed "expert" in nature, the Court

afforded Defendant core protections of Rule 26(a)(2).  *Cf. United States v. Cruise*, 363 F.3d 187,

193-94 (2d Cir. 2004).

Defendant cites *U.S. v. Figueroa-Lopez*, 125 F.3d 1241 (9th Cir. 1997) and *Hoot Winc v.

RSM McGladrey Financial Process Outsourcing*, No. 08-cv-1559, 2010 U.S. Dist. LEXIS 104096

(C.D. Cal. 2010) in support of his argument that expert testimony was improperly admitted as lay

witness testimony.  In *Figueroa-Lopez*, law enforcement officers testified that the defendant's

behavior was consistent with that of an experienced drug trafficker.  The Ninth Circuit ruled that

such conclusions constitute expert testimony because they were based on the witness' specialized

education, training, and experience.  125 F.3d at 1246.  This Court discussed *Figueroa-Lopez* in its

previous order.  Docket No. 209, pp. 2-8.  In addition to the analysis therein, the Court notes that in

*Figueroa-Lopez*, the Ninth Circuit found that the error was harmless, since the witness would have

been qualified to provide the expert opinion delivered at trial, and the defendant did not explain why

the verdict would have been different if he had been given proper notice of the testimony.  125 F.3d

at 1247 (citing *United States v. Maher*, 645 F.2d 780 (9th Cir. 1981)).  For the reasons stated above,

the same is true in the instant case.

In *Hoot Winc*, the court excluded an accountant's testimony as a percipient witness because

the court found "she will inescapably *function* as an expert" and the "only reason [her] testimony

would be relevant is that her specialized knowledge, training, and expertise allow her to identify

accounting 'errors' . . . ."  *Hoot Winc* at *9 (emphasis in original).  Here, the auditors were properly

United States District Court

For the Northern District of California

1    called as percipient witnesses since, unlike in *Hoot Winc*, their testimony was relevant to an

2    explanation of their audit of Embarcadero.

3    E.      Jury Instructions & Closing Argument

4            Defendant next complains that he was prejudiced by the SEC's closing argument regarding

5    the meaning of "knowingly" for purposes of § 13(b)(5) and by the absence of a clause in the jury

6    instruction stating that the SEC must show that "each falsification was intentional, *and not the result*

7    *of errors or oversights*." Mot. at 23.  Specifically, Defendant challenges the SEC's statement at

8    closing that "He violated 13(b)(5) when he knowingly falsified any of Embarcadero's books, records

9    or accounts that reflect the transactions or disposition of the company's assets. . . .  Every entry for

10   all of those backdated stock options in the Equity Edge database are – has a false date, and a false

11   price.  And every stock option agreement has a false date and a false price."  Tr. 2395:5-14.

12   Defendant argues that this statement mischaracterizes the law because (a) "intentional *typing* is not

13   illegal," and (b) the SEC was required to prove that Defendant's actions were "rooted in a conscious

14   undertaking" to falsify records."  Mot at 23.

15           The Court finds no error.  The SEC's closing arugment accurately stated the law.  Moreover,

16   Defendant did not object to the closing argument. *See Hemmings v. Tidyman's, Inc.*, 285 F.3d 1147,

17   1193 (9th Cir. 2002) ("The federal courts erect a 'high threshold' to claims of improper closing

18   arguments in civil cases raised for the first time after trial.")

19           Defendant also asserts that this alleged error was compounded by the Court's failure to

20   instruct the jury that the statute does not require perfection.  Mot. at 23-24 (citing the Court's

21   proposed Jury Instructions (Docket No. 241-1), which purportedly states that the Court will

22   "reiterate that the statute does not require perfection, but only that books, records, and accounts."

23   However, the passage cited contains no promise by the Court to "reiterate that the statute does not

24   require perfection" as Defendant claims.  In any event, the jury instructions given were an accurate

25   statement of the law.

26           Finally, Defendant complains that the SEC improperly misrepresented, in its closing

27   argument, that its "Rule 13b2-1 claim did not require proof of a 'knowing' document falsification"

28   when it stated that Rule 13b2-1 is "like 13(b)(5) lite."  Tr. 2396:14-20.  Defendant's argument is

United States District Court

For the Northern District of California

1  unfounded.  Rule 13b2-1 has no intent element.  *See McConville v. SEC*, 465 F.3d 780, 789 (7th Cir.

2  2006)) (noting that the SEC "has previously stated that there is no scienter requirement in SEC Rule

3  13b2-1 because § 13(b) of the 1934 Securities Exchange Act 'contains no words indicating that

4  Congress intended to impose a "scienter" requirement'" and, "[a]s we have stated, the [SEC's]

5  interpretations of its own regulations are entitled to deference as long as, as in this case, the

6  interpretation is not arbitrary, capricious, or manifestly contrary to the statute").

7        Defendant attacks the absence of an intent requirement in Rule 13b2-1 as an *ultra vires*

8  exercise of the SEC's authority, since the statute it is meant to enforce prohibits only *knowing*

9  actions.  R. 50 Mot at 18-19; New Trial Mot. at 24.  Defendant relies on *Ernst & Ernst v.*

10  *Hochfelder*, 425 U.S. 185 (1976) for support.  However, *Hochfelder* involves Rule 10b-5, which is

11  not implicated here.  More importantly, unlike the situation in *Hochfelder*, Rule 13b2-1 was not

12  promulgated as an interpretation and enforcement of § 13(b)(5).  The SEC promulgated Rule 13b2-1

13  pursuant to its authority under § 23 of the Exchange Act; the rule predates § 13(b)(5), and was

14  intended to implement § 12(b)(2)(A), which contains no scienter requirement.  *See* 44 Fed. Reg.

15  10968 (Feb. 23, 1979).  The rule has been upheld as consistent with statutory intent, despite later

16  amendments to § 13.  *See SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. N.Y. 1998) (explaining that

17  scienter is not an element of civil claims under Exchange Act § 13).

18                          **V.    CONCLUSION**

19        For the reasons set forth herein, the Court finds that the jury's verdict is supported by

20  substantial evidence in the record, and that the verdict is not contrary to the clear weight of the

21  evidence.  The Court also finds the assertions of errors at trial, if not waived, are without merit.  Nor

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

25

did any such error cause prejudice to Defendant.  The Court accordingly **DENIES** Defendant's Motions for Judgment as a Matter of Law or a New Trial.  A contemporaneously issued Order contains the Court's final judgment and addresses the SEC's pending motion.

This order disposes of Docket Nos. 324, 327 and 338.

IT IS SO ORDERED.

Dated:  June 9, 2011

_____
EDWARD M. CHEN
United States District Judge